**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES PACHECO AND SHERYL** | :: | **CASE NO. 1:25-cv-2327** |
| **KRAUSE PACHECO** | :: | |
| **7023 Anthony Lane** | :: | |
| **Parma Heights, Ohio  44130** | :: | **JUDGE:** |
| | :: | |
| **Plaintiffs,** | :: | |
| | :: | |
| **-v-** | :: | **COMPLAINT:  BREACH OF CONTRACT;** |
| | :: | **FRAUDULENT MISREPRESENTATION;** |
| **CROSS RIVER BANK** | :: | **NEGLIGENT MISREPRESENTATION;** |
| **400 Kelby Street, 14th Floor** | :: | **FRAUD IN THE** |
| **Fort Lee, NJ 07024** | :: | **INDUCEMENT/EXECUTION;** |
| | :: | **DECLARATORY JUDGMENT ACTION;** |
| **And** | :: | **NEGLIGENT HIRING AND TRAINING;** |
| | :: | **UNFAIR TRADE PRACTICES ACT;** |
| **SUNLIGHT FINANCIAL LLC d/b/a** | :: | **CONSUMER PROTECTION ACT; CIVIL** |
| **SUNLIGHT FINANCIAL** | :: | **CONSPIRACY; NEGLIGENCE;** |
| **c/o Corporation Service Company,** | :: | **PUNITIVE DAMAGES** |
| **Statutory Agent** | :: | |
| **3366 Riverside Drive, Suite 103** | :: | |
| **Upper Arlington, Ohio 43221** | :: | |
| | :: | |
| | :: | |
| | :: | |
| **Defendants.** | :: | |
| | :: | |
| | :: | |
| | :: | |
| | :: | |
| | :: | |
| | :: | |
| | :: | |
| | :: | |
| | :: | |

1

Now come Plaintiffs, Charles Pacheco and Sheryl Krause Pacheco, by and through the undersigned Counsel, and for their Complaint, state as follows:

## PARTIES, JURISDICTION AND VENUE

1.      At all times relevant herein, Plaintiffs Charles Pacheco and Sheryl Krause Pacheco (hereinafter referred to as "Plaintiffs") resided in the City of Parma Heights, County of Cuyahoga, and State of Ohio.

2.      At all times relevant herein, Power Home Solar, LLC, doing business as Pink Energy, (hereinafter referred to as "Pink Energy"), is/was a Delaware solar power company licensed to transact business in the State of Ohio, and was acting together with Defendants, Trivest Partners, L.P. and/or Jayson Waller, by and through its agents and/or employees by engaging in the solicitation, sale, installation, and maintenance of solar powered energy systems designed for residential use.

3.      On October 7, 2022, Pink Energy filed for Chapter 7 Bankruptcy, placing an automatic stay, and, as such, it has not been added as a party to this Complaint but will remain named in the allegations for sake of clarity.

4.      At all times relevant herein, Defendant, Cross River Bank (hereinafter referred to as "Cross River") is/was a credit union situated in the State of New Jersey and was acting by and through its agents and/or employees, including, but not limited to Sunlight Financial, LLC, and was acting in concert with and/or a dual agency type relationship with Pink Energy, Defendant Trivest, L.P., Defendant Waller, and/or Defendant Sunlight Financial, LLC., by, among other ways, providing financing to the Plaintiffs in the purchase of the Pink Energy solar system.

5.      At all times relevant herein, Defendant, Sunlight Financial, LLC., doing business as Sunlight Financial, (hereinafter referred to as "Sunlight"), is/was a Delaware limited liability company licensed to transact business in the State of Ohio and was acting in concert with and/or in a

dual agency type relationship with Pink Energy, Defendant Trivest, L.P., Defendant Waller, and/or Defendant Cross River, by, among other ways, providing financing to the Plaintiffs in the purchase of the Pink Energy solar system.

6.     At all times relevant herein, Defendant, Trivest Partner, L.P. (hereinafter referred to as "Trivest"), is/was a Florida limited partnership engaged in managing several private equity funds, including Pink Energy; held a 25% ownership in Pink Energy; was involved in the day-to-day operations of Pink Energy; and was an active participant in the facts giving rise to the within causes of action.

7.     Plaintiffs entered into a "Solar Energy System Purchase & Installation Agreement" (hereinafter "Sales Agreement") with Pink Energy and a Loan Agreement (hereinafter "Loan Agreement") with Defendant Cross River and/or Defendant Sunlight, through Pink Energy, Trivest, or Defendant Jayson Waller's agents/employees and said contracts were entered into in Cuyahoga County, Ohio, and form one of the bases of the within lawsuit. Copies of the Sales Agreement and the Loan Documents are attached as Exhibits "A" and "B" of this Complaint.[1]

8.     At all times relevant herein, Defendant Jayson Waller ("Waller") was a resident of Town of Davidson, County of Mecklenburg, and State of North Carolina, and was the founder and Chief Executive Officer of Pink Energy. Hereinafter Pink Energy, Trivest, and Defendant Waller shall collectively be referred to as the "Pink Energy Group."

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) by reason that the Plaintiffs are residents of the State of Ohio; Defendants are residents of the State of Delaware,

---

[1] Plaintiffs, after making a good faith effort, have been unable to obtain a copy of the complete executed Loan Agreement and instead, attach only the Loan Summary.   Plaintiffs will supplement the full Loan Agreement as soon the same can be obtained.

State of New Jersey, State of Florida, and the State of North Carolina, thus creating diversity of citizenship; and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

10.     Venue is proper with this Court pursuant to 28 U.S.C. §1397 and Rule 3.8(c) of the Local Rules for the United States District Court for the Northern District, Eastern Division, by reason that the claims set forth herein arose in the City of Parma Heights, County of Cuyahoga, and State of Ohio.

## GENERAL ALLEGATIONS

11.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

12.     In the spring/summer of 2021, Plaintiffs initiated a search for vendors licensed to sell, install, and maintain solar equipment in order to utilize a more efficient and environmentally friendly energy source for their home.

13.     During that same time, the Pink Energy Group published to the general public, via various national and state media outlets, representations relating to:

A.     the quality and efficiency of their energy-saving products, including, but not limited to, its solar panels, inverters/converter, batteries, and other miscellaneous components;

B.     the quality of the installation of said products/equipment by the Pink Energy Group's installers;

C.     the kilowatt/electricity reduction/savings the plaintiffs would receive after installation; and

D.     the continued maintenance/repair of the equipment after the installation.

14.     Plaintiffs allege that each of the representations knowingly made by the Pink Energy Group were, collectively and separately, patently false, fraudulent, misleading,

scientifically inaccurate, scientifically impossible to obtain, and contrary to law, exaggerated beyond mere puffery.

15.     In justifiable reliance on the truth of the representations made by the Pink Energy Group in their various solicitations, Plaintiffs contacted Pink Energy in the spring/summer of 2021.

16.     In June, 2021, an agent/employee of Pink Energy and/or Defendants Sunlight, Cross River, Trivest, and/or Waller (hereinafter collectively referred to as the "Pink Energy Agent," "sales agent/employee," "Pink Energy Agent/Employee") accepted and scheduled an appointment on behalf of the Pink Energy Group and met the Plaintiffs at their residence located at Parm Heights, Ohio.

17.     The Pink Energy Agent/Employee, recognizing and acknowledging that Plaintiffs were, in fact, relying on his expertise and guidance as an employee/agent of the Pink Energy Group, made representations consistent with those which were contained in the Pink Energy Group's various advertisements, that:

     A.     based on Plaintiffs' expressed expectations, the square footage of their dwelling, a review of their then-existing energy bills, knowledge of the local public utilities rate structure for solar-powered homes, the dwelling's unique topographical setting, and certain local meteorological data that a 7.77 kilowatt/hour system (21 solar panels) was appropriate to fully meet their expectations;

     B.     there would be a significant reduction in Plaintiffs' present, monthly, electrical bill;

     C.     the panels would produce a sufficient number of kilowatt hours to reduce Plaintiffs' usage/cost by a significant percentage of their yearly energy consumption;

D.       Plaintiffs would generate an average number of kilowatt hours per year based on the representations in paragraph A;

E.       upon timely execution of the Sales Agreement, they would receive additional financial benefits via Federal and/or State tax credits which could be applied through various options provided by Pink Energy, Defendant Sunlight and/or Defendant Cross River.

18.   The Pink Energy Group also provided Plaintiffs with an "energy efficiency package" (hereinafter referred to "EEP") which purportedly included miscellaneous "trinkets" such as LED lights bulbs, etc.

19.   As part of the sales presentation, the Pink Energy Agent/Employee grouped the solar system output and supposed EEP benefits together to calculate the amount of power Plaintiffs would draw from the electric grid versus the amount they would make/save by switching to the Pink Energy Group's solar system.

20.   Upon information and belief, the Pink Energy Group was selling its solar panels to customers at a high markup price.

21.   The National Renewable Energy Laboratory ("NREL"), a branch of the U.S. Department of Energy, estimates that the average cost for the purchase and installation of a residential solar system was approximately $2.68 per watt for the calendar year 2021.[2]

22.   Using NREL's average of $2.68 per watt, Plaintiffs should have paid approximately $20,823.60 for their 7.77-kilowatt solar system.

23.   Defendants and Pink Energy charged Plaintiffs $62,750.50 ($82,750.50 - $20,000 Generac battery) ($8.08 per watt) for their solar system.

---

[2] *SolarMarketplaceIntelReportH12021−H22021,*EnergySage,*Energysage.com/data* (last accessed Sept. 15, 2022).

24. Upon information and belief, the Pink Energy Group directed and trained its employees to engage in pressured hard-sell sales tactics, which included, but were not limited to, misleading customers as to the efficiency and efficacy of the solar panels they sold, manipulating customers' concerns with what were referred to as "pain points," misrepresenting the Federal Solar Tax Credit as a tax rebate, and making false promises regarding the Federal Tax Credit in an attempt to make customers quickly sign a contract that they had no opportunity or ability to read.

25. Defendant Waller was intimately involved in designing, implementing, and teaching the fraudulent sales practices employed by Pink Energy's Agents/Employees and holds himself out as intimately familiar with the business of the Pink Energy Group; in fact, in the spring of 2021, Defendant Waller was a recipient of an MVP award and was described as "[i]t's not often a CEO is hands-on in the day-to-day aspects of running a business."[3]

26. Upon information and belief, all or most of the sales techniques/scripts were developed by Defendant Waller, who, in his own words, stated: "I started running the sales department and training reps myself."[4]

27. Upon information and belief, from 2017-2018, Defendant Waller attended all or substantially all of the Pink Energy's sales meetings and routinely pushed for the company's sales representatives to engage in hard-sell tactics, including those tactics described above.

28. Sometime after 2018, Defendant Waller began to attend meetings at Pink Energy's offices throughout the country, either in person or remotely, and continually pushed sales agents to engage in hard-sell tactics, including those described above.

---

[3] *Most Valuable People,* Corp! Magazine, Volume 24, No. 2, pg. 24 (March/April 2021).

[4] *Jayson Waller of POWERHOME SOLAR: 5 Things I Wish Someone Told Me Before Became A Founder and CEO*, Candice Georiadis, Medium.com, https://medium.com/authority-magazine/jayson-waller-of-powerhome-solar-5-things-i-wish-someone-told-me-before-became-a-founder-and-ceo-7eee15ea1b44 (last accessed June 30, 2022).

29.  Defendant Waller further admitted in his Book: *Own Your Own Power: No Excuses.*

*No Bullsh\*t. The Time is Now,* that after he founded Pink Energy:

> I did everything. I called customers. I wrote up proposals. I closed
> deals. I took measurements. You name it. As a result, I know the
> company's business inside and out. I know every job. I could step
> into anyone's role and do the job. That is taking the stairs. When I
> motivate our sales guys today, I've been where they are" [5]

30.  Upon information and belief, these sales tactics and techniques described by Defendant Waller are the same tactics and techniques used on Plaintiffs to secure a sale.

31.  Defendant Waller carried over many of the sales techniques and business practices he developed in his prior companies, ISI Alarms, Inc and Power Home Technologies, Inc, to Pink Energy.

32.  Defendant Waller and ISI Alarms were subject to multiple state enforcement actions, including in Mississippi and North Carolina.

33.  Defendant Waller and ISI Alarms were subject to an enforcement action by the North Carolina Attorney General for, among other things, deceptive sales techniques.

34.  One such technique involved sending robocalls to inform consumers that the FBI was reporting an increase in break-ins in the consumer's area, they would be told that if they pressed a particular number on their phone, a representative would talk to them about the issue.

35.  North Carolina consumers who pressed the button as instructed were connected to a call center where they were given a sales pitch for Waller's alarm company and pressured to make a purchase.

---

[5] *Own Your Own Power: No Excuses. No Bullsh\*t. The Time is Now.* Jason Waller, 2021, Lion Crest Publishing, Pg. 58.

8

36.     The North Carolina Attorney General named Defendant Waller in his capacity as an agent of ISI Alarms, but also in his individual capacity because he "formulated, directed, and controlled the marketing practices" of ISI Alarms.

37.     As a result of Waller's marketing practices, the State of North Carolina fined ISI Alarms and Waller $136,000 with the potential for a million-dollar additional penalty if Waller continued to conduct ISI business in an illegal manner.

38.     Pink Energy closed its doors in late September 2022; similarly, ISI Alarms also abruptly closed its doors after facing a number of state enforcement actions across the country.

39.     Upon information and belief, the Pink Energy Group implemented, trained, and encouraged their employees to use the tactics described above that were similar to those used by ISI Alarms and Waller's other previous companies.

40.     In 2018, Pink Energy, through Defendant Waller, engaged with Defendant Trivest to sell it an ownership interest in the company.

41.     Upon information and belief, Trivest purchased a 25% ownership interest in the company for approximately $15,000,000.00.

42.     Trivest positions itself as a "control-based" private equity investor meaning that it prefers to direct and control its portfolio companies.

43.     Upon information and belief, Defendant Trivest immediately became involved in the day-to-day operation of Pink Energy.

44.     In an interview with Defendant Waller and Trivest partner Jamie Elias, Defendant Trivest immediately "got to work implementing a series of improvements in collaboration with Waller."[6]

---

[6] *How this Florida PE Firm Helped a Solar Business Grow 15X*, Kevin J. Ryan, Inc.com., https://www.inc.com/kevin-j-ryan/powerhome-trivest-solar-private-equity-growth.html (last accessed 10/26/2022).

45.     Upon information and belief, Defendant Trivest also undertook all or a portion of Pink Energy's hiring and talent recruitment responsibilities.

46.     This included placing job postings on behalf of Pink Energy for positions ranging from call center employees to master electricians.

47.     Upon information and belief, the Pink Energy Group trained and encouraged their employees to use hard sell tactics, including providing Plaintiffs with "pain points" regarding their electric bill and referring to the electric company as "Dr. Evil" in an attempt to create a problem for which their solar system would provide a solution.

48.     Defendants and Pink Energy also used various hard sell techniques, such as providing cash incentives and erroneous promises and threats regarding the Federal Tax Credit in an attempt to create urgency to purchase in Plaintiffs, stating that such incentives may not be available if Plaintiffs did not sign that day.

49.     Once knowingly making the false, fraudulent, and misleading representations referred to above, the Pink Energy Agent/Employee produced an electronic copy of the Sales Agreement on his tablet for the Plaintiffs' review.

50.      Upon information and belief, the Sales Agreement was not provided in a written format and was only observable and reviewable on an electronic device.

51.      Pink Energy's Agent/Employee, with knowledge that the pace of review of the Sales Agreement was within his control, knowingly scrolled through each paragraph at a rapid and unacceptable pace, while simultaneously giving his inaccurate and erroneous interpretation of the content of the Sales Agreement.

52.     Upon the Pink Energy's Agent/Employee concluding his explanation of the Agreement, Plaintiffs were to sign via an electronic signature program (e.g., DocuSign), which included auto-filling Plaintiffs' initials after each paragraph.

53.     The Sales Agreement included a number of restrictive clauses, including an arbitration clause, limitation of liability, and the waiver of constitutional rights, none of which were discussed by the Pink Energy's Agent/Employee while supposedly reviewing the Sales Agreement with Plaintiffs.

54.     Relying on the summary of each provision as explained by the Pink Energy Agent/Employee, the Plaintiffs electronically signed the twenty-two-page Sales Agreement on or about June 5, 2021.

55.     Said Pink Energy Agent/Employee, acting in a dual capacity, then confirmed financing for the sale of the chosen solar system with a predetermined finance company acting in concert with the Pink Energy Group.

56.     At the time of the home sale presentation, the Pink Energy Agent/Employee would, as an integral part of the presentation, provide Plaintiffs with one or more financial institutions chosen exclusively by the Pink Energy Group that they could select to finance their solar system.

57.     Upon information and belief, the Plaintiffs were not provided an option of securing alternative financing from those financial institutions selected by the Pink Energy Group.

58.     After completing the signing of the Sales Agreement, the Pink Energy Agent/Employee produced an electronic copy of the Cross River Bank/Sunlight Financial Loan Agreement, which was presented to Plaintiffs in the same manner as the Sales Agreement.

59.     Upon information and belief, the Loan Agreement was not provided in a written format and was only observable and reviewable on an electronic device.

11

60.   Pink Energy's Agent/Employee, with knowledge that the pace of review of the Loan Agreement was within his control, knowingly scrolled through the Loan Agreement at a rapid and unacceptable pace, while simultaneously giving his inaccurate and erroneous interpretation of the contents of the Loan Agreement.

61.   Upon the Pink Energy's Agent/Employee concluding his explanation of each paragraph, Plaintiffs were to sign via an electronic signature program (e.g., DocuSign), which included auto-filling Plaintiff's initial after each paragraph.

62.   Relying on the summary of each provision as explained by the sales Agent/Employee, the Plaintiffs electronically signed the Loan Agreement, in the same manner, they signed the Sales Agreement.

63.   Upon information and belief, the loan provided to Plaintiffs from Defendants Cross River and/or Defendant Sunlight was a "Purchase Money Loan" as defined in the Ohio Retail Installment Sales Act.

64.   The Loan Agreement contained a "Holder Rule" Notice subjecting Defendant Cross River and/or Defendant Sunlight, as the loan holder, to "all claims and defenses which the debtor could assert against the seller of goods or services obtained with the proceeds hereof…" a contract provision that subjects Defendants Cross River and/or Sunlight to any liability that may arise based on the misconduct of the Pink Energy Group.

65.   Once the sale was complete, Pink Energy was then required to obtain the necessary permits and authorizations from various entities, e.g.  Homeowner Associations; local power companies servicing the Plaintiffs' dwelling; and local government permit offices.

66.     In or around September, 2021, an installation crew and/or a sub-contractor crew hired/retained by the Pink Energy Group as their agents and/or employees, arrived at Plaintiffs' residence and commenced the installation of the solar panel system.

67.     The installation crew had a putative crew leader who represented to the Plaintiffs that they were employees of Pink Energy.

68.     Further, the crew leader represented to Plaintiffs that the crew consisted of well-skilled craftsmen who were well-trained in the installation of solar panels.

69.     Upon information and belief, said representations were patently false.

70.     During pre-installation conversations with the Plaintiffs and during the installation of the various components of the solar system kit, the lack of qualifications and skill of the entire crew became apparent to the Plaintiffs.

71.     After the initial conversation with the Plaintiffs as described above, the installation crew, under the direction of the crew leader, commenced installation, resulting in substandard workmanship and property damage.

72.     Upon the representation by the Pink Energy Group that the solar system was properly installed and primed for activation, per the terms of the Sales Agreement, it was the Pink Energy Group's responsibility to ensure all required inspections of the final installed solar system were completed by the electrical supplier and any governmental entities.

73.     The failure of any one of the governmental and non-governmental agencies/organizations to inspect and pass the solar system would delay or prevent the system's activation resulting in added cost and loss of benefit to the Plaintiffs.

13

74.    Once the project was completed, the Pink Energy Group represented to the Plaintiffs that the installation of the solar system was completed by the installers, however, the system was never fully or consistently activated.

75.    Since installation and alleged activation of the system, the solar system consistently failed to produce the kilowatt hours contracted for with the Pink Energy Group.

76.    Pursuant to the estimates provided by the Pink Energy Group, the solar system purchased by the Plaintiffs was estimated to produce approximately 9,214 kilowatt hours per year.

77.    Pursuant to the estimates provided by the Pink Energy Group, the solar system, in conjunction with the "EEP" package, would provide a certain percentage of Plaintiffs' annual energy consumption.

78.    Defendants and/or Pink Energy explained that a significant portion of Plaintiffs' yearly electrical draw would be made up from the solar energy production and savings outlined above, with the remaining percentage coming from the electrical grid through their utility provider.

79.    In fact, the Plaintiffs' system generated, on average, significantly lower output than was quoted to them prior to signing the Sales Agreement.

80.    Plaintiffs' electric bills have remained largely unchanged since the activation of their solar system and now they must pay the amount billed by their electric company in addition to the new loan payment for the installation of the solar system.

81.    Despite the representations made by Defendants and Pink Energy, the solar system affixed to Plaintiffs' house has never provided the cost savings or energy production promised by Defendants and/or Pink Energy.

82.    Plaintiffs have continued to try to work with Defendants and Pink Energy regarding their solar system's issues as recently as the spring and early summer of 2022, yet

14

Defendants and Pink Energy have failed to fix the problems with Plaintiffs' solar system and, in fact, have begun to ignore Plaintiffs' calls for customer support.

83.     Upon information and belief, Plaintiffs' experience with Defendants and Pink Energy has not been unique; in fact, Defendants and Pink Energy have continued to defraud similarly situated customers all throughout the State of Ohio and the rest of the United States and was aware of the issues its customers were facing.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**
**(Against Defendants Cross River, Sunlight, Waller, and Trivest)**

84.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

85.     This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

86.     Pursuant to the terms of the Sales Agreement issued by Pink Energy and its Agent/Employee, the Pink Energy Group agreed and promised to install, activate and maintain a solar power system that would significantly lower Plaintiffs' electric consumption by reducing the number of kilowatt hours drawn from the electric-grid and instead, produce sufficient kilowatt hours from the installed solar system to supply sufficient power for daily residential use, to store and/or sell excess kilowatt hours of electric power for future use.

87.     To date, the solar system installed by the Pink Energy Group has failed to meet the representations to Plaintiffs prior to signing the Sales Agreement.

88.     The Pink Energy Group has breached the terms of the Sales Agreement by failing to deliver a solar system that meets industry standards; by failing to install the system in a workmanlike manner; by failing to competently install and connect the various components of the

15

system, by failing to activate the system according to the Sales Agreement and failing to maintain

and or repair flaws in the system which occurred and continue to occur to the present date.

89.     As a direct and proximate result of said Defendants and Pink Energy's breach of

contract, Plaintiffs have incurred consequential damages including, but not limited to, significant

debt, loss of the benefit of the bargain, loss of the use of their monies, home, and other substantial,

actual, and consequential damages.

90.     As partial owners of Pink Energy, and in their individual capacities, Defendants

Waller and Trivest were complicit with Pink Energy and are liable for the breach of contract.

91.     Plaintiffs ask this Court for an order of rescission for the Sales Agreement and

Loan Agreement between Plaintiffs and Defendants and/or Pink Energy.

92.     Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross

River and/or Defendant Sunlight are subject to the same claims and defenses asserted against

Defendants Waller and Trivest, and which will be asserted against Pink Energy.

### SECOND CAUSE OF ACTION
**(Fraudulent Misrepresentation)**
**(Against Defendants Cross River, Sunlight, Waller, and Trivest)**

93.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this

Complaint as though fully rewritten herein.

94.     This Cause of Action will also be pled against Pink Energy upon the lifting of the

automatic bankruptcy stay.

95.     As partial owners of Pink Energy, in their individual capacities, Defendant Waller,

and Defendant Trivest were complicit with Pink Energy's fraudulent scheme.

96.     Pursuant to the Pink Energy Group's pre-sale solicitations and the representations

made by the Pink Energy Agent/Employee as set forth in the final Sales Agreement entered into

between Plaintiffs and Pink Energy, the Defendants and Pink Energy owed a duty to Plaintiffs to disclose truthful and factually correct scientific and output performance data as to the quality of their system, the installation of the system the activation of the system and the quality of maintenance and repair of the system.

97. Pink Energy and Defendants made false representations regarding facts material to the purchase, installation, performance, and maintenance and repair of their solar system as more fully outlined previously in this Complaint.

98. Pink Energy and Defendants possessed actual and/or constructive knowledge of the falsity of their representations regarding the quality of their product, the quality of their installation, and the ability of their solar system to meet the estimates provided in the Sales Agreement.

99. Pink Energy and Defendants made the fraudulent and false misrepresentations to matters of material fact as fully described herein with the intent to mislead Plaintiffs into relying on such fraudulent and false misrepresentations.

100. Defendants Cross River and/or Sunlight acted by and through their agent, the Pink Energy Agent/Employee.

101. Upon information and belief, these fraudulent and false misrepresentations were part of the sales pitch developed by Defendant Waller.

102. Defendant Waller has a history of deceptive trade practices.

103. Defendant Waller had knowledge and was actively involved in formulating his company's fraudulent sales practices.

104. Plaintiffs justifiably relied on Pink Energy and Defendants' fraudulent and false misrepresentations to their detriment.

17

105. As a direct and proximate result of Pink Energy and/or Defendants' fraudulent misrepresentation, Plaintiffs have incurred consequential damages including, but not limited to, significant debt, loss of the benefit of the bargain, loss of the use of their monies, home, and other substantial, actual, and consequential damages.

106. Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross River and/or Defendant Sunlight are subject to the same claims and defenses asserted against Defendants Waller and Trivest, and which will be asserted against Pink Energy.

### THIRD CAUSE OF ACTION
**(Negligent Misrepresentation)**
**(Against Defendants Cross River, Sunlight, Waller, and Trivest)**

107. Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

108. This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

109. As partial owners of Pink Energy, and in their individual capacities, Defendant Waller and Defendant Trivest were complicit with Pink Energy's fraudulent scheme.

110. Defendants and Pink Energy had a pecuniary interest in the sale, installation, activation, and future maintenance and repair of the solar system.

111. The Pink Energy Group, acting in a dual agency relationship with Defendant Cross River and/or Defendant Sunlight, supplied false information to Plaintiffs to influence the Plaintiffs' decision to purchase the Pink Energy solar power system, to have Pink Energy install and activate the system and maintain and repair the components of the system, and agree to a loan with Defendant Cross River and/or Defendant Sunlight.

112. Upon information and belief, these misrepresentations were part of the sales pitch

developed by Defendant Waller.

113.     Defendants and Pink Energy failed to exercise reasonable care or competence in obtaining or communicating such false information to Plaintiffs.

114.     Defendants Cross River and/or Sunlight acted by and through its agent, the Pink Energy Agent/Employee.

115.     Plaintiffs justifiably relied on the false information received from Pink Energy and the Defendants.

116.     As a direct and proximate result of Pink Energy and the Defendants' negligent misrepresentations, Plaintiffs have incurred consequential damages including, but not limited to, significant debt, loss of the benefit of the bargain, loss of the use of their monies, home, and other substantial, actual, and consequential damages.

117.     Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross River and/or Defendant Sunlight are subject to the same claims and defenses asserted against Defendants Waller and Trivest, and which will be asserted against Pink Energy.

### FOURTH CAUSE OF ACTION
**(Fraud In The Inducment/Execution)**
**(Against Defendants Waller, Trivest, Cross River and Sunlight)**

118.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

119.     This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

120.     Defendants and Pink Energy, by and through its employees/agents and with actual and/or constructive knowledge, made material misrepresentations and/or omissions regarding the sale, installation, activation, and future maintenance/repair of the components.

121.     As partial owners of Pink Energy, and in their individual capacities, Defendants

19

Waller and Trivest were complicit with Pink Energy's fraudulent scheme.

122.    Defendants Cross River and/or Sunlight acted by and through its agent, the Pink Energy Agent/Employee

123.    Upon information and belief, Defendant Waller has a history of formulating, directing, and controlling fraudulent sales practices in his prior businesses.

124.    Upon information and belief, Defendant Waller, consistent with his past business practices, maintained hands-on control of the day-to-day activities of the business, including developing the sales strategy used by the Pink Energy Group.

125.    Plaintiffs justifiably relied on these misrepresentations and assurances when entering into the Sales and Loan Agreements.

126.    The Sales and Loan Agreements were further borne of fraud in the execution, by, among other ways, the sales agent failing to provide Plaintiffs with an opportunity to read the agreements, using significant time pressure and sales techniques, and erroneously assuring Plaintiffs that the parties' oral understanding had been or would be accurately memorialized in the agreements.

127.    As a direct and proximate result of Pink Energy and the Defendants' fraudulent inducement, Plaintiffs have incurred consequential damages including, but not limited to, incurring significant debt, loss of the benefit of the bargain, loss of the use of their monies, home, and other substantial, actual, and consequential damages.

128.    Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross River and/or Defendant Sunlight are subject to the same claims and defenses asserted against Defendants Waller and Trivest, and which will be asserted against Pink Energy.

**FIFTH CAUSE OF ACTION**
**(Declaratory Judgment to Void the Undisclosed Arbitration and Limitation of Liability**
**Clauses in the Sales Agreement)**

129.    Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

130.    This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

131.    Pursuant to the terms of the Sales Agreement, this Court should rely upon Ohio law when reviewing the Sales Agreement and Arbitration Clause.

132.    This Declaratory Judgment action is brought pursuant to Ohio Revised Code, § 2721.01, *et seq.* to declare the rights and other legal relations of the parties.

133.    Pink Energy's Agent/Employee surreptitiously acquired Plaintiffs' signatures on the Sales Agreement, including the Arbitration Provision, without Plaintiffs' knowledge and consent by, among other ways, having them sign the Sales Agreement electronically without giving them the chance to review the terms of the Sales Agreement and instead summarizing its terms, and using high pressured sales tactics to place significant time pressure on Plaintiffs.

134.    The Limitations of Liability and Arbitration clauses found in the Sales Agreement are void as a matter of law as they fail to provide Plaintiffs with a meaningful remedy.

135.    The Sales Agreement, including, but not limited to, the Arbitration clause and the Limitation of Liabilities clause, as a whole, is manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties; and the Sales Agreement is not consistent with the intention of the parties that damages in the amount stated should follow the breach.

136.    The Sales Agreement was further borne of fraud in the inducement and fraud in the execution, by, among other ways, failing to provide Plaintiffs with an opportunity to read the

21

agreement, using significant time pressure and sales techniques, and erroneously assuring Plaintiffs that the parties' oral understanding had been or would be accurately memorialized in the Sales Agreement.

137. As more fully set forth herein, the Sales Agreement was provided on the Pink Energy Agent/Employee's personal electronic device and controlled by the Pink Energy Agent/Employee as instructed by the Pink Energy Group.

138. The Plaintiffs were then instructed to electronically sign said agreement based solely on the Pink Energy Agent/Employee's interpretation of the various clauses to include the Limitations of Liability and Arbitration Clause; and said presentation failed to meet any meaningful review of both clauses by Plaintiffs.

139. Additionally, as more fully set-forth herein, Plaintiffs were promised additional financial and/or tax incentives if they signed the Sales Agreement before the expiration of said additional financial incentives, further increasing the pressure on the Plaintiffs to sign the Sales Agreement on the day of presentation and further evidencing Plaintiffs' position that Pink Energy and/or the Defendants failed to fully explain the Limitation of Liability and Arbitration clauses.

140. Plaintiffs request this Court enter a declaration that there was no meeting of the minds between the parties as to the arbitration clause and thus, there was no agreement from Plaintiffs to the Arbitration clause.

141. Plaintiffs request this Court enter a declaration that the Limitation of Liability clause and the Arbitration clause in the Sales Agreement void as a matter of law.

## SIXTH CAUSE OF ACTION
### (Declaratory Judgment to Void the Undisclosed Arbitration and Limitation of Liability Clauses in the Loan Agreement)

142. Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

143.     This Declaratory Judgment action is brought pursuant to 28 U.S. Code, § 2201 and/or Ohio Revised Code, § 2721.01, *et seq.* to declare the rights and other legal relations of the parties.

144.     Plaintiffs have been unable to obtain a complete copy of the executed Loan Agreement; however, upon information and belief, and based upon review of identical Loan Agreements, the Agreement contains an Arbitration and Limitation of Liability Clause.

145.     If said Loan Agreement contains an Arbitration and Limitation of Liability Clause, Plaintiffs assert the Clauses are void as matter of law as set forth hereinbelow.

146.     The Pink Energy's Agent/Employee surreptitiously acquired Plaintiffs' signatures on the Loan Agreement, including the Arbitration Provision, without Plaintiffs' knowledge and consent by, among other ways, having them sign the Loan Agreement electronically without giving them the chance to review the terms of the Loan Agreement and instead summarizing its terms, and using high pressured sales tactics to place significant time pressure on Plaintiffs.

147.     The Limitations of Liability and Arbitration clauses found in the Loan Agreement are void as a matter of law as it fails to provide Plaintiffs with a meaningful remedy.

148.     The Loan Agreement as a whole is manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties; and is not consistent with the intention of the parties that damages in the amount stated should follow the breach.

149.     The Loan Agreement was further borne of fraud in the inducement and fraud in the execution, by, among other ways, failing to provide Plaintiffs with an opportunity to read the agreement, using significant time pressure and sales techniques, and erroneously assuring

Plaintiffs that the parties' oral understanding had been or would be accurately memorialized in the Loan Agreement.

150.    As more fully set forth herein, the Loan Agreement was provided by the Pink Energy Agent/Employee on a personal electronic device and controlled by the Pink Energy Agent/Employee as instructed by Pink Energy.

151.    The Plaintiffs were then instructed to electronically sign said agreement based solely on the Pink Energy Agent/Employee's interpretation of the various clauses to include the Limitations of Liability and Arbitration Clause; and said presentation failed to meet any meaningful review of both clauses by Plaintiffs.

152.    Additionally, as more fully set forth herein, Plaintiffs were promised additional financial and/or tax incentives if they signed the Sales Agreement before the expiration of said additional financial incentives, further increasing the pressure on the Plaintiffs to sign the Sales Agreement on the day of presentation and further evidencing Plaintiffs' position that the Defendant failed to fully explain the Limitation of Liability and Arbitration clauses.

153.    Plaintiffs request this Court enter a declaration that the Limitation of Liability clause and the Arbitration clause in the Loan Agreement between Plaintiffs and Defendants Cross River and/or Sunlight are void as a matter of law.

154.    Plaintiffs request this Court enter a declaration that there was no meeting of the minds between the parties as to the Arbitration clause, and thus, there was no agreement from Plaintiffs to the Arbitration Agreement.

155.    Plaintiffs assert the Arbitration clause does not contain a delegation clause.

156.     If, however, the Court determines the Arbitration clause contains a delegation clause, Plaintiffs assert such clause is void as a matter of law in that there was no meeting of the minds and does not express the true intention of the parties.

157.     Plaintiffs request this Court enter a declaration that there was no meeting of the minds between the parties as to the delegation clause, and thus, there was no agreement from Plaintiffs to the delegation clause, and further, that the delegation clause is void as a matter of law.

### SEVENTH CAUSE OF ACTION
**(Negligent Selection/ Retention and Training)**
**(Against Defendants Cross River, Sunlight, Waller, and Trivest)**

158.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

159.     This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

160.     As partial owners of Pink Energy, and in their individual capacities, Defendants Waller and Trivest were complicit with Pink Energy's fraudulent scheme.

161.     Plaintiffs state that Pink Energy and Defendants owed a duty of exercising reasonable care in hiring and training its contractors and/or employees to sell, install, activate, and maintain the solar systems installed on Plaintiffs' properties.

162.     Plaintiffs state that Pink Energy and Defendants breached their duty to Plaintiffs in failing to exercise reasonable care in hiring and failing to properly train the contractors and/or employees responsible for installing and/or maintaining the solar systems installed on Plaintiffs' properties.

163.     Upon information and belief, and per Defendant Waller's own words, Defendant

Waller personally oversaw and developed the sales training/techniques used by the Pink Energy Group, Cross River and/or Sunlight salespeople.

164. Upon information and belief, Defendant Trivest undertook all or a substantial portion of Pink Energy's recruitment and hiring responsibilities.

165. Plaintiffs state that Pink Energy and Defendants breached their duty to Plaintiffs in failing to exercise reasonable care in hiring and failing to properly train the employees who advised Plaintiffs regarding the sale of the solar system.

166. As a direct and proximate result of the aforementioned breach, Plaintiffs have suffered those damages as set forth in the General Allegations and other causes of actions.

167. Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross River and/or Defendant Sunlight are subject to the same claims and defenses asserted against Defendants Waller and Trivest, and which will be asserted against Pink Energy.

## EIGHTH CAUSE OF ACTION.
### (Breach of Warranty)
### (Against Defendants Cross River, Sunlight, and Trivest)

168. Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

169. This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

170. Plaintiffs state that there have been no substantial changes to the installed solar system from its condition when it was designed, manufactured, marketed, supplied, distributed and/or sold and/or installed by Pink Energy and Defendants.

171. In supplying, delivering and/or installing said solar system, Defendants and Pink Energy expressly warranted their product as evidenced by Paragraph 7 of the Sales Agreement attached hereto.

172. The said Defendants and Pink Energy breached those express and implied warranties by, among other things, delivering, and/or supplying, and/or selling and/or installing said solar system in an unsafe, defective, and unfit condition.

173. As a direct and proximate result of Pink Energy and said Defendants' breach of warranty, Plaintiffs suffered damages.

174. Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross River and/or Defendant Sunlight are subject to the same claims and defenses asserted against Defendants Waller and Trivest, and which will be asserted against Pink Energy.

**NINTH CAUSE OF ACTION**
**(Violations of the Ohio Consumer Protection Act)**
**(Against Defendant Cross River, Sunlight, Trivest)**

175. Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

176. This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

177. Plaintiffs are, individually, "consumers" within the meaning of O.R.C. §1345.01(D).

178. Pink Energy is a "supplier" as that term is defined by ORC §1345.01(C).

179. Pink Energy's sale of solar systems to Plaintiffs is a "consumer transaction" as defined by ORC §1345.01(A), as the transaction involved a sale of an item of goods in which Plaintiffs purchased a consumer good from Pink Energy.

180. As detailed above, supra, Pink Energy and/or Defendant Waller committed unconscionable, unfair, and unlawful acts and practices by among other things, engaging in high-pressure sales tactics, including threats that Plaintiffs would lose a solar tax credit (among other

benefits) if they did not immediately sign the Sales Agreement and repeatedly quoting the individual Plaintiffs with estimates of power output that Pink Energy and/or Defendant Waller knew, or should have known, their systems were incapable of producing.

181.    Upon information and belief, these high-pressure sales techniques were part of the sales pitch/techniques developed by Defendant Waller.

182.    Pink Energy and Defendant Waller's conduct violates ORC 1345 *et seq.* as an unfair, unconscionable, and/or deceptive act in connection with a consumer transaction.

183.    Pink Energy and the Defendants further engaged in an unfair practice by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Plaintiffs.

184.    Upon information and belief, Defendant Trivest, who was an owner of Pink Energy, was aware of the misconduct being undertaken by Pink Energy, Defendant Waller, Cross River and/or Sunlight agents/employees.

185.    Upon information and belief, Defendant Trivest was engaged in furthering Pink Energy and Defendant Waller's scheme.

186.    Therefore, Trivest is liable for the above-described conduct and violations committed by Pink Energy the other Defendants.

187.    As a direct and proximate result of the foregoing, Plaintiffs have suffered injuries including, but not limited to actual damages and consequential damages.

188.    As a result of the violations of the Pink Energy and/or Defendants, Plaintiffs are entitled to an award of actual damages, statutory damages, as well as an award of reasonable attorney's fees.

189.     Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross River and/or Defendant Sunlight are subject to the same claims and defenses asserted against Defendants Waller and Trivest, and which will be asserted against Pink Energy.

## TENTH CAUSE OF ACTION
### (Civil Conspiracy)
### (Against Defendants Cross River, Sunlight, Waller, and Trivest)

190.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

191.     This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

192.     The cost of installation of the solar system was greatly overpriced, requiring Plaintiffs to pay more than double the cost of the national average per kilowatt hour for a similar solar system in 2021.

193.     Knowing that having easily available credit extended to the potential purchaser of the system would further promote the sale of the system Pink Energy, along with Defendants, conspired together to facilitate the sale of the system.

194.     Upon information and belief, other than the specific lenders provided by the Pink Energy Group, Plaintiffs were unaware they could seek financing through a third party.

195.     Defendants Cross River and/or Sunlight knew, or should have known, that the Pink Energy Group secured the signing of the Sales and Loan Agreements with Plaintiffs through fraudulent, false, and misleading representations at the time of the sale and said fraudulent conduct continues to the present day.

196.     Upon information and belief, Defendants Cross River and/or Sunlight had specific employees and/or departments dedicated to "Partner Relations" that was intimately familiar with

the Pink Energy Group and its sales practices and further informed Plaintiffs that they were partnering with Pink Energy.

197.     Having such knowledge, Defendants Cross River and/or Sunlight acted in concert with the Pink Energy Group in facilitating the fraudulent conduct by agreeing to be one of the financial institutions provided to customers, including Plaintiffs, by the Pink Energy Group.

198.     Having entered into this conspiratorial relationship, Pink Energy and the Defendants acted to secure the Sales and Loan agreements and ultimately for Cross River and/or Sunlight to provide the financing of said system.

199.     Defendants Cross River and/or Sunlight benefited from this conspiracy by securing Plaintiffs as a payor and ensuring that independent of whether the Pink Energy Group actually performed all duties under the Sales Agreement, the Plaintiffs would be obligated to satisfy the loan.

200.     Upon information and belief, Defendant Trivest was aware of the misconduct being undertaken by Pink Energy and the other Defendants.

201.     Upon information and belief, Defendant Trivest was engaged in furthering Pink Energy the other Defendant's scheme.

202.     Defendants Cross River and/or Sunlight's conduct was knowing, intentional, reckless, and malicious.

203.     Defendant Waller's conduct was knowing, intentional, reckless, and malicious.

204.     Defendant Trivest's conduct was knowing, intentional, reckless, and malicious.

205.     As a direct and proximate result of the foregoing, Plaintiffs have suffered injuries including, but not limited to actual damages and consequential damages.

206.     As a result of the conspiracy between Pink Energy and/or Defendants, Plaintiffs are entitled to an award of actual damages, statutory damages, as well as an award of reasonable attorney's fees.

## ELEVENTH CAUSE OF ACTION
### (Negligence)
### (Against Defendants Cross River, Sunlight, Waller, and Trivest)

207.     Plaintiffs hereby incorporate the preceding paragraphs of this Complaint, inclusive, as though fully rewritten and alleged herein.

208.     This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

209.     The Pink Energy Group, by and through their employees/agents, owed a duty to individuals, including Plaintiffs, to use reasonable care when selling, installing, and monitoring its solar system products.

210.     The Pink Energy Group, by and through its employees/agents, breached its duty and was negligent in, among other things, providing Plaintiffs with incorrect information regarding the output expected from their solar system, causing damage to Plaintiffs' property while installing the solar system, failing to monitor/maintain its solar system, and failing to cure any problems or defects that arose after the installation was complete.

211.     Upon information and belief, this false and incorrect information was part of a sales strategy developed and implemented by Defendant Jayson Waller.

212.     Upon information and belief, Defendant Trivest was aware of the negligent conduct being undertaken by Pink Energy, Cross River and/or Sunlight employees.

213.     Upon information and belief, Defendant Trivest was engaged in furthering the other Defendants' scheme.

31

214.     Therefore, Trivest is liable for the above-mentioned negligent conduct and violations committed.

215.     As a direct and proximate result of Pink Energy's negligence, Plaintiffs have suffered injuries and damages as more fully explained in the General Allegations set forth in this Complaint.

216.     Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendant Cross River and/or Defendant Sunlight are subject to the same claims and defenses asserted against Defendants Waller and Trivest, and which will be asserted against Pink Energy.

## TWELFTH CAUSE OF ACTION
**(Declaratory Judgment to disregard Power Home Solar's limited liablity protection form and to find Defendant Waller Personally Liable for any and all damages associated with his formulation, direction, and control over Pink Energy's fraudulent sales and marketing practices)**

217.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

218.     This Declaratory Judgment action is brought pursuant to 28 U.S. Code, § 2201 and/or Ohio Revised Code, § 2721.01, *et seq.* to declare the rights and other legal relations of the parties.

219.     Defendant Waller has maintained and held himself out as maintaining hands-on control of the day-to-day operations of Pink Energy.

220.     Prior to forming Pink Energy (f/k/a PowerHome Solar, LLC), Defendant Waller was found to have personally engaged in deceptive trade practices in the State of North Carolina.

221.     Upon information and belief, many of the same deceptive trade practices Defendant Waller implemented at his prior company, ISI Alarms, Inc., were also implemented by Defendant Waller to train Pink Energy sales representatives.

222.     Defendant Waller used the limited liability form of Pink Energy in furtherance of his fraudulent sales and marketing programs.

223.     Plaintiffs request this Court enter a declaration that Defendant Waller is not protected or shielded by Pink Energy's corporate form.

## THIRTEENTH CAUSE OF ACTION
### (Punitive Damages Claim)
### (Against Defendants Cross River, Sunlight, Waller, and Trivest)

224.     Plaintiffs hereby incorporate the preceding paragraphs, inclusive, of this Complaint as though fully rewritten herein.

225.     This Cause of Action will also be pled against Pink Energy upon the lifting of the automatic bankruptcy stay.

226.     Plaintiffs state that the Pink Energy and the Defendants recklessly and maliciously displayed a conscious disregard for the rights of Plaintiffs by, among other things, fraudulently misrepresenting material facts knowing that such failures and misrepresentations would result, with substantial certainty, in injury and in damage to Plaintiffs.

227.     Plaintiffs further state that Defendants Cross River and/or Sunlight acted in concert with the Pink Energy Group as more fully explained in Plaintiffs' Tenth Cause of Action for Civil Conspiracy.

228.     Plaintiffs further state that Defendant Trivest acted in concert with Pink Energy and the other Defendants as more fully explained in Plaintiffs' Tenth Cause of Action for Civil Conspiracy.

229.     Plaintiffs further state that Defendant Trivest took over many of the day-to-day operations for Pink Energy including hiring and recruitment and was intimately aware of Pink Energy's conduct.

230.     As a direct and proximate result, Plaintiffs suffered those damages as fully set forth and described in Plaintiffs' preceding Causes of Action and is entitled to an award of punitive damages against Defendants Cross River and/or Sunlight, Waller, and Trivest.

231.     Pursuant to the "Holder Rule" Notice in the Loan Agreement, Defendants Cross River and/or Sunlight is subject to the same claims and defenses asserted against Pink Energy.

**WHEREFORE**, Plaintiffs demands judgment against Defendants, Cross River and/or Sunlight, Jayson Waller, and Trivest Partners, L.P., equally and severally in an amount exceeding $75,000.00 in compensatory and punitive damages, attorneys' fees, interest, cost, and further relief to which Plaintiffs may be entitled. Plaintiffs further pray this Court enter judgment declaring the Arbitration provisions/clauses in the Sales Agreement and Loan Agreement unenforceable and void as a matter of law and further disregarding Pink Energy's corporate form as against Jayson Waller.

Respectfully submitted,

*/s/ Andrew R. Burton*
Stacie L. Roth (0071230)
Richard D. Reinbold (0024152)
Andrew R. Burton (0100996)
SCHULMAN, ROTH & ASSOC. CO., LPA.
The Carnegie Building
236 3rd Street SW
Canton, Ohio 44702
(330) 456-4400 (telephone)
(330) 456-3641 (FAX)
sroth@lawyersonyourside.com
aburton@lawyersonyourside.com

And

*/s/ Robert J. Tscholl*           
Robert J. Tscholl (0028532)
Robert J. Tscholl, LLC
236 3rd Street SW
Canton, Ohio 44702
330-497-8614
330-456-3641 (FAX)
Btscholl740@@yahoo.com

*Counsel for Plaintiffs*

## REQUEST FOR ISSUANCE OF SUMMONS

Plaintiffs hereby state that pursuant to Federal Civil Rule 4(b), Plaintiffs have presented a

Summons for each Defendant. Plaintiffs hereby request that said Summons be signed and sealed

by the Clerk of Courts and issued to Plaintiffs for service.

*/s/ Andrew R. Burton*        
Counsel for Plaintiffs

35



Corporate Headquarters
919 North Main Street
Mooresville, NC 28115
1-800-765-2715
CustomerSolutions@powerhome.com
www.PowerHome.com
FEIN 30-0839854

## Purchase and Installation Form
### (*Solar Energy System*)

Effective Date: June 5, 2021 | 3:56 PM EDT

Phone: (440)241-0847

Customer: Charles Pacheco

Email: krausesheryl@yahoo.com

Co-Customer: Sheryl L Krause Pacheco

*Approx*. Start Date: 3 – 4 months from full execution of this Agreement

\* If applicable, must be completed. References to Customer herein include Co-Customer.

*Approx*. Completion Date: 1 day after Start Date (or 2 days after Start Date for ground mount install)

Project Site: 7023 Anthony Ln. , Parma Heights (*City*), OH (*State*) 44130 (*Zip*)
(the "**Property**")

| Qty | Product(s)/Service(s) |
|---|---|
| *Solar Energy System* | |
| 21 | 370 - SILFAB |
| | |

| | *Battery Backup (only complete if applicable & Back-Up Battery Addendum **Must** be Attached)* |
|---|---|
| 1 - $20,000 | Generac battery cabinet (contains three (3) 3.0 kWh modules) |
| 0 | Generac (3.0 kWh) (*each* additional module) |
| | |

| *Other* |
|---|
| |
| |

| | | |
|---|---|---|
| | **Subtotal** | $ 82750.50 |
| | **Taxes** | $ |
| | **Total Contract Price\*** | $ 82750.50 |

\* This does *not* include Federal, state, local, utility or third-party tax credits, incentives or rebates (if any) or Company rebates (if any). Customer should consult its own independent tax or financial advisor regarding the foregoing.

**Mounting Structure (*check one*):** ground [ ] roof [x]  **Roof Age (*roof mounting only*):** New

**System Size (kW):** 7.77

**Annual Solar Production (kWh):** 9214 \*
\* Estimated 1st yr. (Annual decreases based on degradation rate).

**Additional Terms:** N/A



Corporate Headquarters
919 North Main Street
Mooresville, NC 28115
1-800-765-2715
CustomerSolutions@powerhome.com
www.PowerHome.com
FEIN 30-0839854

**Payment Type (*check one*): Customer Financing*** _____X_____ **Cash Payment** _____

\* This Agreement (and Customer's obligations hereunder) are not contingent on obtaining or securing financing. The payment terms of Customer financing shall be determined by, and in accordance with, the specific lender that Customer applies to for financing and subsequently elects to finance Customer's purchase and installation of the Product(s)/Service(s) above. Power Home Solar LLC makes no representation, warranty or guarantee as to Customer financing (including eligibility, approval or terms). Please see Customer financing documents from your lender for additional details.

*Customer Financing*: The following shall be applicable if Customer is financing all or a portion of the Total Contract Price:

| Total Contract Price | $ 82750.50 |
|---|---|
| Amount Financed | $ 87250.50 |
| Remaining Balance | $ 0 |

If applicable, the Remaining Balance (above) of the Total Contract Price shall be payable by Customer as follows:

| Payment Amount | Payment Due Date |
|---|---|
| $ | |
| $ | |

*Cash Payment*:  The following shall be applicable if Customer is paying in cash:

| | | Payment Due Date |
|---|---|---|
| Total Contract Price | $ | |
| Deposit | ___% of Total Contract Price | Payable by Customer upon the execution and delivery hereof |
| Installment Payment | ___% of Total Contract Price | |
| Installment Payment | ___% of Total Contract Price | |
| Final Payment | ___% of Total Contract Price | Payable by Customer upon the Substantial Completion of Installation (as defined below) |

For purposes hereof, "**Substantial Completion of Installation**" shall mean that all labor, materials and equipment have been installed and completed and are ready for permit inspection by any applicable governmental authorities.

**SEE EXHIBIT A FOR NOTICES FOR PROPERTY LOCATED IN SELECT STATES, AND EXHIBIT B FOR CUSTOMER ACKNOWLEDGEMENTS.**

**THIS AGREEMENT IS ENTERED INTO AS OF THE EFFECTIVE DATE AND IS EXECUTED IN AT LEAST TWO ORIGINAL COPIES, ONE OF WHICH IS TO BE DELIVERED TO COMPANY AND ONE OF WHICH IS TO BE DELIVERED TO CUSTOMER.**

**CUSTOMER MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION.  *SEE* THE**



Corporate Headquarters
919 North Main Street
Mooresville, NC 28115
1-800-765-2715
CustomerSolutions@powerhome.com
www.PowerHome.com
FEIN 30-0839854

**ATTACHED NOTICE OF CANCELLATION FORM (<u>EXHIBIT C</u>) FOR AN EXPLANATION OF THIS RIGHT.**

**NOTICE TO CUSTOMER: DO NOT SIGN THIS CONTRACT IF BLANK. YOU ARE ENTITLED TO A COPY OF THE CONTRACT AT THE TIME YOU SIGN.**

Customer agrees that by signing below Customer is agreeing to pay the amount(s) set forth on this Purchase and Installation Form and to be bound by the terms and conditions hereof and set forth in the Terms of Purchase and Installation (including any Exhibit, Addendum or other attachment hereto), all of which are attached and incorporated into this Purchase and Installation Form.

DocuSigned by:

*Charles Pacheco*
4C7AA6956F464D0...
*(Customer Signature)*

June 5, 2021 | 4:02 PM EDT
_____
*(Date)*

DocuSigned by:

*Sheryl L Krause Pacheco*                    *
CB18BD70EF0A420...
*(Co-Customer Signature)*

June 5, 2021 | 4:07 PM EDT
_____
*(Date)*

* If applicable, please obtain Co-Customer signature

POWER HOME SOLAR LLC*

DocuSigned by:

*David Nordstrom*
4938577F681A403...
*(Authorized Agent Signature)*

June 5, 2021 | 3:56 PM EDT
_____
*(Date)*

* Power Home Solar LLC maintains State business licenses as follows:

NC License: NCGC 60946/EL 26074-U
SC License: SCGC G119763/EL M113628
MI License: Residential Builder #2102214053
VA License: VAGC 2705165346
IL Roofing Contractor License: 104018682
OH License: 48524
PA HIC Registration No.: PA143619
TN Contractor License: 74358 (Unlimited; CE)
MO License: 2019026037
KY License: CE65748
WV License: WV 060565
TX License: 35846 (EC)

## <u>Letter of Authorization</u>

Project Site: ___7023 Anthony Ln.___, ___Parma Heights___ (*City*), OH ___ (*State*) 44130 _____ (*Zip*)
(the "**<u>Property</u>**")

Owner(s) Name(s): ___Charles Pacheco_____Sheryl L Krause Pacheco_____

We/I duly authorize (and grant permission to) POWER HOME SOLAR LLC (and its subsidiaries and their respective employees and agents) to act on our/my behalf as an agent in all aspects relating to (and in connection with the) making, delivering, signing and/or otherwise obtaining any submissions, reports, applications, permits, authorizations and/or verifications as required by and to regulating authorities, utility companies and/or governmental agencies in connection with the permitting, installation, commissioning, and/or interconnection of the equipment, materials, work and/or labor at the Property.

Under penalties of perjury, we/I declare that we/I have read the foregoing and that the facts stated in it are true to the best of my/our knowledge and belief.

**<u>Customer</u>:**

Signature: *Charles Pacheco*
4C7AA6950F404D0...

Printed Name: ___Charles Pacheco___

Date: ___June 5, 2021 | 4:02 PM EDT___

**<u>Co-Customer</u>:**

Signature: *Sheryl L krause Pacheco*
ABDEC664A79D427...

Printed Name: ___Sheryl L Krause Pacheco___

Date: ___June 5, 2021 | 4:07 PM EDT___

\* If applicable, please obtain Co-Customer signature

## Terms of Purchase and Installation

These TERMS OF PURCHASE AND INSTALLATION (these "Terms of Purchase") are entered into by and between POWER HOME SOLAR LLC ("Company") and Customer (including Co-Customer, if applicable) as of the Effective Date. Unless otherwise indicated in these Terms of Purchase, all capitalized terms herein shall have the meaning ascribed to them in the Purchase and Installation Form (the "Purchase Form"), which is attached hereto and incorporated herein by this reference. As used herein, "Agreement" means these Terms of Purchase, together with the Purchase Form, and all Exhibits, Addendums and attachments hereto and referenced herein.

1.   Purchase and Installation of Product(s); Performance of Service(s).

(a)   Customer agrees to (i) purchase the Product(s) and/or Service(s) set forth on the Purchase Form, and (ii) timely remit payment of the Total Contract Price in accordance with the Purchase Form. Company will contact Customer to schedule the installation of the Product(s) and/or perform the Service(s) (the foregoing is referred to as the "Project", and any work necessary to prepare and complete the Project, including submission of permits, is referred to as the "Project Work"). Upon verbal or written notice from Customer to proceed, which shall not unreasonably be withheld, conditioned or delayed, Company shall commence with the Project Work and shall continue diligently in its performance until Substantial Completion of Installation is complete. Customer hereby agrees and acknowledges that the period of time for Substantial Completion of the Project shall vary with the complexity, scope, and size of the Project. Company is not responsible for any delays that are outside of the control of Company, including, without limitation, delays caused by government agencies, building jurisdictions, or by utility companies.  Customer agrees to provide Company, or its affiliates or subcontractors, with access to the Property so Company can install the Product(s) and/or perform the Service(s).

(b)   Customer understands that the installation of the Product(s) may cause incidental dust. Customer should cover any surfaces Customer wants to protect and remove any moveable objects near the installation site that Customer does not want exposed to the installation process. Customer further understands that incidental damage may occur to Customer's walls, ceiling, and landscaping, and Customer agrees to not hold Company liable for any such incidental damages which may occur during installation.

(c)   Company will perform all Project Work in a professional and workmanlike manner. Company shall comply with all local requirements for building permits and inspections and shall be responsible for applying for and obtaining any applicable permits necessary to install the Product(s) and perform the Service(s) (including, to the extent applicable, interconnection and other regulatory approvals required to complete the Project). At Company's sole discretion, Company may employ or engage subcontractors to  perform portions of the Service(s), including roofers or electricians to perform specialized portions of the Project. To the extent required under applicable law, Company will provide Customer with information, such as names, addresses and telephone numbers, of any subcontractor engaged to perform any of the Service(s) and will enter into a written contract with any such subcontractor, which contract will include all relevant provisions, terms and conditions of this Agreement, to the extent applicable.  To the extent required by applicable law, all of the Service(s) shall be performed by individuals duly licensed and authorized by applicable law to  perform such Service(s). To the best of Company's actual knowledge, all employees on the Project, including employees of any subcontractor, are legally authorized to work in the United States.

2.   Customer Cooperation. Customer acknowledges and agrees that Customer shall cooperate (within a reasonable amount of time) with Company in connection with the Project Work (including the design, permitting, interconnection, scheduling and installation relating thereto) and the performance of Company's obligations under this Agreement (whether before, during or after the installation of the Product(s) or performance of the Service(s)), including, but not limited to, responding to inquiries or approval requests, providing access to the Property, scheduling installation, providing any documents or other information reasonably requested by Company in Customer's possession, custody or control relating to the Product(s), Service(s) and/or the Project and any claims, deficiencies or defects Customer alleges with respect thereto (such as, by way of example only, and without limitation, up to 12 months of Customer's electricity bills in order for Company to adequately analyze post-installation consumption, production, savings and/or Customer-alleged claims, deficiencies or defects).   In furtherance of Customer's obligations hereunder, Customer agrees to (and shall) execute the Letter of Authorization attached to the Purchase Form.

3.    <u>Payment</u>.  Customer authorizes Company to apply (and to the extent applicable, charge) any amount(s) due under this Agreement (or the Purchase Form) to the applicable payment method designated and/or provided by Customer (*i.e.*, credit card, check, debit card or other form of payment delivered by Customer and accepted by Company). If Customer fails to cure any payment default **within seven (7) days** of written notice (email will suffice), Customer shall pay to Company interest on all amounts due in the amount of the *lesser* of (i) **eighteen percent (18%) per annum, or (ii) the maximum rate allowed by applicable law**, plus, to the extent not otherwise prohibited by applicable law, reasonable attorneys' fees and/or collection charges incurred by Company in connection with the collection of such non-payment by Customer. Customer shall be responsible for paying any applicable sales, use, excise, value added, withholding or similar taxes, duties or assessments imposed in connection with this Agreement for the Product(s)/Service(s) by any federal, state, local or foreign government authority, exclusive of any taxes based upon Company's income or payroll.

4.    <u>Security Interest; Mechanic's Lien Warning</u>.  Customer grants to Company a continuing security interest on the Product(s) and in all of the equipment and components installed at the Project, including, but not limited to, all equipment identified herein and any additional items installed. In the event Customer defaults on the payment of any amounts associated with the installation or repayment of any amounts advanced by Company for the benefit of Customer and such default is not cured in full within ten (10) days of written notice of default from Company (or such longer period of time required by applicable law), Company may, in addition to its remedies set forth in <u>Section 3</u> above and to the extent permitted by applicable law, remove all of the Product(s) from the Property, including without limitation, any and all equipment and components covered by the security interest granted by Customer to Company under this Agreement.  Company shall be permitted to file, and is hereby authorized to file without further notice, a Form UCC-1 financing statement in the real estate records of the jurisdiction in which the Project is located.  Upon payment in full of the Total Contract Price, the security interest provided for in this <u>Section 4</u> shall terminate and Company shall take all steps necessary to terminate any such Form UCC-1 financing statement filed by Company. *See* <u>Exhibit A</u> for applicable state specific mechanic's lien notices.

5.    <u>Change Orders</u>.

(a)    The material, quantities, and amounts listed in the Purchase Form are Company's good faith estimates of the Project cost based on all factors known to Company at the time of such estimate. Changes to the Project Work may become necessary after work on the Project has been commenced (each such change shall be referred to as a "<u>Change Order</u>", and collectively, the "<u>Change Orders</u>"). A Change Order may occur as follows: (i) due to the unavailability of quoted materials; (ii) Company discovers a previously unknown condition that must be corrected, remedied or addressed to properly complete the Project (for example, but without limitation, the need to modify existing wiring, reinforce rafters or support joists, repair existing roofing, or any task that may be required to successfully complete the Project and assure that it conforms to building codes); and/or (iii) Customer's request to modify the Project after commencement of the Project Work (for example, but without limitation, requests to move the Product(s) from one area/location to another area/location at the Property, requests to install equipment different than as illustrated on the approved building plans, requests to remove or relocate existing fixtures, such as antennas, or any additional work or task outside the Project Work). Company has the right to substitute similar, functionally equivalent materials should the originally quoted materials not be readily-available.

(b)    In the event of a Change Order, any materials, quantities, and/or amounts listed in the Purchase Form are subject to revision, and the Total Contract Price may increase or decrease accordingly. The Change Order shall describe the scope of the extra Project Work, the cost to be added to (or subtracted from) the Total Contract Price, and the impact the Change Order may have on the scheduled estimated date of Substantial Completion of Installation. Change Orders become part of this Agreement once a Charge Order is prepared in writing and signed and delivered by both Company and Customer. Company's failure to execute and deliver a Change Order shall not preclude Company's recovery based on legal or equitable remedies designed to prevent unjust enrichment.

(c)    Notwithstanding the requirement under this Agreement that all Change Orders be in writing, if there are any changes to the Project Work requested by Customer or required by Company for the successful completion of the Project and which contemplated changes Company discusses with Customer and to which contemplated changes Customer gives Company its verbal assent, such verbal assent by Customer to such contemplated changes will have the same legality and full force and effect as a written Change Order once Company has commenced performance of any Project Work that was discussed verbally between Company and Customer.

(d)    Any Change Orders shall be incorporated herein. Customer shall pay to Company any increase to the Total Contract Price within ten (10) days of request or billing by Company for any Change Order (except as otherwise provided in a Change Order).

6.    Removal and/or Relocation of the Product(s). Company shall not be obligated or required to relocate, remove and/or re-install the Product(s) (or any part thereof) at the Property or to another location or property, except as otherwise may be expressly agreed in a written contract signed by Company and Customer. To the fullest extent permitted by appliable law, Company does not make (and hereby disclaims any) representations or warranties (oral or written) as to the costs, suitability, ability, interconnection, approvals (including homeowners associations), and production, usage or savings relating to, or in connection with, any relocation, removal and/or re-installation of Customer's Product(s) from one location or property to another location or property. Each location or property is different, and as such, results, requirements, approvals, costs, savings, etc. will vary (often substantially) depending on location or property.

7.    Tax Credits, Incentives and Rebates.

(a)    Customer acknowledges that Customer may apply (and may qualify) for certain Federal, State, local or utility rebates, tax credits, incentives and/or power rate adjustments relating to the Project ("Rebate(s)").  Customer further acknowledges that while Company *may* assist Customer with certain aspects of submitting applicable documents to the respective Rebate authority, Customer (and not Company) shall be solely responsible for negotiating and applying for any such Rebates and acknowledges that Company does not (and cannot) guarantee Customer's eligibility for, or the actual dollar amount of, any Rebates. The availability of Rebates may be limited, and Company strongly recommends that Customer contact Customer's financial, tax and legal advisors for details and information on whether Customer qualifies for any Rebates associated with the Project and the amount of any such Rebates, given Customer's individual (or joint, with such Customer's spouse) tax and financial circumstances. Customer's obligations hereunder are *not* contingent upon Customer or the Project qualifying for any Rebates or other similar financial benefit.

(b)    TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, COMPANY MAKES NO REPRESENTATION, WARRANTY, ASSURANCE OR GUARANTEE THAT CUSTOMER WILL QUALIFY FOR OR RECEIVE, IN WHOLE OR IN PART, ANY REBATE OR SIMILAR FINANCIAL BENEFIT IN CONNECTION WITH THE PROJECT, AND CUSTOMER SHOULD NOT MAKE CUSTOMER'S DECISION TO ENTER INTO THIS AGREEMENT IN RELIANCE ON OBTAINING ANY SUCH BENEFIT.  IT IS CUSTOMER'S SOLE RESPONSIBILITY TO INVESTIGATE WHAT REBATES OR OTHER SIMILAR FINANCIAL BENEFITS, IF ANY, MAY BE AVAILABLE TO CUSTOMER AND TO TAKE THE STEPS NECESSARY TO CLAIM ANY SUCH REBATES OR BENEFITS.

8.    Limited Warranty. Company warrants and represents for five (5) years following the date of completion of the Service(s) and installation of the Product(s) (the "General Warranty Period") that (A) the Project Work will be of good quality, new when installed and installed in a good workmanlike manner, using principles, criteria and standards generally accepted for use by a contractor in the same industry as Company, (B) the Project Work is, at the time of completion, in compliance with the requirements of all applicable governmental laws, regulations and requirements, and (C) the Project Work is free from defects in workmanship. Company further separately warrants and represents for five (5) years following the date of the completion of the Service(s) and installation of the Product(s) (the "Roof Warranty Period", together with the General Warranty Period, the "Limited Warranty Period") that, with respect to roof-mounted installations only, each roofing penetration made in connection with the Project Work and the surrounding area within a five (5) inch radius of each penetration shall be free from damage to the roof and against water infiltration through the roof. During the applicable Limited Warranty Period, the exclusive remedy of Customer, and Company's sole obligation, in the event of any warranty claim under this Section 8 shall be for Company to repair or replace the defective Service(s). Any repair or replacement work hereunder shall not extend the applicable Limited Warranty Period, but the remainder of the original Limited Warranty Period shall apply to the repair work until natural expiration of the applicable Limited Warranty Period. Company's total monetary liability under this warranty is limited up to the Total Contract Price. Customer must notify Company in writing of the existence of any defect subject to this limited warranty within a reasonable amount of time after Customer discovers such defect (but no later than five (5) business days, or such longer period required by applicable law). This limited warranty does not cover (and

DocuSign Envelope ID: 88AB66D3-8A25-4FE8-B346-57EBDAFA6E7F

expressly excludes) any damage, defects, deterioration or malfunction resulting from any of the following (as determined in Company's reasonable discretion): (i) any alteration, modification, improper or unreasonable use or maintenance, misuse, abuse, accident, neglect, exposure to excess moisture, fire, lightning, power surges, acts of God or other events that are beyond the reasonable control of Company; (ii) the installation or removal of the Product(s) by any person or entity other than Company; (iii) any unauthorized tampering with the Product(s); (iv) any negligence, improper action or inaction, or willful or malicious acts by any party other than Company; (v) any maintenance or repairs attempted by anyone unauthorized by Company to make such maintenance or repairs; and/or (vi) any other cause which does not relate to a defect in workmanship of the Service(s), including (1) trees, new buildings, or other obstructions which are installed, grow beyond the point of the original Product install, or otherwise change after installation of the Product(s), (2) damage from external stress, impact, foreign objects, or falling rocks or debris, (3) damage or corrosion caused by roofing materials, chemicals, or substrates, including those used for corrosion resistance, thermal expansion and contraction, and moisture barriers and sealing, and/or (4) damages attributable to normal weathering or defects or damages caused by vapors or chemical pollutants or air pollution, building settlement or structural failure of roof, walls, foundations or any part of the attached structure.  Only the original Customer is covered under this limited warranty and this limited warranty is not transferable or assignable to any subsequent purchaser(s) or owner(s). Except for defects covered by this limited warranty, all maintenance obligations upon acceptance by Customer shall be the responsibility of Customer.  **Customer understands and agrees that nothing in this Agreement (or otherwise, including any prior oral statement or written proposal) shall be construed as a guarantee of system production, minimum power or savings**.

9.  Product(s) Warranty.  Customer understands and agrees that the Product(s) purchased by Customer may have manufacturer warranties (including, for example, such Products as solar photovoltaic modules, battery backups, inverters, and solar mounting racks), and such manufacturer(s), not Company, are responsible for, and obligated under, any such manufacturer warranty(ies). Please refer to each manufacturer's warranty guidelines for additional info. Company does not warrant the Product(s) (and disclaims all such warranties pursuant to Section 10 below).  It is Customer's sole responsibility as the owner to register the Product(s) with the manufacturer and maintain it according to the manufacturer's specifications. Company will assign any manufacturer warranties upon completion and payment in full of the Total Contract Price by Customer. No other warranties are provided by Company except as expressly set forth in this Agreement. For additional information, restrictions and exclusions regarding (1) the SolarEdge Manufacturer Inverter Warranty (including the optional 25 year extended warranty), please visit https://www.solaredge.com/sites/default/files/solaredge-warranty-april-2019.pdf and https://www.solaredge.com/sites/default/files/ONLINE_HomeownerExtendedWarranty.pdf; and (2) the Generac Manufacturer Limited Warranty, please visit https://www.generac.com/service-support/product-support-lookup/product-support-details?productid=aa180473-602e-4494-b195-d35dd49feee5&isBaseModel=false and https://soa.generac.com/manuals/X7602-08749/A0000416920. **BUYER MUST HAVE AN ACCESSIBLE INTERNET CONNECTION OTHERWISE CUSTOMER'S LIMITED MANUFACTURER'S WARRANTY(IES) (AS WELL AS THEIR RIGHTS THEREUNDER) WILL BE ADVERSELY IMPACTED AND MAY RESULT IN VOIDING (OR SUBSTANTIALLY IMPACTING) THE PRODUCT WARRANTY.**

10.  Disclaimer of Warranties.  EXCEPT AS *EXPRESSLY* SET FORTH IN THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, COMPANY MAKES NO WARRENTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, FEDERAL, STATE OR OTHER TAX CREDITS, REBATES, GRANTS OR INCENTIVES, THE CONDITION OF THE PRODUCTS, THEIR MERCHANTABILITY, THEIR DESIGN, THEIR CAPACITY, THEIR PERFORMANCE, PRODUCTION, MINIMUM POWER, THEIR MATERIAL, THEIR WORKMANSHIP, THEIR FITNESS FOR ANY PARTICULAR PURPOSE, OR THAT THE PRODUCT(S) AND/OR SERVICE(S) WILL MEET THE REQUIREMENTS OF ANY LAWS, RULES, SPECIFICATIONS, OR CONTRACTS WHICH PROVIDE FOR SPECIFIC APPARATUS OR SPECIAL METHODS. EXCEPT AS *EXPRESSLY* SET FORTH IN THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, COMPANY FURTHER DISCLAIMS ANY LIABILITY WHATSOEVER FOR LOSS, DAMAGE, OR INJURY TO CUSTOMER OR THIRD PARTIES AS A RESULT OF ANY DEFECTS, LATENT OR OTHERWISE, IN THE PRODUCTS AND/OR SERVICE(S). SOME STATES DO NOT ALLOW THE LIMITATIONS SET FORTH IN THIS SECTION 10, AND IN SUCH EVENT, SUCH LIMITATIONS MAY NOT APPLY TO CUSTOMER. The Customer Acknowledgements set forth in Exhibit B are expressly incorporated herein and acknowledged and agreed to by Customer.

11.  <u>Termination; Customer's Right to Cancel</u>.

(a)  Either party may terminate this Agreement for breach of a material term of this Agreement, upon first giving the other party written notice identifying the alleged breach, provided the breaching party does not cure such breach within thirty (30) days of receipt of such notice. Termination of this Agreement for any reason shall not relieve Customer of its obligations hereunder to pay (or reimburse Company) for actual third-party costs and expenses incurred by Company relating to the Project Work as of the effective date of termination.

(b)  In addition, (i) should the Project be stopped by any public authority for a period of thirty (30) days or more, through no fault of Company, then Company may terminate this Agreement; (ii) should the Project be stopped through act of neglect or breach of Customer for a period of fifteen (15) days or more, then Company may terminate this Agreement; or (iii) should Customer fail or refuse to pay Company after seven (7) days from the date of written notice of default, then Company may terminate this Agreement. In the event this Agreement is terminated or otherwise cancelled by Customer through no fault (or breach) of Company (a "<u>Customer No Cause Termination</u>") (excluding as otherwise expressly permitted under a nonwaivable provision of applicable law or pursuant to <u>Section 11(c)</u> below) or pursuant to <u>subsections (i) – (iii) of this Section 11(b)</u>, then Company shall be entitled to be paid from Customer (and recover promptly from Customer) (within five (5) business days of demand thereof) (1) the reasonable value of Project Work performed (the basis of payment being based on the terms of this Agreement, less any down payments, if any, made under this Agreement) prior to termination, plus (2) the actual third party costs and expenses incurred by Company relating to the Project Work as of the date of termination, plus (C) with respect to a Customer No Cause Termination or a termination pursuant to <u>subsections (ii) – (iii) of this Section 11(b)</u>, if Company has already, at the time of termination, substantially commenced Project Work involving the design and permitting of the Project and/or the installation of energy efficiency equipment at the Property that may be included as part of the purchase in the Purchase Form, then a termination fee equal to ten percent (10%) of the Total Contract Price (to the fullest extent permitted under applicable law). Some States do not allow a termination (or similar) fee, and in such event and such States only, such termination fee may not apply.

(c)  **CUSTOMER'S RIGHT TO CANCEL**. Customer shall have the right to terminate and cancel this Agreement at any time *prior to* midnight of the third business day after the full execution and delivery of this Agreement (or such longer period as may be *expressly* required by applicable law) (the "<u>Cooling Off Period</u>"). Please see the attached Notice of Cancellation form (<u>Exhibit C</u>) for an explanation of this right. After the expiration of the Cooling Off Period, this Agreement (and the Purchase Form) may not be cancelled or terminated by Customer (for convenience or otherwise) except pursuant to <u>Section 11(a)</u> above, with Company's express prior written consent (exercisable in its sole discretion) or as otherwise required by a nonwaivable provision of applicable law.

(d)  In the event of a termination through no fault (or breach) of Company, Customer understands and agrees that Customer shall solely be responsible for the amounts provided for or payable pursuant to this <u>Section 11</u>, regardless of whether all, or a portion of, the Total Contract Price was intended on being paid through Customer Financing.  It is expressly agreed by Customer that the amounts payable under this Agreement in the event of termination or cancellation of this Agreement through no fault (or breach) of Company do not constitute a penalty and that the parties, having negotiated in good faith for such specific amounts and having agreed that the amount thereof are reasonable in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy, are estopped from contesting the validity or enforceability of such amounts payable hereunder by Customer in the event of termination or cancellation of this Agreement through no fault (or breach) of Company.

12.  <u>Limitation of Liability</u>. EXCEPT TO THE EXTENT OTHERWISE PROHIBITED BY APPLICABLE LAW, COMPANY SHALL NOT BE LIABLE TO CUSTOMER FOR ANY INCIDENTAL, INDIRECT, SPECIAL, TREBLE, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR LOST OR IMPUTED PROFITS, WHETHER LIABILITY IS ASSERTED IN CONTRACT, TORT OR NEGLIGENCE, AND IRRESPECTIVE OF WHETHER COMPANY HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE. CUSTOMER HEREBY WAIVES ANY CLAIM THAT THESE EXCLUSIONS DEPRIVE CUSTOMER OF AN ADEQUATE REMEDY. EXCEPT TO THE EXTENT OTHERWISE PROHIBITED BY APPLICABLE LAW, IN NO EVENT SHALL COMPANY'S TOTAL CUMULATIVE LIABILITY TO CUSTOMER UNDER THIS AGREEMENT OR FOR ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO CUSTOMER'S PURCHASE OF COMPANY'S PRODUCT(S) AND/OR SERVICE(S) OR CUSTOMER'S USE OF THE

DocuSign Envelope ID: 88AB66D3-8A25-4FE8-B346-57EBDAFA6E7F

PRODUCT(S) AND/OR SERVICE(S), REGARDLESS OF THE FORM OF ACTION, EXCEED THE TOTAL AMOUNT ACTUALLY PAID TO COMPANY BY CUSTOMER UNDER THIS AGREEMENT. SOME STATES DO NOT ALLOW THE LIMITATIONS SET FORTH IN THIS <u>SECTION 12</u>, AND IN SUCH EVENT, SUCH LIMITATIONS MAY NOT APPLY TO CUSTOMER.

13. <u>Indemnification</u>. To the fullest extent permitted by law, Customer shall indemnify, defend, protect, save and hold harmless Company, its employees, officers, directors, agents, successors and assigns from any and all third party claims, actions, costs, expenses (including reasonable attorneys' fees and expenses), damages, liabilities, penalties, losses, obligations, injuries, demands and liens of any kind or nature arising out of, connected with, relating to or resulting from Customer's breach of this Agreement or Customer's negligence or willful misconduct.

14. <u>Inspection</u>. Customer shall inspect the Product(s) and Service(s) within five (5) days of completion of the Service(s) or installation of the Product(s) (the "<u>Inspection Period</u>"), whichever is later. Unless Customer provides written notice to Company during the Inspection Period specifying any defect in the Products and/or Service(s), Customer agrees that it shall be conclusively presumed, as between Company and Customer, that Customer has fully inspected and acknowledged that the Product(s) and Service(s) are in full compliance with the terms of this Agreement, in good condition, and that Customer is satisfied with and has accepted the Product(s) and Service(s) in such good condition.

15. <u>Company Insurance</u>. Company shall maintain, at its sole cost and expense, the following insurance coverage and shall, within a reasonable time of Customer's request, furnish to Customer a certificate evidencing such coverage: (i) Commercial General Liability Insurance (CGL) (Company carries commercial general liability insurance with coverage amounts that meet or exceed those required by law), and (ii) Workers Compensation Insurance (Company carries workers' compensation insurance for all employees in compliance with applicable law).

16. <u>Force Majeure</u>. Company shall not be liable for any delays in completion of the Service(s) or delivery (or installation) of the Product(s) caused by: (i) governmental restrictions on manufacture, sale, distribution, and/or use of necessary materials, (ii) Company's inability to obtain necessary materials or perform the work contemplated herein because of strikes, lockouts, fires, floods, earthquakes, hurricanes, pandemics, epidemics or other acts of God, military operations and requirements, national or state emergencies, etc., or (iii) any other acts or omissions beyond Company's reasonable control.

17. <u>Governing Law; Arbitration</u>. Except to the extent inconsistent with or preempted by Federal law (including the Federal Arbitration Act), the interpretation, construction and enforcement of this Agreement, and all matters related to this Agreement, shall be governed by the laws of the State where the Property is located (without giving effect to any conflict of law provisions). **BY SIGNING THIS AGREEMENT, COMPANY AND CUSTOMER AGREE TO RESOLVE ANY AND ALL DISPUTES THROUGH BINDING BILATERAL ARBITRATION, AND EACH PARTY WAIVES ANY RIGHT TO PARTICIPATE IN CLASS ACTIONS, ALL AS DETAILED IN, AND SUBJECT TO, THE "ARBITRATION AGREEMENT" ATTACHED HERETO AS <u>EXHIBIT D</u>, WHICH SHALL BE SIGNED BY THE PARTIES AS OF THE EFFECTIVE DATE.**

18. <u>Miscellaneous</u>. Any term of this Agreement may be amended or modified only with the written and signed consent of the parties. No waiver of any provision in this Agreement shall be valid unless the same is in writing and signed by the party against whom such waiver is sought to be enforced. No valid waiver of any provision of this Agreement at any time shall be deemed a waiver of any other provision of this Agreement or be held as a waiver of any subsequent breach or a continuing waiver. This Agreement constitutes the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof. Customer may not assign this Agreement or delegate any of Customer's rights or obligations hereunder. Except as otherwise prohibited by applicable law, Company may freely assign and delegate all of its rights and duties under this Agreement, and the covenants herein shall be enforceable by such successor and/or assign. Sections 2-4, 6-10, 12 - 14 and 16 - 18 (and the parties' respective obligations and rights thereunder) shall survive the termination or cancellation hereof. Should any provision hereof require judicial or other interpretation or construction, it is agreed that the court or fact finder interpreting or construing same shall not apply a presumption that the terms shall be more strictly construed against one party or the other by reason of the rule of construction that a document is to be construed more strictly against the party who through itself or through its agents prepared the document. Any notice under this Agreement shall be in

writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or electronic transmission (such as email), forty-eight (48) hours after being deposited in the regular mail as certified or registered mail (airmail if sent internationally) with postage prepaid, if such notice is addressed to the party to be notified at such party's address or email as set forth on the Purchase Form, or as subsequently modified by advance written notice. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including .pdf or any electronic signature complying with applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. Customer warrants and represents that Customer is the sole legal owner of the property where the Product(s) will be delivered and the Service(s) will be performed, and that Customer has the authority to enter into this Agreement.

DocuSign Envelope ID: 88AB66D3-8A25-4FE8-B346-57EBDAFA6E7F

## Exhibit A

## Notices for Property Located in Select States

A State-specific notice contained in this Exhibit A is only applicable to a Customer whose Product(s) are being installed and/or Service(s) are being performed within the referenced State. If Customer's Product(s) are being installed and/or Service(s) are being performed within the referenced State, please read the applicable State-specific notice(s) below carefully.

*For Pennsylvania Only*: The official registration number of Power Home Solar LLC can be obtained from the Pennsylvania Office of Attorney General's Bureau of Consumer Protection by calling toll-free within Pennsylvania 1-888-520-6680.  Registration does not imply endorsement.

*For Virginia Only*: Consumer is hereby notified of the existence of the Virginia Contractor Transaction Recovery Fund. The Virginia Contractor Transaction Recovery Fund provides relief to eligible consumers who have incurred losses through the improper and dishonest conduct of a licensed contractor. More information on the Fund or filing a claim can be obtained by visiting http://www.dpor.virginia.gov/Boards/Contractors_Recovery_Fund/ or by contacting the Board for claim information at the following address: Recovery Fund Office | DPOR, 9960 Mayland Drive, Suite 400, Richmond, VA 23233, (804) 367-1559, email: RecoveryFund@dpor.virginia.gov.

*For Illinois Only*:

Customer acknowledges that Company has provided to Customer a copy of the "Home Repair: Know Your Consumer Rights" pamphlet prior to the execution of this Agreement (attached hereto). A copy of the pamphlet can also be found at http://illinoisattorneygeneral.gov/consumers/homerep0505c.pdf.

THE LAW REQUIRES THAT THE CONTRACTOR SHALL SUBMIT A SWORN STATEMENT OF PERSONS FURNISHING MATERIALS AND LABOR BEFORE ANY PAYMENTS ARE REQUIRED TO BE MADE TO THE CONTRACTOR.  Unless provided in a sworn statement of Company separately provided to Customer, Company is the only person furnishing materials and labor under this Agreement and its name and address is contained herein.

Pursuant to Illinois law, before this Agreement is accepted and executed by Customer, Company advised (and is hereby advising in writing) Customer that this Agreement contains contractual provisions that require Customer to (i) submit all contract or agreement disputes to binding arbitration in place of a hearing in court before a judge or jury; and (ii) waive Customer's right to a trial by jury. If Customer located in Illinois, Customer has the option of accepting or rejecting both the binding arbitration clause and the jury waiver clause before this Agreement is accepted and executed by Customer. If the consumer rejects either the binding arbitration clause or the jury trial waiver clause, or rejects both clauses, by writing "reject" on Exhibit D, then, as long as Customer accepts and executes the remainder of this Agreement, the following provision shall replace (and control over) Section 17 and Exhibit D only:

> The interpretation, construction and enforcement of this Agreement, and all matters related to this Agreement, shall be governed by the laws of the State where the Property is located (without giving effect to any conflict of law provisions). The venue for any claim, cause of action or dispute involving this Agreement shall take place in Cook County, Illinois. THE PARTIES AGREE THAT EACH SHALL ONLY BRING CLAIMS AGAINST THE OTHER IN THEIR INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION.

*For Michigan Only*: A residential builder or a residential maintenance and alteration contractor is required to be licensed under article 24 of the occupational code, 1980 PA 299, MCL 339.2401 to 339.2412. An electrician is required to be licensed under article 7 of the skilled trades regulation act, MCL 339.5701 to 339.5739. A plumbing contractor is required to be licensed under article 11 of the skilled trades regulation act, MCL 339.6101 to 339.6133. A mechanical contractor is required to be licensed under article 8 of the skilled trades regulation act, MCL 339.5801 to 339.5819.  Contractor is licensed in the State of Michigan and Contractor's license number is Residential Builder #2102214053.

*For Missouri Only*: FAILURE OF THIS CONTRACTOR TO PAY THOSE PERSONS SUPPLYING MATERIAL OR SERVICES TO COMPLETE THIS CONTRACT CAN RESULT IN THE FILING OF A MECHANIC'S LIEN ON THE PROPERTY WHICH IS THE SUBJECT OF THIS CONTRACT PURSUANT TO CHAPTER 429, RSMO.  TO AVOID THIS RESULT YOU MAY ASK THIS CONTRACTOR FOR "LIEN WAIVERS" FROM ALL PERSONS SUPPLYING MATERIAL OR SERVICES FOR THE WORK DESCRIBED IN THIS CONTRACT.  FAILURE TO SECURE LIEN WAIVERS MAY RESULT IN YOUR PAYING FOR LABOR AND MATERIAL TWICE.

*For Tennessee Only*:  All home improvement contractors must be licensed by the Tennessee Home Improvement Commission. Any inquiries about a contractor should be transmitted to the Commissions office.

*For Ohio Only*:  EXCESS COSTS. IF AT ANY TIME A HOME CONSTRUCTION SERVICE REQUIRES EXTRA COSTS ABOVE THE COST SPECIFIED OR ESTIMATED IN THE CONTRACT THAT WERE REASONABLY UNFORESEEN, BUT NECESSARY, AND THE TOTAL OF ALL EXTRA COSTS TO DATE EXCEEDS FIVE THOUSAND DOLLARS OVER THE COURSE OF THE ENTIRE HOME CONSTRUCTION CONTRACT, YOU HAVE A RIGHT TO AN ESTIMATE OF THOSE EXCESS COSTS BEFORE THE HOME CONSTRUCTION SERVICE SUPPLIER BEGINS WORK RELATED TO THOSE COSTS.  INITIAL YOUR CHOICE OF THE TYPE OF ESTIMATE YOU REQUIRE:

(Only applicable in Ohio, check here if in Ohio: _____)

written estimate _____ oral estimate _____ (*check one*) (if neither checked, then written estimate applies)

*For Georgia Only*:

GEORGIA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT OR OTHER ACTION FOR DEFECTIVE CONSTRUCTION AGAINST THE CONTRACTOR WHO CONSTRUCTED, IMPROVED, OR REPAIRED YOUR HOME. NINETY DAYS BEFORE YOU FILE YOUR LAWSUIT OR OTHER ACTION, YOU MUST SERVE ON THE CONTRACTOR A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE. UNDER THE LAW, A CONTRACTOR HAS THE OPPORTUNITY TO MAKE AN OFFER TO REPAIR OR PAY FOR THE DEFECTS OR BOTH. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY A CONTRACTOR. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT OR OTHER ACTION.

Notwithstanding anything to the contrary contained herein, the standards (the "Standards") for evaluating work and activities covered by the limited warranty (each, a "Covered Claim") described in the Agreement shall conform to the guidelines set forth in the current edition of the Residential Construction Performance Guidelines as published by the National Association of Home Builders (the "Guidelines"). To the extent there are no Standards set forth in the Guidelines for evaluating a particular Covered Claim, the Standards used shall be consistent with standard practices in the solar installation industry for evaluating similar Covered Claims.

*For Kentucky Only*:

SECTIONS 411.250 TO 411.260 OF THE KENTUCKY REVISED STATUTES CONTAIN IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST THE BUILDER OF YOUR HOME. YOU MUST DELIVER TO THE BUILDER A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR BUILDER THE OPPORTUNITY TO MAKE AN OFFER TO REPAIR OR PAY FOR THE DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE BUILDER. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT.

**BUYER'S RIGHT TO CANCEL**: If this agreement was solicited to your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want

the goods or services and must be mailed before midnight of the third business day after you sign this agreement. The notice must be mailed to: 919 North Main Street, Mooresville, NC 28115. *See* Exhibit C for additional information.

*For West Virginia Only*:

WEST VIRGINIA STATE LAW, AS SET FORTH IN CHAPTER 21, ARTICLE 11A OF THE WEST VIRGINIA CODE, CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST THE CONTRACTOR WHO MADE RESIDENTIAL IMPROVEMENTS TO YOUR PROPERTY. AT LEAST NINETY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS THE OPPORTUNITY TO MAKE AN OFFER TO REPAIR OR PAY FOR THE DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS. THERE ARE DEADLINES AND PROCEDURES UNDER STATE LAW AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT.

Company's workers' compensation policy number is EN4WC00157-201 (Everest National Insurance Company) and Company's unemployment insurance account number is 000008224-4.

*For Kansas Only*: KANSAS LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST THE CONTRACTOR WHO CONSTRUCTED YOUR HOME. NINETY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR THE OPPORTUNITY TO MAKE AN OFFER TO REPAIR OR PAY FOR THE DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT.

*For Texas Only*: IMPORTANT NOTICE: You and your contractor are responsible for meeting the terms and conditions of this contract. If you sign this contract and you fail to meet the terms and conditions of this contract, you may lose your legal ownership rights in your home. KNOW YOUR RIGHTS AND DUTIES UNDER THE LAW.

---

Customer Acknowledgement of Notice:

By initialing below, Customer and, if applicable, Co-Customer, have reviewed and acknowledged receipt of any applicable State-specific notice(s) contained above in this **Exhibit A**.

**Customer (*initials*):** _CP_      **Co-Customer (*initials*):** _SUkP_

## Exhibit B

## Customer Acknowledgements

As part of the information, documents, materials or proposals provided to Customer at (or before) the time of execution hereof (in writing or orally), Company may provide, among other information, projections of energy production from Customer's solar energy system and *estimates* of Customer's projected energy consumption and savings (collectively, the "Projections"). The Projections are based, in part, on factors that are inherently variable and/or beyond the control of Company, like weather conditions, man-made obstructions, natural obstructions (like trees and other shading issues), Customer's usage, and the applicable cost of energy. Even small changes, for example, in Customer's usage or energy costs, will impact Customer's potential savings. As a result, the Projections (including the amounts provided for production, usage and savings) are illustrative and hypothetical only and (to the fullest extent permitted under applicable law) are not (and shall not be in any way interpreted to be) guarantees, representations or warranties of any kind, shape or fashion. The Projections were compiled based on information supplied by Customer and other third-party sources and have not been independently verified by Company. To the fullest extent permitted under applicable law, no representation or warranty, express or implied, oral or written, is made as to the accuracy or completeness of the information, estimates, projections or assumptions contained therein, and nothing contained herein or therein is, or shall be relied upon as, a promise, representation, warranty or guarantee, whether in the past or the future with respect to the Projections (whether relating to production, performance, usage or savings). To the fullest extent permitted under applicable law, Company expressly disclaims any such promise, representation, warranty or guarantee (whether oral, written or otherwise). Ultimately, the production, performance, consumption and savings with respect to any given solar system may vary from those set forth in the Projections.

Customer (*initials*): _____      Co-Customer (*initials*): _____

If Customer engages or otherwise employs any contractor, subcontractor or other person(s) unrelated or unaffiliated with Company (each, a "Non-Company Party"), whether relating to the Project or otherwise, Company shall not be responsible for the services, acts or omissions of such Non-Company Party, and Customer shall be solely responsible for such Non-Company Party, including any compensation, fees or costs due and owing to such Non-Company Party.

Customer (*initials*): _____      Co-Customer (*initials*): _____

Net metering and similar excess or surplus outflow credits (if any) contained in the Projections are estimated based on your utility rules and state statutes or other regulations (or other third-party resources). These amounts are subject to change from time to time by, among other things, a change or termination by executive, legislative or regulatory action, and any change would have an impact on the assumptions and estimates in the Projections. Customer assumes sole responsibility for the risks set forth under this paragraph, and understands the Agreement is not contingent on Customer's application, acceptance or receipt of benefits, if any, related to net metering (or similar credits or programs). Company makes no guarantees regarding eligibility, acceptance or receipt of net metering (or similar credits or programs).

Customer (*initials*): _____      Co-Customer (*initials*): _____

Often, depending on Customer's electricity provider, after twelve (12) months (or at least once annually), Customer's monthly net energy charges and credits are reconciled in an annual true-up statement. Generally, depending on the electricity provider, any remaining charges must be paid and any excess surpluses are typically reset to zero (or, in some cases, roll over to the next billing cycle) Customer should (and Company recommends Customer) contact their electricity provider for additional information or if Customer has any questions regarding this paragraph.

**Customer (_initials_):** _CP_        **Co-Customer (_initials_):** _SLkP_

The Projections were prepared using the current rates, rules and regulations promulgated by Customer's applicable utility commission or other government agency (the "Commission"). The Commission may alter its rules and regulations and/or change rates in the future. If this occurs, Customer may be subject to those changes and would be responsible for paying any future increases to electricity rates, charges or service fees from Customer's utility. Further, it is important to understand that future electric utility rates used in the Projections (or otherwise presented to Customer) are estimates only. Customer's future electric utility rates may vary.

**Customer (_initials_):** _CP_        **Co-Customer (_initials_):** _SLkP_

Depending on Customer's electricity provider, Customer may be charged fixed (or similar) charges (_i.e._, a monthly charge or fee that is fixed in value intended to capture an electricity provider's basic costs to provide electricity service to Customer). These fixed charges, if any, vary by electricity provider and jurisdiction, and are applied regardless of volumetric charges (_i.e._, electricity costs that vary due to usage). In addition, depending on Customer's electricity provider, Customer may be required to pay a minimum monthly bill, which is the lowest bill amount an electricity provider would (or can) bill Customer. Lastly, Customer may be charged taxes or other state or local charges on all or a portion of their bill. Customer should (and Company recommends Customer) contact their electricity provider for additional information or if Customer has any questions regarding this paragraph.

**Customer (_initials_):** _CP_        **Co-Customer (_initials_):** _SLkP_

Federal, State, local or utility rebates, tax credits, incentives and/or power rate adjustments (if any), including potential participation in any renewable energy credit or similar program, (collectively, "Rebates") are estimated only based on existing utility rules and Federal and State statutes or other regulations (or other third-party resources). These amounts are subject to change from time to time by, among other things, a change or termination by executive, legislative or regulatory action, and any change would have an impact on the assumptions and estimates in the Projections. Customer assumes sole responsibility for the risks set forth under this paragraph, and understands the Agreement is not contingent on Customer's application, acceptance or receipt of benefits, if any, related to Rebates. Company makes no guarantees regarding eligibility, acceptance, amount or receipt of any Rebates. Customer should contact their tax advisor for additional information or if Customer has any questions regarding this paragraph.

**Customer (_initials_):** _CP_        **Co-Customer (_initials_):** _SLkP_

If Customer's Product(s) and/or Service(s) are financed, carefully read any agreements and/or disclosure forms provided by Customer's lender. Neither this statement (nor this Agreement) contains the terms of Customer's financing agreement. If Customer sells their home where the System is located before paying off such financing, transfer of the System to the new owner may require consent of Customer's lender. If Customer has any questions about the foregoing, please contact Customer's finance provider before signing this Agreement.

**Customer (_initials_):** _CP_        **Co-Customer (_initials_):** _SLkP_

If Customer has a homeowner's association or similar community governing body (a "HOA"), Customer understands and acknowledges that the HOA's approval may be required for the Project. Customer's rights to proceed with the Project (and the HOA's approval rights) are generally governed by the applicable HOA governing documents. Customer assumes sole responsibility for the risks set forth under this paragraph, and understands the Agreement is not contingent on Customer's application or acceptance of the Project by a HOA. Company makes no guarantees regarding eligibility, acceptance, or timing of approvals relating to a HOA. Customer should (and Company recommends Customer) contact their HOA, if applicable, for additional information.

**Does Customer Have an HOA (*check one*):** Yes \_\_\_\_ No  X

If Yes, please provide:

| HOA Name | Phone # | Email | Facsimile | Contact Person |
|---|---|---|---|---|
| | | | | |

**Customer (*initials*):** CP    **Co-Customer (*initials*):** SUbP

Customer acknowledges and represents that Customer is not aware of any active or unrepaired leaks, defects or other intrusion on or relating to the roof at the Property.  If Company discovers that the roof has any active or unrepaired leaks, defects or other intrusion, or is otherwise in poor condition, Company has the right, in its discretion, to cease work until Customer makes the necessary or advisable repairs to the roof or terminate the Agreement. Notwithstanding, if Customer requests that Company proceed with the Project after being advised of the condition of the roof, then Customer agrees to (and shall) release, indemnify and hold Company harmless from any and all claims relating to pre-existing roof damage, defects, leaks or intrusions.

**Customer (*initials*):** CP    **Co-Customer (*initials*):** SUbP

If applicable, Customer acknowledges that in order for Company to successfully install the solar system (and complete the related Project Work), it may be necessary or advisable for Company to trench or dig on Customer's Property, and in connection therewith, Company will use commercially reasonable efforts to restore the condition of the Property by filling in the trench or hole dug by Company. If necessary, Company will add grass seed and straw to the impacted area(s), but will not restore the area(s) with sod.

**Customer (*initials*):** CP    **Co-Customer (*initials*):** SUbP

Customer acknowledges that full or partial shading can have a negative impact on a solar system's production and output. Shading is when something, whether a natural or man-made object or obstruction, partially or fully blocks one or more solar panels from catching sunlight.  Examples of shading include, without limitation, trees, chimneys, passing of clouds, neighboring buildings and similar man-made or naturally occurring obstructions partially or fully blocking one or more solar panels.  Customer understands and agrees that Customer is solely responsible for the removal or trimming of any trees or other objects that may impact a solar system's production and output.  Any shading (including the impact thereof on a solar system's production and output) presented in any Projections are based on assumptions, should not be relied upon by Customer and are in no way any guarantee with respect to any current or future shading conditions and/or their impact on a solar system's production and output.  All warranties or representations (whether express or implied) with respect to shading (including the impact thereof on a solar system's production and output) are expressly disclaimed. Customer is further advised that trees and/or other objects causing any shading issues that are adverse to the proper Company recommended operation of Customer's system may need to be removed by Customer at Customer's cost and expense.

**Customer (*initials*):** CP    **Co-Customer (*initials*):** SUbP

## Exhibit C

### Notice of Cancellation

**Date of Transaction:** June 5, 2021 | 3:56 PM EDT

CUSTOMER AND COMPANY ARE PARTIES TO THAT CERTAIN PURCHASE AND INSTALLATION FORM (AND THE ASSOCIATED TERMS OF PURCHASE AND INSTALLATION, TOGETHER WITH THE EXHIBITS, ADDENDUMS AND ATTACHMENTS THERETO) (COLLECTIVELY, THE "AGREEMENT").

CUSTOMER MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE (3) BUSINESS DAYS FROM THE ABOVE DATE (*I.E.*, THE DATE WHICH THIS AGREEMENT IS SIGNED) (OR, TO THE EXTENT APPLICABLE, SUCH LONGER PERIOD THAT MAY BE *EXPRESSLY* REQUIRED BY APPLICABLE GOVERNING LAW).

IF CUSTOMER CANCELS, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY CUSTOMER UNDER THE AGREEMENT, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY CUSTOMER WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY COMPANY OF CUSTOMER'S CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELED.

IF CUSTOMER CANCELS, CUSTOMER MUST MAKE AVAILABLE TO COMPANY AT CUSTOMER'S RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO CUSTOMER UNDER THE AGREEMENT, OR CUSTOMER MAY, IF CUSTOMER WISHES, COMPLY WITH THE INSTRUCTIONS OF COMPANY REGARDING THE RETURN SHIPMENT OF THE GOODS AT COMPANY'S EXPENSE AND RISK.

IF CUSTOMER DOES MAKE THE GOODS AVAILABLE TO COMPANY AND COMPANY DOES NOT PICK THEM UP WITHIN TWENTY (20) DAYS OF THE DATE OF CUSTOMER'S NOTICE OF CANCELLATION, CUSTOMER MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF CUSTOMER FAILS TO MAKE THE GOODS AVAILABLE TO COMPANY, OR IF CUSTOMER AGREES TO RETURN THE GOODS TO COMPANY AND, THEREAFTER FAILS TO DO SO, THEN CUSTOMER REMAINS LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE AGREEMENT.

TO CANCEL THE AGREEMENT, E-MAIL, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS NOTICE OF CANCELLATION TO:

Power Home Solar LLC
919 N Main St.
Mooresville, NC 28115
conciergeleaders@powerhome.com

By no later than midnight of: (*Insert Date*) 06/09/2021 _____

I hereby cancel the Agreement to purchase the Product(s)/Service(s) from Power Home Solar LLC under the Agreement.

Signature: _____
Printed Name: _____
Date: _____

<u>**Notice of Cancellation (*Duplicate*)**</u>

June 5, 2021 | 3:56 PM EDT

**Date of Transaction: _____**

**CUSTOMER AND COMPANY ARE PARTIES TO THAT CERTAIN PURCHASE AND INSTALLATION FORM (AND THE ASSOCIATED TERMS OF PURCHASE AND INSTALLATION, TOGETHER WITH THE EXHIBITS, ADDENDUMS AND ATTACHMENTS THERETO) (COLLECTIVELY, THE "<u>AGREEMENT</u>").**

**CUSTOMER MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE (3) BUSINESS DAYS FROM THE ABOVE DATE (*I.E.*, THE DATE WHICH THIS AGREEMENT IS SIGNED) (OR, TO THE EXTENT APPLICABLE, SUCH LONGER PERIOD THAT MAY BE *EXPRESSLY* REQUIRED BY APPLICABLE GOVERNING LAW).**

**IF CUSTOMER CANCELS, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY CUSTOMER UNDER THE AGREEMENT, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY CUSTOMER WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY COMPANY OF CUSTOMER'S CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELED.**

**IF CUSTOMER CANCELS, CUSTOMER MUST MAKE AVAILABLE TO COMPANY AT CUSTOMER'S RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO CUSTOMER UNDER THE AGREEMENT, OR CUSTOMER MAY, IF CUSTOMER WISHES, COMPLY WITH THE INSTRUCTIONS OF COMPANY REGARDING THE RETURN SHIPMENT OF THE GOODS AT COMPANY'S EXPENSE AND RISK.**

**IF CUSTOMER DOES MAKE THE GOODS AVAILABLE TO COMPANY AND COMPANY DOES NOT PICK THEM UP WITHIN TWENTY (20) DAYS OF THE DATE OF CUSTOMER'S NOTICE OF CANCELLATION, CUSTOMER MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF CUSTOMER FAILS TO MAKE THE GOODS AVAILABLE TO COMPANY, OR IF CUSTOMER AGREES TO RETURN THE GOODS TO COMPANY AND, THEREAFTER FAILS TO DO SO, THEN CUSTOMER REMAINS LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE AGREEMENT.**

**TO CANCEL THE AGREEMENT, E-MAIL, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS NOTICE OF CANCELLATION TO:**

Power Home Solar LLC
919 N Main St.
Mooresville, NC 28115
conciergeleaders@powerhome.com

06/09/2021

By no later than midnight of: (*Insert Date*) _____

I hereby cancel the Agreement to purchase the Product(s)/Service(s) from Power Home Solar LLC under the Agreement.

Signature: _____

Printed Name: _____

Date: _____

*Illinois Residents Only*: (Customer __ (yes); _X_ (no) / Co-Customer __ (yes); _X_ (no)). If yes, Customer was given the option to accept or reject this Exhibit D. Customer shall sign his/her name below and write "accept" or "reject" in the margin next to the binding arbitration and jury trial waiver clauses. If Customer writes "accept" or leaves the box blank, this Exhibit D shall apply, and if Customer writes "reject", then, and only then, will the substitute provisions under "*For Illinois Only*" on Exhibit A apply.

## Exhibit D

## Arbitration Agreement

**THE UNDERSIGNED PARTIES, AS COMPANY AND CUSTOMER UNDER THE ATTACHED PURCHASE AND INSTALLATION FORM (AND THE ASSOCIATED TERMS OF PURCHASE AND INSTALLATION, TOGETHER WITH THE EXHIBITS, ADDENDUMS AND ATTACHMENTS THERETO) (THE "AGREEMENT"), ACKNOWLEDGE, COVENANT AND AGREE THAT ANY CLAIM, DISPUTE OR OTHER MATTER IN QUESTION ARISING OUT OF OR RELATED TO THE AGREEMENT, THE PROJECT, AND/OR THE PRODUCT(S)/SERVICE(S) (INCLUDING ANY ALLEGED DEFECT THEREOF) SHALL BE SUBJECT TO BINDING BILATERAL ARBITRATION IN ACCORDANCE WITH THE CONSTRUCTION INDUSTRY ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA") IN EFFECT. EVERY ARBITRATION PURSUANT TO THIS PROVISION SHALL TAKE PLACE IN THE COUNTY WHERE THE PROJECT AND PROPERTY IS LOCATED AND BE FACILITATED BY A SINGLE ARBITRATOR MUTUALLY SELECTED BY THE PARTIES TO THE ARBITRATION; PROVIDED, HOWEVER, IF THE PARTIES ARE UNABLE OR UNWILLING TO MUTUALLY AGREE UPON AN ARBITRATOR WITHIN FIFTEEN (15) BUSINESS DAYS, THEN THE ARBITRATOR SHALL BE APPOINTED BY THE AAA. THE EXPENSES OF ARBITRATION SHALL BE BORNE EQUALLY BY THE PARTIES; PROVIDED, HOWEVER, EACH PARTY SHALL PAY FOR AND BEAR THE COST OF ITS OWN EXPERTS, EVIDENCE AND COUNSEL'S FEES. THE PARTIES AGREE THAT EACH SHALL ONLY BRING CLAIMS AGAINST THE OTHER IN THEIR INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION. UNLESS BOTH PARTIES AGREE IN WRITING, NO ARBITRATOR OR JUDGE MAY CONSOLIDATE MORE THAN ONE PERSON'S CLAIM OR OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. THE AWARD RENDERED BY THE ARBITRATOR SHALL BE FINAL AND BINDING ON THE PARTIES, AND JUDGMENT MAY BE ENTERED UPON IT IN ACCORDANCE WITH APPLICABLE LAW IN ANY COURT HAVING JURISDICTION. THE ARBITRATION, INCLUDING THE FACTS OF THE DISPUTE, RELATED DOCUMENTS AND DECISION, SHALL BE CONFIDENTIAL, EXCEPT AS OTHERWISE MAY BE NECESSARY IN ORDER TO ENFORCE ANY AWARD RENDERED BY THE ARBITRATOR. NOTWITHSTANDING THE FOREGOING, IF ANY CLAIM, DISPUTE OR MATTER IN QUESTION RELATES TO OR IS THE SUBJECT OF A MECHANIC'S LIEN, COMPANY MAY PROCEED IN ACCORDANCE WITH APPLICABLE LAW TO COMPLY WITH LIEN NOTICE, FILING, ENFORCEMENT OR FORECLOSURE REQUIREMENTS. THE FEDERAL ARBITRATION ACT, RATHER THAN ANY STATE ARBITRATION LAW, APPLIES TO THIS ARBITRATION AGREEMENT.**

DocuSigned by:
*Charles Pacheco*
4C7AA6956F404D0...
*(Customer Signature)*

POWER HOME SOLAR LLC
DocuSigned by:
*David Nordstrom*
4938577F681A403...
*(Authorized Agent Signature)*

DocuSigned by:
*Sheryl L krause Pacheco*
ABF54A3DD427...
*(Co-Customer Signature)*

\* If applicable, please obtain Co-Customer signature

v. 2.0 (06.01.2021)



## SMARTPWR360°™ Program Product Attachment

As part of Customer's enrollment in Company's SMARTPWR360° program, Customer will be eligible to receive the energy efficiency products checked below. The SMARTPWR360° program, which combines the listed products and an energy conscious lifestyle, together with Customer's solar system, helps to maximize Customer's potential savings, boost energy independence and protect the environment for future generations.  For more info on the SMARTPWR360° program, please see the enclosed letter from Company's CEO, Jayson Waller.

<u>Check all that apply (*only those checked apply*)</u>:

☒ Blown Insulation (R-49)
☒ Hot Water Heater Thermal Blanket
☒ Attic Staircase Cover
☒ Air Sealant Tape
☒ 2 Showerheads
☒ 2 Bathroom Faucet Aerators / 1 Kitchen Sink Swivel Aerator
☒ 16 LED Bulbs / 2 LED Flood Lights / 2 LED Night Lights
☒ 2 Smart Power Strips
☒ 1 Nest Thermostat Model No. G4CVZ

POWER HOME SOLAR LLC

DocuSigned by:

*Charles Pacheco*
(*Customer Signature*)

DocuSigned by:

*David Nordstrom*
(*Authorized Agent Signature*)

DocuSigned by:

*Sheryl L krause Pacheco* *
(*Co-Customer Signature*)

* If applicable, please obtain Co-Customer signature

*For Internal Use Only*

Installation Notes: _____
N/A
_____
_____
_____
_____
_____



Dear Valued Customer,

Congratulations! We share the excitement of your upcoming solar panel installation, because we know it will change the shape of your energy future. In addition to the amazing solar technology being installed, we will be enrolling you in the SMARTPWR360° program. This is a suite of products and efficiency recommendations that puts you in charge of how efficient your home becomes and how much money you may save. We like to think of it as a lifestyle – a lifestyle that determines your level of success.

We will take care of installing the panels, and, if applicable, the extra blown insulation in your attic, hot water heater blanket, attic staircase cover and attic baffles, and you help by installing the items provided in the SMARTPWR360° kit:

• LED light bulbs. Install these in your most-occupied living spaces, because they use 75% less energy than incandescent bulbs.
• Faucet aerators and showerheads. Stop water (and energy) from unnecessarily going down the drain by installing these in your kitchen and/or bathrooms.
• Nest thermostat. Replace your existing thermostat with the Nest and control your home's temperature anywhere and anytime. Learn more about how you can maximize your savings: https://support.google.com/googlenest/answer/9249254?hl=en.
• Smart power strips. Use these in your home office or entertainment center to minimize vampire load (devices using power even when turned off).
• Hot water temperature card. Fine-tune your water heater temperature and still remain comfortable with this handy tool. Energy.gov recommends setting that temperature at 120° F.

Now all this new technology may help make your house more efficient, but the SMARTPWR360° program is about more than technology. It's about you making SMARTPWR360° choices that maximize your savings opportunity. For example:

• Have your HVAC system serviced for the summer and winter seasons
• Change your air filters regularly
• Shut off the lights when you leave a room
• Shave off 1-2 minutes from your shower time
• Decide what you want in the fridge before opening it
• Attach a timer to holiday lights so they don't stay on all night
• Wash your clothes and dishes only with full loads



We hope you agree that SMARTPWR360° is the right choice for you and your family. We'd love for you to commit to this lifestyle by installing the provided technology, making SMARTPWR360° choices, monitoring your energy usage, keeping yourself up to date on things you can do to save energy and being a key part of your success. If you agree, please sign below and start living the SMARTPWR360° lifestyle today.

DocuSigned by:

Charles Pacheco

Customer Name
SMARTPWR360° inductee

Jayson Waller
CEO, POWERHOME SOLAR

## CUSTOMER PHOTO RELEASE FORM

Customer(s) Name(s): _____Charles Pacheco_____Sheryl L Krause Pacheco_____ ("**Customer**")

Date: ____June 5, 2021 | 4:02 PM EDT____ June 5, 2021 | 4:07 PM EDT

This CUSTOMER PHOTO RELEASE FORM (this "**Release**") is entered into as of the date first set forth above in favor of (and for the benefit of) Power Home Solar LLC, a Delaware limited liability company ("**Company**"). Customer acknowledges and agrees that (and grants permission for) Customer's interior and exterior residence, likeness, image, voice, and/or appearance to be recorded, captured, taken or otherwise obtained by Company, its employees, contractors or agents relating to Customer's experience with Company and/or Customer's purchase, installation, testimonial and/or opinion of Company's products and/or services, and in connection therewith acknowledges and agrees to the following:

For good and valuable consideration, the adequacy and sufficiency of which is acknowledged, Customer grants Company and its affiliates, successors and assigns (the "**Company's Agents**") permission and the full and irrevocable right to use, reuse, edit, exhibit and/or otherwise exploit the likeness, image, voice, performance, and/or appearance of Customer on film, videotape, audiotape, photographic, digital, electronic or other media or medium, whether now known or hereinafter created, that is recorded, captured, taken or otherwise obtained by Company, its employees, contractors or agents (the "**Recordings**") for any legal purpose, including relating to the marketing or promotion of Company's products, services, or business (the "**Use**"), and in all forms of media now known or hereinafter created in perpetuity throughout the world. Customer grants and assigns to Company and the Company's Agents all right, title, and interest in and to the Recordings, including, but not limited to, copyright. Customer understands and agrees that the Recordings shall be the sole property of Company, and that Customer shall have no right to: (i) inspect or approve the Recordings; or (ii) receive any royalties or any compensation (or other payment) arising from or related to the Recordings or the Use (except to the extent otherwise expressly agreed to by Company above). Customer agrees to release, discharge, and hold harmless Company and the Company's Agents from any and all damages, liabilities, costs, expenses, claims, and/or judgments of any kind or nature whatsoever arising from the Recordings or the Use, including, but not limited to, those based on copyright infringement, invasion of privacy, right of publicity, libel, defamation, or false light. Customer acknowledges and agrees that this Release is binding on Customer, and Customer's heirs, legal representatives, and assigns.

Customer hereby represents that Customer is a legal adult and has the full legal capacity to execute this Release. Customer further represents that the rights granted under this Release will not conflict with or violate any other commitment Customer has with any other party.

**CUSTOMER HAS READ THIS RELEASE PRIOR TO SIGNING IT AND FULLY UNDERSTANDS ITS CONTENTS, MEANING, AND IMPACT.**

DocuSigned by:

*Charles Pacheco*
_____
(*Customer Signature*)

DocuSigned by:

*Sheryl L krause Pacheco*
_____
(*Co-Customer Signature*)

Name (Printed): ____Charles Pacheco____      Name (Printed): ____Sheryl L Krause Pacheco____

# Addendum to Purchase and Installation Form
## (*Customer Rebate*)

This ADDENDUM (this "**Addendum**") is being delivered and executed by Company and Customer in connection with that certain Purchase and Installation Form (and the associated Terms of Purchase and Installation attached thereto) (as amended, the "**Agreement**"). All capitalized terms used herein, not otherwise defined herein, shall have the meanings ascribed to such terms in the Agreement.

Subject to the terms of this Addendum, Company has agreed to provide Customer with the rebate(s) set forth below in connection with the completion of the installation, sale and purchase of the Product(s)/Service(s) under the Agreement (each, a "**Rebate**").

| Rebate | Amount |
|---|---|
| 12 mos on us (296) | $ 3552 |
| 2021 rebate 21 panel and batt | $ 1500 |
| | $ |
| | $ |
| Total | $ 5052.00 |

Customer understands and agrees that each Rebate is subject to (and conditioned on): (i) completion of the installation of the Product(s) and performance of the Service(s) under the Agreement; and (ii) Company's receipt, in full, of payment of the Total Contract Price (as provided in the Agreement). Customer further understands and agrees that each Rebate will be sent to Customer via regular mail to the address on file in the form of a check addressed to Customer **within 6 – 8 weeks** after the later of (1) completion of the installation of the Product(s) and performance of the Service(s) or (2) payment in full of the Total Contract Price.

Dated: June 5, 2021 | 4:02 PM EDT _____, 20____.

**Customer:**

Signature: *Charles Pacheco*
4C7A46956F464D0...

Printed Name: Charles Pacheco

Date: June 5, 2021 | 4:02 PM EDT

**Company:**

Signature: *David Nordstrom*
4938577F681A403...

Printed Name: David Nordstrom

Date: June 5, 2021 | 3:56 PM EDT

**Co-Customer:**

Signature: *Sheryl L krause Pacheco* *
ABDEC864A79D427...

Printed Name: Sheryl L Krause Pacheco

Date: June 5, 2021 | 4:07 PM EDT

* If applicable, please obtain Co-Customer signature

v. 2.0 (06.01.2021)

DocuSign Envelope ID: E70B67EB-2F4C-4B71-96B9-56122B5289C3

THIS IS A COPY
This copy view of the Authoritative Copy held
by the designated custodian

# SUNLIGHT  FINANCIAL

## SUMMARY OF KEY LOAN TERMS

Hello Charles Pacheco,

We are excited to partner with Power Home Solar to help you go solar! We sincerely appreciate and support your commitment to energy and financial independence.

Our goal is to provide you financing that is simple, affordable, and easy to understand. To this end, we have provided the key details and terms of your solar financing below. We'd also like to introduce our lending partner, Cross River Bank, a New Jersey state bank ("Lender") that is a leader in providing financing for innovative, environmentally-friendly products (such as solar systems). Once Lender approves your credit and the solar system is installed, Lender will advance the funds to pay for the solar system, extending you credit under a solar loan.  Lender will service your loan and will contact you directly with payment details after installation.

**What Happens Next:**

- Once you sign the Solar Energy System Loan Agreement and Promissory Note ("Loan Agreement"), a copy will be available through DocuSign and emailed to you.
- Due to installation timelines, it may take up to 180 days before your loan is set up.
- Lender will not advance funds until after installation.

**Payment Information:**

- The interest rate on your loan is based on your selected payment method.  A 0.50% discount is offered if you pay by ACH. You may select this option up to final installation of the solar system and prior to loan funding by inserting your ACH information on the Payment Election Form provided or by contacting Sunlight at (888) 850-3359 before your system is fully installed.  If you change your payment method any time after your system is installed, you may be subject to the corresponding higher or lower interest rate, as determined by the Lender.

| | Loan Amount | Term | APR | Monthly Payment | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | First 17 Payments | Payment 18+ with Voluntary Payment* | Payment 18+ without Voluntary Payment** |
| Non-ACH (Standard) | $82,750.50 | 300 | 3.49% | $313.35 | $313.35 | $425.29 |
| ACH (Reduced) | $82,750.50 | 300 | 2.99% | $295.99 | $295.99 | $402.32 |

*Monthly payment for payments 18 and beyond when a voluntary payment **IS** applied to your loan.
** Monthly payment for payment 18 and beyond when a voluntary payment **IS NOT** applied to your loan.
The last payment amount may differ from the remaining payment amounts.

Initials CP SLkP

- Your first monthly payment is due approximately 60 days after the system is installed.  You may be required to make payments before your system begins generating electricity. The first payment date on your Loan Agreement is an estimate only.
- You may prepay the unpaid balance in full or in part at any time without penalty.
- Interest accrues on the unpaid balance of the amount financed on a daily basis from the date your system is installed.

**Important Reminders:**

- Your obligation to repay this loan is independent of system performance.
- You are providing a security interest in the solar equipment related to this transaction.
- We may disable the system in the event of default.

Initials CP SLkP

- Please consult your tax advisor regarding your eligibility for the Federal Tax Credit.  Your loan and your requirement to make payments is not contingent on the availability or your receipt of a tax credit or other benefit.
- To protect your solar system from an unforeseen disaster, you should reach out to your insurance provider and update your personal property coverage to include the solar system.

DocuSign Envelope ID: E70D67EB-2F4C-4B71-96B9-E6122B6289C3
THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

This information can also be found in your Loan Agreement, included within this package.
If you have any questions or concerns, please call us at (888) 850-3359 or email us at support@sunlightfinancial.com.





THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian
COPY (watermark)

# Sample Amortization Schedule for 25-year Solar Loan with a 2.99% APR

**This is an example and may not reflect the actual amount or terms of your loan. Your results may vary based on loan amount, annual percentage rate (APR), payment amounts, and the timing of your payments.**

- The tables below illustrate the schedule of payments for the first two years of a $82,751 solar system where payment is deferred for the first 60 days after installation. The table on top shows the payment schedule if voluntary payment defined above is made **by the 17th scheduled payment**. In this case, the monthly payment **should** remain the same for the entire term of the loan. The 2nd table illustrates the payment schedule if **no** voluntary payment is made **by the 17th scheduled payment.** In this case, the monthly payment amount increases **with the 18th scheduled payment** and remains at this higher amount through the remaining term of the loan.
- Please consult your tax advisor regarding the Federal Tax Credit. Your loan and your requirement to make payments is not contingent on the availability or your receipt of a tax credit or other benefit.

**Voluntary Payment**

| Payment Number | Principal Balance | Accrued Interest | Accrued & Unpaid Interest | Monthly Payment | Amount Paid to Principal | Amount Paid to Interest | Unpaid Interest |
|---|---|---|---|---|---|---|---|
| 0 | $82,750.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0 | $82,750.50 | $203.36 | $203.36 | $0.00 | $0.00 | $0.00 | ($203.36) |
| 1 | $82,750.50 | $210.14 | $413.50 | $295.99 | $0.00 | $295.99 | ($117.51) |
| 2 | $82,750.50 | $210.14 | $327.65 | $295.99 | $0.00 | $295.99 | ($31.66) |
| 3 | $82,750.50 | $203.36 | $235.02 | $295.99 | $60.96 | $235.03 | $0.00 |
| 4 | $82,689.54 | $209.99 | $209.99 | $295.99 | $86.00 | $209.99 | $0.00 |
| 5 | $82,603.53 | $203.00 | $203.00 | $295.99 | $92.99 | $203.00 | $0.00 |
| 6 | $82,510.54 | $209.53 | $209.53 | $295.99 | $86.46 | $209.53 | $0.00 |
| 7 | $82,424.08 | $209.31 | $209.31 | $295.99 | $86.68 | $209.31 | $0.00 |
| 8 | $82,337.41 | $188.86 | $188.86 | $295.99 | $107.13 | $188.86 | $0.00 |
| 9 | $82,230.27 | $208.82 | $208.82 | $295.99 | $87.17 | $208.82 | $0.00 |
| 10 | $82,143.10 | $201.87 | $201.87 | $295.99 | $94.12 | $201.87 | $0.00 |
| 11 | $82,048.98 | $208.36 | $208.36 | $295.99 | $87.63 | $208.36 | $0.00 |
| 12 | $81,961.35 | $201.42 | $201.42 | $295.99 | $94.57 | $201.42 | $0.00 |
| 13 | $81,866.79 | $207.90 | $207.90 | $295.99 | $88.09 | $207.90 | $0.00 |
| 14 | $81,778.69 | $207.67 | $207.67 | $295.99 | $88.32 | $207.67 | $0.00 |
| 15 | $81,690.38 | $200.76 | $200.76 | $295.99 | $95.23 | $200.76 | $0.00 |
| 16 | $81,595.14 | $207.21 | $207.21 | $295.99 | $88.78 | $207.21 | $0.00 |
| 26% Prepayment | $81,506.36 | $200.30 | $200.30 | $21,515.13 | $21,314.83 | $200.30 | $0.00 |
| 17 | $60,191.53 | $0.00 | $0.00 | $295.99 | $295.99 | $0.00 | $0.00 |
| 18 | $59,895.54 | $152.10 | $152.10 | $295.99 | $143.89 | $152.10 | $0.00 |
| 19 | $59,751.66 | $151.74 | $151.74 | $295.99 | $144.25 | $151.74 | $0.00 |
| 20 | $59,607.40 | $136.72 | $136.72 | $295.99 | $159.27 | $136.72 | $0.00 |
| 21 | $59,448.13 | $150.97 | $150.97 | $295.99 | $145.02 | $150.97 | $0.00 |
| 22 | $59,303.11 | $145.74 | $145.74 | $295.99 | $150.25 | $145.74 | $0.00 |

**No Voluntary Payment**

| Payment Number | Principal Balance | Accrued Interest | Accrued & Unpaid Interest | Monthly Payment | Amount Paid to Principal | Amount Paid to Interest | Unpaid Interest |
|---|---|---|---|---|---|---|---|
| 0 | $82,750.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0 | $82,750.50 | $203.36 | $203.36 | $0.00 | $0.00 | $0.00 | ($203.36) |
| 1 | $82,750.50 | $210.14 | $413.50 | $295.99 | $0.00 | $295.99 | ($117.51) |
| 2 | $82,750.50 | $210.14 | $327.65 | $295.99 | $0.00 | $295.99 | ($31.66) |
| 3 | $82,750.50 | $203.36 | $235.02 | $295.99 | $60.96 | $235.03 | $0.00 |
| 4 | $82,689.54 | $209.99 | $209.99 | $295.99 | $86.00 | $209.99 | $0.00 |
| 5 | $82,603.53 | $203.00 | $203.00 | $295.99 | $92.99 | $203.00 | $0.00 |
| 6 | $82,510.54 | $209.53 | $209.53 | $295.99 | $86.46 | $209.53 | $0.00 |
| 7 | $82,424.08 | $209.31 | $209.31 | $295.99 | $86.68 | $209.31 | $0.00 |
| 8 | $82,337.41 | $188.86 | $188.86 | $295.99 | $107.13 | $188.86 | $0.00 |
| 9 | $82,230.27 | $208.82 | $208.82 | $295.99 | $87.17 | $208.82 | $0.00 |
| 10 | $82,143.10 | $201.87 | $201.87 | $295.99 | $94.12 | $201.87 | $0.00 |
| 11 | $82,048.98 | $208.36 | $208.36 | $295.99 | $87.63 | $208.36 | $0.00 |
| 12 | $81,961.35 | $201.42 | $201.42 | $295.99 | $94.57 | $201.42 | $0.00 |
| 13 | $81,866.79 | $207.90 | $207.90 | $295.99 | $88.09 | $207.90 | $0.00 |
| 14 | $81,778.69 | $207.67 | $207.67 | $295.99 | $88.32 | $207.67 | $0.00 |
| 15 | $81,690.38 | $200.76 | $200.76 | $295.99 | $95.23 | $200.76 | $0.00 |
| 16 | $81,595.14 | $207.21 | $207.21 | $295.99 | $88.78 | $207.21 | $0.00 |
| 17 | $81,506.36 | $200.30 | $200.30 | $295.99 | $95.69 | $200.30 | $0.00 |
| 18 | $81,410.67 | $206.74 | $206.74 | $402.32 | $195.58 | $206.74 | $0.00 |
| 19 | $81,215.09 | $206.24 | $206.24 | $402.32 | $196.08 | $206.24 | $0.00 |
| 20 | $81,019.01 | $185.83 | $185.83 | $402.32 | $216.49 | $185.83 | $0.00 |
| 21 | $80,802.53 | $205.19 | $205.19 | $402.32 | $197.13 | $205.19 | $0.00 |
| 22 | $80,605.40 | $198.09 | $198.09 | $402.32 | $204.23 | $198.09 | $0.00 |

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

# PATRIOT ACT

# INFORMATION DISCLOSURE

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW
ACCOUNT —

To help the government fight the funding of terrorism and money laundering activities, federal law requires all
financial institutions to obtain, verify, and record information that identifies each person who opens an
account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and
other information that will allow us to identify you. We may also ask to see your driver's license or other
identifying documents.



THIS IS A COPY
Imaged copy view of the Authoritative Copy held by the designated custodian

| **FACTS** | **WHAT DOES CROSS RIVER BANK DO WITH YOUR PERSONAL INFORMATION?** Rev. 11/2018 |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>- Social Security number and Account balances<br>- Payment history and Transaction history<br>- Account transactions and Wire transfer instructions<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Cross River Bank chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Cross River Bank share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes--** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes--** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes--** information about your transactions and experiences | No | We don't share |
| **For our affiliates' everyday business purposes--** information about your creditworthiness | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| **Questions?** | Call toll-free 1-877-55CRB55 or go to www.crossriverbank.com |
|---|---|

cross river®

DocuSign Envelope ID: E70D67EB-2F4C-4B71-96B9-56122B6289C3

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

COPY VIEW

| What we do | |
|---|---|
| **How does Cross River Bank protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. <br><br> We also maintain other physical, electronic and procedural safeguards to protect this information and we limit access to information to those employees for whom access is appropriate. |
| **How does Cross River Bank collect my personal information?** | We collect your personal information, for example, when you <br> - Open an account or Apply for a loan <br> - Make deposits or withdrawals from your account or Provide employment information <br> - Give us your contact information <br><br> We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only <br> - sharing for affiliates' everyday business purposes--information about your creditworthiness <br> - affiliates from using your information to market to you <br> - sharing for nonaffiliates to market to you <br><br> State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| | |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies. <br> - *Cross River Bank does not share with our affiliates.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies. <br> - *Nonaffiliates we share with can include loan finance companies* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you. <br> - *Our joint marketing partner(s) include loan finance companies.* |

| Other important information |
|---|
| **For Alaska, Illinois, Maryland and North Dakota Customers**. We will not share personal information with nonaffiliates either for them to market to you or for joint marketing-without your authorization. <br> **For California Customers**. We will not share personal information with nonaffiliates either for them to market to you or for joint marketing-without your authorization. We will also limit our sharing of personal information about you with our affiliates to comply with all California privacy laws that apply to us. <br> **For Massachusetts, Mississippi and New Jersey Customers**. We will not share personal information from deposit or share relationships with nonaffiliates either for them to market to you or for joint marketing-without your authorization. <br> **For Vermont Customers**. We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures. Additional information concerning our privacy policies can be found at www.crossriverbank.com or call 1-877-55CRB55. |

DocuSign Envelope ID: E70B67EB-2F4C-4B71-96B9-56122B6289C3

THIS IS A COPY
The display view of the Authoritative Copy held by the designated custodian

Rev. 01/2021

| FACTS | WHAT DOES SUNLIGHT FINANCIAL LLC DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information.  Federal law gives consumers the right to limit some but not all sharing.  Federal law also requires us to tell you how we collect, share, and protect your personal information.  Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>-   Social Security number and income<br>-   Payment history and transaction history<br>-   Credit history and credit scores |
| How? | All financial companies need to share customers' personal information to run their everyday business.  In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Sunlight Financial chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Sunlight Financial share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes—**<br>such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes—**<br>to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | **Yes** | No |
| **For our affiliates' everyday business purposes—**<br>information about your transactions and experiences | **No** | We don't share |
| **For our affiliates' everyday business purposes—**<br>information about your creditworthiness | No | We don't share |
| **For our affiliates to market to you** | No | We don't share |
| **For nonaffiliates to market to you** | Yes | Yes |

| To limit our sharing | ▪  Call 888-850-3359—our menu will prompt you through your choice(s).<br><br>**Please note:**<br><br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we may continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call 888-850-3359 or go to www.sunlightfinancial.com. |



DocuSign Envelope ID: E70B67EB-2F4C-4B71-96B9-56122B5289C3
THIS IS A COPY
of the Authoritative Copy held
by the designated custodian

| Who we are | |
|---|---|
| Who is providing this notice? | **Sunlight Financial LLC** |

| What we do | |
|---|---|
| **How does Sunlight Financial LLC protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We also maintain other physical, electronic, and procedural safeguards to protect this information and we limit access to information to those employees for whom access is appropriate. |
| **How does Sunlight Financial LLC collect my personal information?** | We collect your personal information, for example, when you<br><br>• Apply for a loan,<br>• Give us your income information,<br>• Provide account information,<br>• Pay your bills, or<br>• Give us your contact information.<br><br>We also collect your personal information from others, such as credit bureaus or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br><br>• sharing for affiliates' everyday business purposes—<br>• information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to everyone on your account – unless you tell us otherwise. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• *Sunlight Financial has no affiliates.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• *Nonaffiliates we share with may include mortgage companies, banks, credit unions and other finance companies.* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>• *Our joint marketing partners include mortgage companies, banks, credit unions and other finance companies.* |

COPY VIEW

DocuSign Envelope ID: E70D67EB-2F4C-4B71-96B9-56122B5289C3

THIS IS A COPY

Case: 1:25-cv-02327 Doc #: 1 Filed: 10/28/25 68 of 94. PageID #: 68 ~~and not of the Authoritative Copy held~~
by the designated custodian

| Other important information |
| --- |

**California , North Dakota, and Vermont Residents:** We will not share your information with companies outside of Sunlight Financial LLC except for our everyday business purposes, which includes to service your account, or for marketing our products and services to you or with your consent.

**Vermont Residents only**: We will not disclose credit information about you within or outside Sunlight Financial LLC, except as required or permitted by law.

**Nevada Residents**: Notice provided pursuant to state law. To be placed on our internal Do Not Call List, call 888-850-3359. If you would like more information about telemarketing practices, you may contact us at Sunlight Financial LLC, 101 N. Tryon Street, Suite 1000, Charlotte, North Carolina 28246 or at support@sunlightfinancial.com. For more on this Nevada law, contact Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: 1-702-486-3132; e-mail: BCPINFO@ag.state.nv.us.

Telephone Communications: All telephone communications with us or our authorized agents may be monitored or recorded.

\* Notice provided by: Sunlight Financial LLC.

COPY VIEW

THIS IS A COPY
This copy view of the Authoritative Copy held
by the designated custodian

# PAYMENT ELECTION

You must select one of the payment options below. Your choice is voluntary, and the extension of credit is not conditioned upon your election to make automatic payments. You may change your selection at any time. If you change your selection, we may create a new Payment Election and Note for you to sign. If you select Option One-Payment by Preauthorized EFTs and provide the required information, you will be eligible for a reduced APR, as stated in your Loan Agreement and Promissory Note.

[ X ] **Option One—Payment by Preauthorized EFTs**: If this box is checked, you elect to make your Scheduled monthly payments by having us initiate preauthorized electronic fund transfers ("EFTs") from your designated deposit account (the "Account") when your monthly payments are due. **YOU MUST PROVIDE A VOIDED CHECK OR FILL OUT THE FIELDS BELOW IN ORDER TO IDENTIFY THE ACCOUNT**. We may treat any replacement or substitute deposit account of yours as the "Account." You promise us that you are authorized to make payments from the Account. In the event we make an error in processing an EFT, you authorize us to initiate an EFT to or from the Account to correct the error. You agree that we may resubmit up to two times any EFT that is dishonored. We are not responsible for bank charges you may incur due to dishonored EFTs. You may cancel your election to pay by EFTs under Option One at any time. To do so, you must notify us, by phone at (888) 850-3359 or in writing at

**Cross River Bank**
**c/o Sunlight Financial LLC**
**P.O. Box 843840**
**Dallas, TX 75284-3840**

at least three (3) business days before the scheduled date of the next payment you would like to make by some other method.



------------------------------------  ------------------------------------  ------------------------------------
Bank Name                             Routing Number                        Account Number

[ ] **Option Two—Payment by Alternative Method:** If this box is checked, you elect NOT to make your scheduled monthly payments by having us initiate preauthorized electronic fund transfers ("EFTs") from your designated deposit account. Each month, you must mail a check to us or arrange for payment to be made in some other manner acceptable to us. Terms used in this Payment Election and not otherwise defined are defined in the Long-Term Note. **BY SIGNING BELOW, YOU ELECT OPTION ONE OR OPTION TWO AS SET FORTH ABOVE**.

Borrower: _Charles Pacheco_  Co-Borrower: _Sheryl L krause Pacheco_  Date: 6/5/2021 6:52:41 PM EDS / 6/5/2021 5:22:01 PM EDT

Charles Pacheco
7023 ANTHONY LN, PARMA HEIGHTS, OH 44130

Sheryl L Krause Pacheco
7023 ANTHONY LN, PARMA HEIGHTS, OH 44130

**IF YOU HAVE ELECTED OPTION ONE AND HAVE NOT FILLED OUT THE ABOVE ACCOUNT FIELDS, PLEASE PROVIDE A VOIDED CHECK TO IDENTIFY THE ACCOUNT**

THIS IS A COPY
True copy view of the Authoritative Copy held
by the designated custodian

# SOLAR ENERGY SYSTEM LONG-TERM
# LOAN AGREEMENT AND PROMISSORY NOTE
## NONNEGOTIABLE CONSUMER NOTE

Loan Number: QU-20210605-677977      Date: 06/05/2021 | 2:38 PM EDT

| | |
|---|---|
| Charles Pacheco | 7023 ANTHONY LN, PARMA HEIGHTS, OH 44130 |
| Borrower: Name | Address |
| Sheryl L Krause Pacheco | 7023 ANTHONY LN, PARMA HEIGHTS, OH 44130 |
| Co-Borrower: Name | Address |

**DEFINITIONS:** As used in this Long-Term Loan Agreement and Promissory Note ("Note"), "you" and "your" mean Borrower and any Co-Borrower. For purposes of the Note provisions under the caption "GRANT OF SECURITY INTEREST; MAINTENANCE OF PROPERTY AND SYSTEM; ACCESS" (except the first sentence) and "ARBITRATION PROVISION," "you" and "your" also include any grantor trust or limited liability company (either "Entity Owner") that owns the residence located at the Borrower address set forth above (the "Residence"). "We," "us" and "our" mean Cross River Bank, located at 400 Kelby Street, Ft. Lee, New Jersey 07024 ("Lender"), and any subsequent holder of this Note. "Contractor" means Power Home Solar. "Loan" means the loan evidenced by this Note. You are purchasing one of the following: (1) a solar energy system, (2) a solar energy system including electricity storage equipment, or (3) electricity storage equipment (each of which are referred to as the "System"). "Installation" is complete and the System is "Installed" on the date the System is substantially completed. The System does not need to be connected to a power grid or operating to be considered Installed for purposes of this Note.

## TRUTH IN LENDING ACT ("TILA") DISCLOSURES

| ANNUAL PERCENTAGE RATE ("APR")<br><br>The cost of your credit as a yearly rate | FINANCE CHARGE (e)<br><br>The dollar amount the credit will cost you | Amount Financed (e)<br><br>The amount of credit provided to you or on your behalf | Total of Payments (e)<br><br>The amount you will have paid after you have made all scheduled payments |
|---|---|---|---|
| 3.49% | $42,511.06 | $82,750.50 | $125,261.56 |

**Payment Schedule (e):** This payment schedule reflects the APR disclosed above, which applies if you elect not to make automatic payments by preauthorized Electronic Funds Transfer/ACH payments ("ACH Payments"). Monthly payments are due commencing approximately two (2) months after the Installation date, as follows: 17 payments of $313.35, followed by 281 payments of $425.29 and a single payment of $428.12.*

**Late Fee:** If any part of a payment is more than ten days late, we will charge you a late fee equal to 5% of the scheduled payment or $25, whichever is greater.

**Security Interest:** You are giving us a security interest in the System, including any modifications, attachments, improvements, revisions and/or additions thereto (the "Equipment") and in your contractual and other rights, if any, regarding renewable energy credits and similar benefits.

**Prepayment:** If you pay this Loan early, you will not have to pay a penalty.

**Contract Reference:** See the remainder of this Note for any additional information about nonpayment, default, our right to accelerate maturity of this Note and prepayment rebates and penalties.

(e) means an estimate

Borrower:_____

Co-Borrower:_____

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

**ACH Payment Disclosures (Reduced APR) (e):** If you choose to make automatic payments through ACH Payments and comply with all stated requirements on the Payment Election Form on or before the date the System is Installed, you will qualify for a reduced APR of **2.99%** (0.50% reduction) ("Reduced APR"), which results in a reduced finance charge of **$35,737.92**, and reduced total payments of **$118,488.42**. Your Amount Financed will remain **$82,750.50**.

**ACH Payment Schedule (Reduced APR) (e):** The following payment schedule reflects the Reduced APR of **2.99%**, which applies if you elect to make ACH Payments and comply with all requirements.   Monthly payments are due commencing approximately two months after the Installation date, as follows: **17** payments of **$295.99**, followed by **281** payments of **$402.32** and a single payment of **$404.67**.*

* Both payment schedules assume no voluntary payments. If you make all payments on time and in full and also make a voluntary payment of $21,515.13   ("Voluntary Payment") on or before the scheduled date of your 17th payment, your subsequent scheduled monthly payments will be reduced to the approximate level of your prior monthly payments.

| ITEMIZATION OF AMOUNT FINANCED | |
| --- | --- |
| Amount Financed/Gross Amount Due to Contractor for System | $82,750.50 |

Borrower:____

Co-Borrower:____

THIS IS A COPY
This copy view of the Authoritative Copy held
by the designated custodian

**AL RESIDENTS:** The Alabama license or privilege tax required by law in the amount of <u>$124.13</u> has been paid or will be paid directly to the Department of Revenue. **The Alabama license or privilege tax will be paid only if the Residence is in Alabama.**

CT RESIDENTS: THIS INSTRUMENT IS BASED UPON A HOME SOLICITATION SALE, WHICH SALE IS SUBJECT TO THE PROVISIONS OF THE HOME SOLICITATION SALES ACT. THIS INSTRUMENT IS NOT NEGOTIABLE.

**FL RESIDENTS:** Florida documentary stamp tax required by law in the amount of <u>$289.80</u> has been paid or will be paid directly to the Department of Revenue. Certificate of Registration No. 78-8017218158-2. **The Florida documentary stamp tax will be paid only if the Residence is in Florida.**

**IA RESIDENTS: THIS IS A CONSUMER CREDIT TRANSACTION.**

**IA RESIDENTS: NOTICE TO CONSUMER: 1. Do not sign this Note before you read it. 2. You are entitled to a copy of this Note. 3. You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with law.**

**MD RESIDENTS:** The Maryland recordation tax required by law in the amount of  has been paid or will be paid directly to the applicable Maryland County office. **The Maryland recordation tax will be paid only if the Residence is in Maryland.**

**TN RESIDENTS:** Maximum principal indebtedness for Tennessee recording tax purposes is <u>$92.86</u>. **The Tennessee recordation tax will be paid only if the Residence is in Tennessee.**

THIS IS A COPY
The copy view of the Authoritative Copy held
by the designated custodian

BY SIGNING BELOW, YOU AGREE TO THE TERMS OF THIS NOTE, INCLUDING THE ADDITIONAL TERMS AND CONDITIONS BELOW AND THE ATTACHED ARBITRATION PROVISION. YOU AGREE BOTH INDIVIDUALLY AND FOR PURPOSES OF THE NOTE PROVISIONS UNDER THE CAPTION "GRANT OF SECURITY INTEREST; MAINTENANCE OF PROPERTY AND SYSTEM; ACCESS" (EXCEPT THE FIRST SENTENCE) AND "ARBITRATION PROVISION," AS TRUSTEE OR MEMBER OF ANY ENTITY OWNER. BY CONSIDERING YOUR APPLICATION FOR THE LOAN, WE AGREE TO THE TERMS OF THIS NOTE. YOU SPECIFICALLY AND SEPARATELY AGREE THAT WE MAY DIRECTLY OR REMOTELY DISABLE THE FUNCTIONING OF THE SYSTEM IF THERE IS A DEFAULT, AS DESCRIBED IN THE "ACCELERATION; DEFAULT REMEDIES" SECTION OF THE ADDITIONAL TERMS AND CONDITIONS. YOU ACKNOWLEDGE THAT, BEFORE SIGNING THIS NOTE, YOU RECEIVED A LEGIBLE, SIGNED, DATED AND COMPLETELY FILLED-IN COPY OF THIS NOTE (INCLUDING THE ATTACHMENTS).

RI RESIDENTS: Notice to Buyer: (1) Do not sign this agreement if any of the spaces intended for the agreed terms to the extent of then available information are left blank. (2) You are entitled to a copy of this agreement at the time you sign it. (3) You may at any time pay off the full, unpaid balance due under this agreement and in so doing you may be entitled to receive a partial rebate of the finance and insurance charges. (4) The seller has no right to unlawfully enter your premises or commit any breach of the peace to repossess goods purchased under this agreement. (5) You may cancel this agreement if it has not been signed at the main office or a branch office of the seller, provided you notify the seller at his or her main office or branch office shown in the agreement by registered or certified mail, that shall be posted not later than midnight of the third calendar day after the day on which the buyer signs the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made. See the attached notice of cancellation form for an explanation of buyer's rights.

NOTICE TO WI RESIDENTS: (A) DO NOT SIGN THIS BEFORE YOU READ THE WRITING ON THE REVERSE SIDE, EVEN IF OTHERWISE ADVISED. (B) DO NOT SIGN THIS IF IT CONTAINS ANY BLANK SPACES. (C) YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN. (D) YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE DUE UNDER THIS AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

Borrower: *Charles Pacheco*
CBE4957C0C4A43E...

Co-Borrower: *Sheryl L Krause Pacheco*
ABDEC664A79D427...

Date: 6/5/2021 | 2:54 PM EDT

6/5/2021 | 2:59 PM EDT

Charles Pacheco

Sheryl L Krause Pacheco

YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.

THE ARBITRATION PROVISION ATTACHED AS EXHIBIT A WILL HAVE A SUBSTANTIAL IMPACT ON YOUR RIGHTS IN THE EVENT OF A DISPUTE BETWEEN YOU AND US OR BETWEEN YOU AND CONTRACTOR. FOR EXAMPLE, WE (OR CONTRACTOR) MAY REQUIRE YOU TO ARBITRATE ANY CLAIM YOU INITIATE. IF SO, YOU WILL NOT HAVE THE RIGHT TO A JURY TRIAL OR THE RIGHT TO PARTICIPATE IN A CLASS ACTION IN COURT OR IN ARBITRATION.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

THIS IS A COPY
This copy view of the Authoritative Copy held
by the designated custodian

## ADDITIONAL TERMS AND CONDITIONS

**ADVANCES TO FINANCE SYSTEM INSTALLATION; FUNDING CONDITIONS:** You have entered into an agreement with Contractor (the "Contractor Agreement") for Contractor to sell the System to you and install it at the Residence, subject to your receipt of all necessary financing. We are prepared to provide the necessary financing under this Note. However, before we fund the Loan, the Contractor must provide us with a satisfactory document package that includes, among other documents, the Contractor Agreement your application for credit (the "Application"); and this Note. Our final review and funding are also subject to Contractor's receipt from you and third parties of any and all other amounts to which it is entitled under the Contractor Agreement. If the conditions to funding are not satisfied within 90 days from the date we approved your Application, we may deem our approval of the Application to have expired.

**INTEREST; PROMISE TO PAY:** If the System is Installed, you agree to pay the actual Amount Financed by us (equal to the amount owed by you to the Contractor and satisfied by the Loan), together with interest on the unpaid balance of the Amount Financed from time to time commencing on the date of the initial payment made by us to Contractor under this Note, which is typically the Installation date (the "Initial Disbursal Date"), and ending on the date of payment in full. Interest is charged at a Daily Rate of 0.0095616438% (which corresponds to an annual rate of 3.49%). The Daily Rate and APR in this section assume that you did not satisfy all requirements for the Reduced APR or chose not to pay by ACH Payments. The Amount Financed and your monthly payment amount are shown on the Payment Schedule included in the TILA Disclosures unless they are reduced based on preauthorized ACH Payments or the Site Audit (defined below). See the section of this Note captioned "POSSIBLE REPLACEMENT OR MODIFICATION OF THIS NOTE DUE TO SITE AUDIT." Payments will be due on the same day of each month, commencing approximately two months after the Installation date. However, if the first payment is due on the last day of a month, all payments will be due on the last day of each month. Also, payments otherwise due on a non-business day will be due on the next business day. On the date of your final required payment (the "Maturity Date"), any unpaid balance under this Note will be payable in full. The final required payment will likely vary somewhat from prior required payments (and the estimated amount in the TILA Disclosures) due to, among other things, any payments not made on the scheduled payment date, the differing lengths of months, and monthly anniversaries of the initial payment date that fall on days that are not business days.

**REDUCED APR FOR ACH PAYMENTS:** If you choose to make ACH Payments and comply with all stated requirements on the Payment Election Form before Installation, you will qualify for a Reduced APR of 2.99 % (equal to a 0.50% reduction from the APR stated in the TILA Disclosures above) for the term of this Loan. This corresponds to a reduced daily interest rate of 0.0081917808% and reduced total payments of $118,488.42. Your Amount Financed will remain $82,750.50 and the number of total payments due will remain the same. The Reduced APR and corresponding payment schedule will only be effective if the Payment Election Form and required information are received at or before the time that the System is Installed.   All other payment obligations will remain the same.

**PREPAYMENTS; POSSIBLE CHANGE IN PAYMENT SCHEDULE: You may prepay the unpaid Amount Financed in whole or in part at any time.** On the date of your 17th scheduled payment, we will change your subsequent payment schedule, if necessary, so that your remaining outstanding balance would be repaid in full over the remaining life of the Loan through substantially equal monthly payments, commencing on the scheduled date of your 18th payment. If you make all payments on time and in full and also   make a Voluntary Payment of $21,515.13 on or before the scheduled date of your 17th payment, your subsequent scheduled monthly payments will be reduced to the approximate level of your prior monthly payments. Except as set forth above and unless we otherwise agree, a partial prepayment made after the 17th payment will not reduce subsequent monthly payments until the Loan is paid in full.

**PAYMENT APPLICATION:** We will apply payments (including any voluntary payments) first to outstanding charges, then to accrued but unpaid interest, then to the unpaid balance of the Amount Financed. Because interest accrues on the unpaid balance of the Amount Financed on a daily basis, extended first payment periods and payment deferrals will increase the amount of interest you owe. One or more payments made after any extended first payment or deferral period may only pay accrued interest. Such payments may be insufficient to reduce the Amount Financed.

**POSSIBLE REPLACEMENT OR MODIFICATION OF THIS NOTE DUE TO SITE AUDIT:** This Note may be executed prior to the time that Contractor has completed a full site audit of the Residence ("Site Audit"). The Site Audit may reveal that changes to the proposed System are necessary or desirable. These changes may increase or decrease the cost of the System. If the System cost is increased, you may elect to pay the cost difference to Contractor in cash and keep this Note in force. Alternatively, you may elect to cancel this Note by giving us written notice of cancellation. If you cancel this Note, you may apply to us for a larger loan. Subject to receipt of credit approval, you will be offered the opportunity to enter into a new loan agreement and promissory note to reflect the increased loan amounts. If the System cost is reduced, you may elect to cancel this Note by giving us written notice of cancellation and enter into new loan agreement and promissory note to reflect the decreased loan amount. If you and we enter into an updated note, the updated note (and not this Note) will govern.

**GRANT OF SECURITY INTEREST; MAINTENANCE OF PROPERTY AND SYSTEM; ACCESS:** You represent that you are an owner(s) of the Residence, or trustee(s) or member(s) with signing authority of an Entity Owner that is an owner of the

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Residence. You hereby grant us a first priority purchase-money security interest in, and assign to us as collateral under this Note (the "Collateral"): (i) the Equipment; (ii) all agreements previously or subsequently entered into by you and all credits, benefits, emissions reductions, offsets, and allowances, howsoever entitled, whether currently identified or identified any time in the future, attributable to the generation from the Equipment, and its avoided emission of pollutants provided to you, regarding renewable energy credits, tradable generation rights, pollution/emission credits or other associated benefits; the sale of credits, credit certificates or similar items for greenhouse gas reduction, the generation of green power or renewable energy; or similar matters (collectively, "Environmental Incentives"); and (iii) all proceeds and revenues resulting from the foregoing. You will sign and deliver to us (and cause any Entity Owner to sign and deliver to us) any document that is or may be required to perfect our security interest in the Collateral. Except for Delaware, Illinois and Pennsylvania residents and except where prohibited by applicable law, you irrevocably appoint us as your attorney-in-fact to sign, file and/or record any such document on your behalf.

You understand and agree that we may make a fixture filing covering the Equipment.   You further understand and agree that, at our election, we may enforce rights in the Equipment under the Uniform Commercial Code and/or under state real estate or mortgage law.

You agree to maintain the System in good operating condition and will not remove the System from the Residence without our prior written approval. In order to protect our interest in the Equipment, you agree that we shall have the right, but not the obligation, to monitor performance of the System, both directly and remotely, and to undertake servicing and maintenance of the System, directly or through third parties, including Contractor. You will allow us to remotely monitor System performance and we will have the right to use any monitoring information we obtain and to disclose such information to affiliated or unaffiliated third parties for any purpose, provided that we will not disclose any personally identifiable monitoring information to any unaffiliated third party for any purpose other than to facilitate maintenance or repair of the System or to enforce our rights under this Note. Upon any event of default and after we give you any notice and right to cure required by applicable law, and/or to the extent necessary to perform any maintenance we elect to perform, you grant us (and have caused and otherwise will cause any Entity Owner to grant us) and our agents, employees and contractors a non-exclusive right to access the Residence, as necessary or convenient to enforce our rights under this Note, including to access, disable and/or remove the System or make any necessary modifications to the System. We will provide you with reasonable notice of our need to access the Residence prior to doing so, which notice may be by an email or recorded telephone message. You will ensure that our access rights are preserved and will not interfere with or allow any third party to interfere with such rights or access. So long as any amounts remain unpaid under this Note, you agree to: (1) ensure that any modifications, attachments, improvements, revisions and/or additions to the System are made solely by qualified and properly licensed contractors; (2) execute and deliver any interconnection agreement required by your local electrical distribution system; (3) promptly notify us upon discovery of damage, malfunction or theft of the System; (4) use the System primarily for personal, family or household purposes; and (5) not transfer or assign any Environmental Incentive without our written consent unless the transfer or assignment is an arms-length transaction and the proceeds of the transfer or assignment are used to pay down amounts outstanding under this Note. Upon your default, we may direct any party to an Environmental Incentive to pay us any amounts otherwise due to you under the Environmental Incentive and you agree that such party shall have no liability to you on account of any payment made by such party to us pursuant to our direction.

**MONITORING AND MAINTENANCE:** You understand that you are solely responsible for proper maintenance and operation of the System. However, in our absolute discretion, we may elect voluntarily to provide you, directly or through contractors of our choice, including Contractor, System monitoring and maintenance services, a help line to address System performance issues and/or referrals to qualified maintenance and repair companies or personnel. Notwithstanding any language in this Note, any other document provided to you or any statement made to you, excepting only any separate warranty we give you, we have no obligation to provide (or continue to provide) such services to you.

**FEES:** If any part of a payment is more than ten days late, we will charge you a late fee equal to 5% of the scheduled payment or $25, whichever is greater. If any payment you make is returned unpaid for insufficient funds, you will be charged a returned payment fee of $20.

**COMPLETION CERTIFICATE:** Upon our request, once the System is Installed to your reasonable satisfaction and becomes operational, you agree to sign and deliver to us a Completion Certificate certifying to such Installation and operation.

**EVENTS OF DEFAULT:** Subject to applicable law, you will be in default under this Note upon the occurrence of any of the following events: (1) you fail to make any payment under this Note in full within ten (10) days after the payment due date; (2) you fail to perform or violate any material obligation in this Note; (3) any representation or warranty made by you in this Note or any statement made by you in the Application proves to have been false or misleading in any material respect when made; (4) you fail to advise us of any material adverse development in your creditworthiness from the time of the Application to the date of this Note; (5) you violate any law or utility system requirement in connection with the System, including operation of the System prior to receipt of permission from the utility to operate the System and connect it to the utility's electrical grid; (6) you take any action or fail to take any action resulting in a termination of any manufacturer or Contractor warranties in connection with the System; (7) you attempt to assign or transfer this Note; (8) any party, including a lender that has made or subsequently makes any loan secured by the Residence, asserts that it has rights in the Collateral that

THIS IS A COPY

This copy view of the Authoritative Copy held by the designated custodian

are superior to our rights in the Collateral; (9) your estate fails to acknowledge its obligations under this Note upon our request after your death, in a written document acceptable to us in our reasonable discretion; (10) you make an assignment or any general arrangement for the benefit of creditors; have a liquidator, administrator, receiver, trustee, conservator or similar official appointed for you or your property, file a petition or otherwise commence, authorize or acquiesce in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, or have such a petition filed against you and such petition is not withdrawn or dismissed for twenty (20) business days after such filing; (11) you otherwise become bankrupt or insolvent (however evidenced) or are unable to pay your debts as they fall due; (12) any mortgage on the Residence is foreclosed; or (13) more than fifty percent of the System is destroyed or stolen. Despite the foregoing, if the Residence is in Massachusetts, you will only be in default if you fail to make any payment under this Note in full within ten (10) days after the payment due date or we reasonably believe the value of the Collateral has been impaired. If required by applicable law, we will only consider you in default for other than non-payment if the prospect of your payment, performance or our realization of the Collateral is significantly impaired.

**ACCELERATION; DEFAULT REMEDIES:** Subject to applicable law (including any notice, cure and/or redemption rights provided by applicable law), upon any default, we may: (1) declare immediately due and payable the entire unpaid balance of the Amount Financed, plus accrued and unpaid interest and any other amounts lawfully due hereunder (or choose not to "accelerate" this Note in such manner); (2) remotely disable the functioning of the Equipment, whether or not we then attempt to remove the Equipment; (3) enter upon the Residence and disable and/or remove the Equipment (or leave the Equipment in place); (4) sell or otherwise dispose of any Collateral, including the Equipment and/or any Environmental Incentives (or defer disposing of the Collateral); (5) assume your rights under any Environmental Incentives and give notice to the other parties thereto that payments thereunder shall be made to us and not to you; (6) initiate a collection action against you; (7) recover our costs of repossession, storage and collection; and (8) exercise any other rights provided by this Note or applicable law. If the Residence is in Connecticut, before remotely disabling the functioning of the System, we will give you at least 15 days' advance written notice of our intent to do so. The notice will describe the default we believe entitles us to remotely disable the functioning of the System and will include the name, title, address and telephone number of a person with whom you may communicate about our security interest. Except as prohibited by applicable law, interest will continue to accrue after maturity or acceleration of this Note (and after any judgment) at the Daily Rate. Any waiver of our rights must be in writing, and any waiver of any default will not constitute a waiver of any subsequent or continuing default.

**ATTORNEYS' FEES:** Subject to applicable law and any limits specified in the Notices section of this Note, in the event we obtain a judgment against you after an event of default involving a payment delinquency of at least ten days, you agree to pay our reasonable attorney's fees that are paid to an attorney who is not our employee and that are incurred in the collection of this Note.

**ASSIGNMENT; HOME SALE:** If you sell (or any Entity Owner sells) the Residence, either you or the purchaser of the Residence (the "Purchaser") may pay off the Loan. Or, you may instead transfer this Note to the Purchaser if, and only if, the Purchaser meets our transfer criteria and signs an instrument, in a form we provide, agreeing to be bound by your obligations under this Note. We may establish and modify transfer criteria from time to time in light of interest rate and market conditions and such other factors as we deem relevant.   You may not transfer this Note to any person other than a Purchaser. We may transfer or assign this Note and/or any of our rights or obligations, and such transfer or assignment shall not result in any changes to your rights and obligations under this Note.

**ENTIRE AGREEMENT:** This Note constitutes the entire agreement of the parties relating to the Loan. This Note replaces any earlier contract of a similar nature. No oral modification is valid.

**NOTICE AND CURE:** Prior to initiating a lawsuit or arbitration regarding a legal dispute or claim relating in any way to this Note, the System, the Collateral or the work performed by Contractor (as more fully defined in the Arbitration Provision, a "Claim"), the party asserting the Claim (the "Complaining Party") shall give the other party (the "Defending Party") written notice of the Claim (a "Claim Notice") and a reasonable opportunity, not less than 30 days, to resolve the Claim. If we are the Complaining Party, we will send the Claim Notice to you at your address appearing in our records or, if you are known to be represented by an attorney, to your attorney at his or her office address. A Claim Notice to you may be in the form of a collection letter. Any Claim Notice to us shall be sent by certified mail, return receipt requested, to **Cross River Bank, c/o Sunlight Financial LLC, PO Box 1654 Cedar Rapids, IA 52406-1654** (such address, or any subsequent address we give you notice of, the "Notice Address"), Attn: Claim Notice. We will credit or reimburse you for the documented cost of the certified mail. Any Claim Notice you send must provide your name, mailing address and telephone number. Any Claim Notice must explain the nature of the Claim and the relief that is demanded. The Complaining Party must reasonably cooperate in providing any information about the Claim that the Defending Party reasonably requests.

**CREDIT REPORTING:** You authorize us to make inquiries concerning your credit history and standing. We may report information about your performance under this Note to credit bureaus (and other parties). **As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit. Late payments, missed payments or other defaults on this Note may be reflected in your credit report.** If you believe that any information about this Note that we have furnished to a

THIS IS A COPY

This is a copy view of the Authoritative Copy held by the designated custodian

consumer reporting agency is inaccurate, or if you believe that you have been the victim of identity theft in connection with any Note made by us, write to us at the Notice Address, Attn: Reporting Error. In your letter: (1) provide your name, mailing address and phone number; (2) identify the specific information that is being disputed; (3) explain the basis for the dispute; and (4) provide any supporting documentation you have that substantiates the basis of the dispute. If you believe that you have been the victim of identity theft, submit an identity theft affidavit or identity theft report.

**TRUTHFULNESS OF APPLICATION**: You represent that every statement made in the Application is true, complete and correct and that you have attained the age of majority and are legally competent to execute this Agreement in the state in which the Residence is located.

**TELEPHONE RECORDINGS:** You understand and agree that we may monitor and/or record any of your phone conversations with any of our representatives. However, we are not required to monitor and/or record any such conversations.

**CONTACTING YOU; PHONE AND TEXT MESSAGES**. To the extent permitted by applicable law, you authorize us and our affiliates, agents, assigns and service providers (collectively, the "Messaging Parties") to contact you using automatic telephone dialing systems, artificial or prerecorded voice message systems, text messaging systems and automated email systems in order to provide you with information about this Note, including information about upcoming payment due dates, missed payments and returned payments. You authorize the Messaging Parties to make such contacts using any telephone numbers (including wireless, landline and VOIP numbers) or email addresses you supply to the Messaging Parties in connection with the Application, the Messaging Parties' servicing and/or collection of amounts you owe under this Note or any other matter. You understand that anyone with access to your telephone or email account may listen to or read the messages the Messaging Parties leave or send you, and you agree that the Messaging Parties will have no liability for anyone accessing such messages. You further understand that, when you receive a telephone call, text message or email, you may incur a charge from the company that provides you with telecommunications, wireless and/or Internet services, and you agree that the Messaging Parties will have no liability for such charges except to the extent required by applicable law. You expressly authorize the Messaging Parties to monitor and record your calls with the Messaging Parties. You understand that, at any time, you may withdraw your consent to receive text messages and calls to your cell phone or to receive artificial or prerecorded voice message system calls by calling the Messaging Parties at 855-326-9784. To stop text messages, you can also simply reply "STOP" to any text message the Messaging Parties send you. To stop emails, you can follow the opt-out instructions included at the bottom of the Messaging Parties' emails.

**WAIVER OF RIGHT TO TRIAL BY JURY**: YOU AND WE ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT BUT MAY BE WAIVED IN CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, YOU AND WE KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS CONTRACT. THIS JURY TRIAL WAIVER SHALL NOT AFFECT OR BE INTERPRETED AS MODIFYING IN ANY FASHION ANY ARBITRATION PROVISION TO WHICH YOU AND WE ARE SUBJECT, WHICH CONTAINS ITS OWN SEPARATE JURY TRIAL WAIVER.

**PAYMENT OF DISPUTED BALANCE**: If you wish to make payment in satisfaction of a disputed balance, you must send it to us at the Notice Address, Attn: Disputed Balance, together with a letter of explanation. We may deposit any such payment without such deposit constituting a satisfaction of the disputed balance.

**BANKRUPTCY**: You represent that you are not contemplating bankruptcy and that you have not consulted with an attorney regarding bankruptcy in the past six months. Any communication with us required or permitted under the Federal Bankruptcy Code must be in writing, must include your Loan number, and must be sent to us at the Notice Address, Attn: Bankruptcy Notice.

**TAX IMPLICATIONS**: Installing a System may entitle you to a tax credit or other benefits. You should consult a tax advisor concerning available benefits and whether you qualify. This loan and your requirement to make payments does not depend on the availability of any tax benefit or your receipt of any tax credit or deduction.

**GOVERNING LAW**: Cross River Bank is located in the State of New Jersey and this Note will be entered into in the State of New Jersey. This Note shall be governed by: (1) federal law and the law of the state of New Jersey regarding matters including, but not limited to, interest, late fees and returned check fees; (2) the Federal Arbitration Act regarding the ARBITRATION PROVISION; and (3) certain laws of the state where the Residence is located regarding other matters.

THIS IS A COPY
This copy is not of the Authoritative Copy held by the designated custodian

**NOTICES:** If the Residence is in—

_Alabama:_ CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

If you attempt to make a payment, whether by automated withdrawal from your designated account or by other means, and the payment cannot be made due to (i) insufficient funds in your account, (ii) the closure, change or inaccessibility of your account without your having notified Lender as provided herein, or (iii) for any other reason (other than an error by Lender), you will pay Lender an additional fee of $15 for each returned or failed automated withdrawal or other item, unless prohibited by applicable law. You will pay this fee when it is assessed.

_Arizona:_ **NOTICE TO BUYER 1. Do not sign this agreement if any of the spaces intended for the agreed terms to the extent of then available information are left blank. 2. You are entitled to a copy of this agreement at the time you sign it. 3. You may pay off the full unpaid balance due under this agreement at any time, and in so doing you shall be entitled to a full rebate of the unearned finance and insurance charges. 4. You may cancel this agreement any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right. 5. It shall not be legal for the seller to enter your premises unlawfully or commit any breach of the peace to repossess goods purchased under this agreement.**

Notice: Borrower may request that the initial disclosures prescribed in the Truth in Lending Act (15 United States Code §§ 1601 through 1666j) be provided in Spanish before signing any loan documents.

Aviso:   Puede solicitar que las divulgaciones iniciales prescritas en la Ley de Prestamos Auténticos (Código Estados Unidos 15, S S, de 1601 hasta 1666j) sean provistas en Español antes de la firma de cualquier documento de préstamo.

_Arkansas:_ **Your obligation for attorneys' fees will be limited to ten percent (10%) of the amount of principal due, plus accrued interest, for services actually rendered**.

_California:_   You have the right to prohibit the use of information contained in your credit file in connection with transactions not initiated by you. You may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If Lender takes any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, you have the right to obtain within sixty (60) days a free copy of your consumer credit report from the consumer reporting agency which furnished your consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. You have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

(AVISO PARA LOS QUE RESIDEN EN CALIFORNIA): SI SU PRÉSTAMO FUÉ NEGOCIADO PRIMERAMENTE EN ESPAÑOL, ESTAMOS OBLIGADOS A PRESENTARLE UNA TRADUCCIÓN EN ESPAÑOL DE LAS DISPOSICIONES REQUERIDAS POR LA REGULACIÓN FEDERAL Z, 12C.F.R. APARTADO 1026.

_Colorado:_ Your obligation for attorneys' fees will be limited to 15% of the amount due and payable on this Note when we refer this Note to an attorney for collection, or such additional fees as may be directed by a court.

_Connecticut:_ **THIS INSTRUMENT IS BASED UPON A HOME SOLICITATION SALE, WHICH SALE IS SUBJECT TO THE PROVISIONS OF THE HOME SOLICITATION SALES ACT. THIS INSTRUMENT IS NOT NEGOTIABLE.**

Your obligation for attorneys' fees will be limited to 15% of the amount due and payable on this Note when we refer this Note to an attorney for collection (or 15% of the amount of any judgment we obtain if the cash price of the Equipment exceeds $50,000).

_District of Columbia:_ (1) Your obligation for attorneys' fees will not exceed 10% of the amount found due in a foreclosure proceeding if the amount financed is $25,000 or less and the interest rate is greater than 6% per annum, or 15% of the unpaid balance for all other loans. (2) If this agreement was solicited at or near your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you signed this agreement. The notice must be mailed to: **Cross River Bank, c/o Sunlight Financial LLC, PO Box 1654 Cedar Rapids, IA 52406-1654**. If you cancel, the seller may not keep any of your cash down payment.

_Illinois:_ If we pledge this Note as security for an obligation we incur, the following applies: This instrument is non-negotiable in form but may be pledged as collateral security. If so pledged, any payment made to the payee, either of principal or of interest, upon the debt evidenced by this obligation, shall be considered and construed as a payment on this instrument, the same as though it were still in the possession and under the control of the payee named herein; and the pledgee holding this instrument as collateral security hereby makes said payee its agent to accept and receive payments hereon, either of principal or of interest.

THIS IS A COPY

This is a copy view of the Authoritative Copy held
by the designated custodian

_Iowa_: **THIS IS A CONSUMER CREDIT TRANSACTION.**  You will not be required to pay attorneys' fees or collection costs. We will only consider you in default for other than non-payment if the prospect of payment, performance or our realization of the Collateral is materially impaired.

_Iowa, Missouri and Nebraska_: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING AGREEMENTS TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT BORROWER(S) AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS YOU AND LENDER REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN BORROWER AND LENDER, EXCEPT AS THEY MAY LATER AGREE IN WRITING TO MODIFY IT.

_Kansas:_ This written credit agreement is a final expression of the credit agreement between the Lender and you.    This written credit agreement may not be contradicted by evidence of any prior oral credit agreement or of a contemporaneous oral credit agreement.    Your obligation for attorneys' fees will be limited to 15% of the amount due and payable on this Note when we refer this Note to an attorney, who is not our salaried employee, for collection. You will not be charged for collection agency fees.

**NOTICE TO CONSUMER: 1. Do not sign this agreement before you read it. 2. You are entitled to a copy of this agreement. 3. You may prepay the unpaid balance at any time without penalty.**

_Louisiana:_ Your obligation for attorneys' fees will be limited to 25% of the amount due and payable on this Note after default and referral to an attorney for collection.

_Maine, New York, Rhode Island and Vermont:_ A consumer report (credit report) may be obtained from a consumer-reporting agency (credit bureau) in connection with this Loan. If you request, (1) you will be informed whether or not consumer reports were obtained, and (2) if reports were obtained, you will be informed of the names and addresses of the credit bureaus that furnished the reports. If Lender agrees to make this Loan to you, a consumer credit report may be requested or used in connection with renewals or extensions of any credit for which you applied, reviewing your Loan, taking collection action on the Loan, or legitimate purposes associated with the Loan.

_Maryland:_ You and Lender have agreed that this Note is governed by federal law and the laws of New Jersey without regard to conflict of laws rules; if any court should nevertheless determine that this Note is subject to Maryland laws concerning credit, then only to the extent that Maryland law applies, you and Lender agree and elect that this Agreement is made under and governed by Subtitle 10, Credit Grantor Closed End Credit Provisions, of Title 123 of the Commercial Law Article of the Annotated Code of Maryland, except as preempted by federal law.    Lender may repossess the Collateral with or without resort to legal process.

_Massachusetts:_ Massachusetts law prohibits discrimination based upon sex, gender identity, marital status, age, or sexual orientation. If this Note is secured by a non-possessory interest in consumer goods, the Events of Default Section of this Note is enforceable only to the extent that the default is material and consists of a failure to make one (1) or more payments as required by the Note or the occurrence of an event that substantially impairs the value of the collateral.

If you attempt to make a payment, whether by automated withdrawal from your designated account or by other means, and the payment cannot be made due to (i) insufficient funds in your account, (ii) the closure, change or inaccessibility of your account without your having notified Lender, or (iii) for any other reason (other than an error by Lender), your will pay Lender an additional fee of $10 for each returned or failed automated withdrawal or other item, unless prohibited by applicable law. you will pay this fee when it is assessed.

_Minnesota_: You are not obligated to pay attorney's fees.

_Mississippi:_ We will apply payments first to accrued but unpaid interest, then to the unpaid balance of the Amount Financed, then to outstanding charges.

_Missouri:_ **Oral agreements or commitments to loan money, extend credit or forbear from enforcing repayment or debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

_Nebraska_: A credit agreement must be in writing to be enforceable under Nebraska law. To protect you and Lender from any misunderstandings or disappointments, any contract, promise, undertaking, or offer to forebear repayment of money or to make any other financial accommodation in connection with this Loan, or any amendment, cancellation, of waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this Loan, must be in writing to be effective.

_New Hampshire:_ If Lender refers this Note to an attorney for collection, you agree to pay Lender's reasonable attorneys' fees. However, if you prevail in (1) any action, suit, or proceeding Lender brings, or (2) an action brought by you in connection

DocuSign Envelope ID: E70B67EB-2F4C-4B71-96B9-56122B6289C3

THIS IS A COPY
This is a true and correct view of the Authoritative Copy held
by the designated custodian

with this Note, reasonable attorneys' fees shall be paid to you. If you successfully assert a partial defense or setoff, recoupment, or counterclaim to an action brought by Lender, the court may withhold from Lender the entire amount or such portion of the attorneys' fees as the court considers equitable.

_New Jersey:_ The section headings of this agreement are not contract terms.   (1) You agree to pay our reasonable attorney's fees, up to 20% of outstanding principal and interest, paid in the collection of this Note to an attorney who is not our employee. (2) No provision of this Note is void, unenforceable or inapplicable by virtue of language to the effect that such provision only applies to the extent permitted (or not prohibited) by applicable law.

_North Carolina_: You agree to pay our reasonable attorney's fees up to 15% of the outstanding balance owing on the Note.

_Ohio:_ (1) You will not be required to pay attorneys' fees. (2) The Ohio laws against discrimination require that all creditors make credit equally available to all credit-worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with the law.

_Oklahoma_: You agree to pay our reasonable attorney's fees, not in excess of fifteen percent (15%) of the unpaid debt, after default and referral to an attorney not a salaried employee of ours.

_South Carolina:_ Your obligation for attorneys' fees will not exceed 15% of the outstanding principal and interest under this Note.

_South Dakota_: Any improprieties in making the Loan or in loan practices may be referred to the Division of Banking, South Dakota Department of Labor and Regulation, 1601 N. Harrison Avenue, Suite 1, Pierre, South Dakota, 57501; Phone: (605) 773-3421.

_Utah:_ This Note is the final expression of the agreement between you and Lender and it may not be contradicted by evidence of an alleged oral agreement.   As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

---

**VERMONT RESIDENTS - NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**Lender is engaged in loan production. EACH BORROWER SHOULD RETAIN A COPY FOR HIS/HER RECORDS.**

---

_Washington:_ ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

_West Virginia._ **You will not be required to pay attorneys' fees or collection costs as a result of a default under this Note.**

_Wisconsin (if the Amount Financed in the TILA DISCLOSURES is $25,000 or less):_ You will only be in default if: (1) you have outstanding an amount exceeding one full payment due under this Note that remains unpaid for more than 10 days after its due date; (2) you fail to pay the first payment or the last payment due under this Note within 40 days of its due date; or (3) you fail to perform or violate any term of this Note the breach of which materially impairs your ability to pay amounts due under the Note or materially impairs the condition, value or protection of or our right in the Collateral.

_Wisconsin:_ You will not be required to pay attorney's fees. If you are a married Wisconsin resident: (1) your signature confirms that the obligation evidenced by this Note is being incurred in the interest of your marriage or family. (2) No provision of any marital property agreement, unilateral statement under § 766.59 of the Wisconsin Statutes, or court decree under § 766.70 adversely affects our interest unless prior to the time that this Note is approved, we are furnished with a copy of the marital property agreement, statement, or decree or have actual knowledge of the adverse provision**.**

---

**MARRIED WISCONSIN RESIDENTS MUST FURNISH THEIR NAME AND THEIR SPOUSE'S NAME AND ADDRESS TO CROSS RIVER BANK, C/O SUNLIGHT FINANCIAL LLC, PO BOX 1654 Cedar Rapids, IA 52406-1654.**

---

**MISCELLANEOUS:** Any provision of this Note that is found to be invalid under applicable law shall be invalid only with respect to the offending provision and only to the extent of the invalidity. However, notwithstanding any provision of this Note to the contrary, if any law applicable to this Note is finally interpreted so that the interest or other fees and charges collected or to be collected in connection with this Note exceed the legally permitted limit, then any such interest, fee or charge shall be reduced by the amount necessary to comply with the maximum permitted limit and any amounts above such limit already collected will be credited or refunded to you. If more than one person signs this Note as Borrower or Co-

DocuSign Envelope ID: E70D67EB-2F4C-4B71-96B9-E6122B6289C3

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Borrower, your rights and obligations shall be joint and several, and each of you shall be personally liable for all amounts due under this Note. Singular words shall be construed in the plural, and plural in the singular, as their context may require, or as required to give effect to the terms of this Note. This Note may be executed electronically or manually. If executed manually, this Note may be executed in counterparts, which will together constitute a single agreement. Any copy of this Note (including a copy printed from an image of this Note that has been stored electronically) may be introduced into evidence in any legal proceeding.

**IMPACT OF SECURITY INTEREST ON POTENTIAL HOME MORTGAGE:** We believe that our security interest in the Equipment should take priority over any mortgage on the Residence, whether such mortgage is granted before or after the date of this Note. It is possible that a lender considering making a loan secured by the Residence, including but not limited to a mortgage refinancing a mortgage now in existence, will deem the Equipment to be part of the Residence and will object to our interest in the Equipment taking priority over its interest in the Residence. Upon request, we will confirm to any mortgage lender that our interest in the Equipment is limited to the Equipment and does not extend to any part of the Residence. **However, it is possible that a lender will insist upon repayment of this Note in full before such lender makes a new mortgage loan secured by the Residence.**

**Insurance:** You covenant and agree that from the Installation date and at all times until the Loan is paid in full, you will maintain insurance of a type and in an amount sufficient to cover the replacement cost of the System. This insurance coverage may be provided by any insurer of your choice who is authorized by law to provide such coverage.

THIS IS A COPY
This copy is a true copy of the Authoritative Copy held
by the designated custodian

## ARBITRATION PROVISION (EXHIBIT A)

**THIS ARBITRATION PROVISION ("PROVISION") MAY HAVE A SUBSTANTIAL IMPACT ON THE WAY YOU OR WE WILL RESOLVE ANY CLAIM WHICH YOU OR WE MAY HAVE AGAINST EACH OTHER NOW OR IN THE FUTURE.**

(a) *Effect of Provision.* Unless prohibited by applicable law, you and we agree that either party may elect to require arbitration of any Claim under this Provision.

(b) *Certain Definitions.* As used in this Provision, the following terms have the following meanings:

(i) Our "Related Parties" include all our parent companies, subsidiaries and affiliates, as well as the Contractor and Sunlight Financial, LLC (which has provided services to Lender and Contractor in connection with this Note) and their parent companies, subsidiaries and affiliates, and our and their employees, directors, officers, shareholders, governors, managers and members. Our "Related Parties also include third parties, such as subcontractors, that you bring a Claim against at the same time you bring a Claim against us or any other Related Party. References to you include any Entity Owner that owns the Residence.

(ii) "Claim" means any claim, dispute or controversy between you and us (or any Related Party) that arises from or relates in any way to this Note (including any amendment, modification or extension of this Note), the Contractor Agreement, the work performed by the Contractor or a subcontractor; the System, including maintenance and servicing of the System; the arrangements between and among us, Sunlight and the Contractor; any of our marketing, advertising, solicitations and conduct relating to your request for credit or the System; our collection of any amounts you owe; or our disclosure of or failure to protect any information about you. "Claim" is to be given the broadest reasonable meaning and includes claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims, and claims based on constitution, statute, regulation, ordinance, common law rule (including rules relating to contracts, torts, negligence, fraud or other intentional wrongs) and equity. It includes disputes that seek relief of any type, including damages and/or injunctive, declaratory or other equitable relief. Despite the foregoing, "Claim" does not include any individual action brought by you in small claims court or your state's equivalent court, unless such action is transferred, removed, or appealed to a different court. In addition, except as set forth in the immediately following sentence, "Claim" does not include disputes about the validity, enforceability, coverage or scope of this Provision or any part thereof (including, without limitation, subsections (f)(iii), (f)(iv) and/or (f)(v) (the "Class Action and Multi-Party Claim Waiver"), the last sentence of subsection (j) and/or this sentence); all such disputes are for a court and not an arbitrator to decide. However, any dispute or argument that concerns the validity or enforceability of this Note as a whole is for the arbitrator, not a court, to decide. "Claim" also does not include any "self-help remedy" (that is, any steps taken to enforce rights without a determination by a court or arbitrator) or any individual action by you or us to prevent the other party from using any self-help remedy, so long as such self-help remedy or individual judicial action does not involve a request for monetary relief of any kind.

(iii) "Proceeding" means any judicial or arbitration proceeding regarding any Claim. "Complaining Party" means the party who threatens or asserts a Claim in any Proceeding and "Defending Party" means the party who is a subject of any threatened or actual Claim. "Claim Notice" means written notice of a Claim from a Complaining Party to a Defending Party.

(c) *Arbitration Election; Administrator; Arbitration Rules.*

(i) A Proceeding may be commenced after the Complaining Party complies with subsection (k). The Complaining Party may commence the Proceeding either as a lawsuit or an arbitration by following the appropriate filing procedures for the court or the arbitration administrator selected by the Complaining Party in accordance with this subsection (c). If a lawsuit is filed, the Defending Party may elect to demand arbitration under this Provision of the Claim(s) asserted in the lawsuit. If the Complaining Party initially asserts a Claim in a lawsuit on an individual basis but then seeks to assert the Claim on a class, representative or multi-party basis, the Defending Party may then elect to demand arbitration. A demand to arbitrate a Claim may be given in papers or motions in a lawsuit. If you demand that we arbitrate a Claim initially brought against you in a lawsuit, your demand will constitute your consent to arbitrate the Claim with the administrator of our choice, even if the administrator we choose does not typically handle arbitration proceedings initiated against consumers.

(ii) Any arbitration Proceeding shall be conducted pursuant to this Provision and the applicable rules of the arbitration administrator (the "Administrator") in effect at the time the arbitration is commenced. The Administrator will be the American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org.; JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.org; or any other company selected by mutual agreement of the parties. If both AAA and JAMS cannot or will not serve and the parties are unable to select an Administrator by mutual consent, the Administrator will be selected by a court. Notwithstanding any language in this Provision to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any Administrator that has in place a formal or informal policy that is inconsistent with the Class Action and Multi-Party Claim Waiver. The arbitrator will be selected under the Administrator's rules, except that the arbitrator must be a lawyer with at least ten years of experience or a retired judge unless the parties agree otherwise. The party initiating an arbitration gets to select the Administrator.

(d) *Non-Waiver.* Even if all parties have elected to litigate a Claim in court, you or we may elect arbitration with respect to any Claim made by a new party or any new Claim asserted in that lawsuit (including a Claim initially asserted on an individual basis but modified to be asserted on a class, representative or multi-party basis), and nothing in that litigation shall constitute a waiver of any rights under this Provision. This Provision will apply to all Claims, even if the facts and circumstances giving rise to the Claims existed before the effective date of this Provision.

(e) *Location And Costs.* The arbitrator may decide that an in-person hearing is unnecessary and that he or she can resolve a Claim based on the papers submitted by the parties and/or through a telephone hearing. However, any arbitration hearing that you attend will take place in a location that is reasonably convenient for you. We will consider any good faith request you make for us to pay the Administrator's or arbitrator's filing, administrative, hearing and/or other fees if you cannot obtain a waiver of such fees from the Administrator and we will not seek or accept reimbursement of any such fees we agree to pay. We will also pay any fees or expenses we are required by law to pay or that we must pay in order for this Provision to be enforced. We will pay the reasonable fees and costs you incur for your

THIS IS A COPY
True copy view of the Authoritative Copy held
by the designated custodian

attorneys, experts and witnesses if you are the prevailing party in an arbitration Proceeding or if we are required to pay such amounts by applicable law or by the Administrator's rules. The arbitrator shall not limit the attorneys' fees and costs to which you are entitled because your Claim is for a small amount. Notwithstanding any language in this Provision to the contrary, if the arbitrator finds that any Claim or defense is frivolous or asserted for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the arbitrator may award attorneys' and other fees related to such Claim or defense to the injured party so long as such power does not impair the enforceability of this Provision.

(f) *No Class Actions Or Similar Proceedings; Special Features Of Arbitration.* **IF YOU OR WE ELECT TO ARBITRATE A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO: (i) HAVE A COURT OR A JURY DECIDE THE CLAIM; (ii) OBTAIN INFORMATION PRIOR TO THE HEARING TO THE SAME EXTENT THAT YOU OR WE COULD IN COURT; (iii) PARTICIPATE IN A CLASS ACTION IN COURT OR IN ARBITRATION, EITHER AS A CLASS REPRESENTATIVE, CLASS MEMBER OR CLASS OPPONENT; (iv) ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN ARBITRATION; OR (v) JOIN OR CONSOLIDATE CLAIM(S) INVOLVING YOU WITH CLAIMS INVOLVING ANY OTHER PERSON. THE RIGHT TO APPEAL IS MORE LIMITED IN ARBITRATION THAN IN COURT. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.**

(g) *Getting Information.* In addition to the parties' rights under the Administrator's rules to obtain information prior to the hearing, either party may ask the arbitrator for more information from the other party. The arbitrator will decide the issue in his or her sole discretion, after allowing the other party the opportunity to object.

(h) *Effect Of Arbitration Award.* Any court with jurisdiction may enter judgment upon the arbitrator's award. The arbitrator's award will be final and binding, except for: (i) any appeal right under the Federal Arbitration Act, 9 U.S.C. §1, et seq. (the "FAA"); and (ii) Claims involving more than $50,000 (including Claims that may reasonably require injunctive relief costing more than $50,000). For Claims involving more than $50,000, any party may appeal the award to a three-arbitrator panel appointed by the administrator, which will reconsider from scratch any aspect of the initial award that is appealed. The panel's decision will be final and binding, except for any appeal right under the FAA. Costs in connection with any such appeal will be borne in accordance with subsection e of this Provision.

(i) *Governing Law.* Your credit purchase of the System involves interstate commerce and this Provision shall be governed by the FAA, and not Federal or state rules of civil procedure or evidence or any state laws that pertain specifically to arbitration. The arbitrator is bound by the terms of this Provision. The arbitrator shall follow applicable substantive law to the extent consistent with the FAA, applicable statutes of limitation and applicable privilege rules, and shall be authorized to award all remedies available in an individual lawsuit under applicable substantive law, including, without limitation, compensatory, statutory and punitive damages (which shall be governed by the constitutional standards applicable in judicial proceedings), declaratory, injunctive and other equitable relief, and attorneys' fees and costs. The arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(j) *Survival, Severability, Primacy.* In the event of any conflict or inconsistency between this Provision and the Administrator's rules or the rest of this Note, this Provision will govern. This Provision shall survive the full payment of any amounts due under this Note; any rescission or cancellation of this Note; any exercise of a self-help remedy; our sale or transfer of this Note or our rights under this Note; any legal proceeding by us to collect a debt owed by you; and your (or our) bankruptcy. If any part of this Provision cannot be enforced, the rest of this Provision will continue to apply. However, if the Class Action and Multi-Party Claim Waiver is declared invalid in a proceeding between you and us, without in any way impairing the right to appeal such decision, this entire Provision (other than this sentence) shall be null and void in such proceeding.

(k) *Pre-Dispute Resolution Procedure.* Before a Complaining Party asserts a Claim in any Proceeding (including as an individual litigant or as a member or representative of any class or proposed class), the Complaining Party shall give the Defending Party: (i) a Claim Notice providing at least 30 days' written notice of the Claim and explaining in reasonable detail the nature of the Claim and any supporting facts; and (ii) a reasonable good faith opportunity to resolve the Claim on an individual basis without the necessity of a Proceeding. If you are the Complaining Party, you must send any Claim Notice to us at **Cross River Bank, c/o Sunlight Financial LLC, PO Box 1654 Cedar Rapids, IA 52406-1654, Attn:** Claim Notice (or such other address as we shall subsequently provide to you). If we are the Complaining Party, we will send the Claim Notice to you at your address appearing in our records or, if you are represented by an attorney, to your attorney at his or her office address. A Claim Notice to you may be in the form of a collection letter. If the Complaining Party and the Defending Party do not reach an agreement to resolve the Claim within 30 days after the Claim Notice is received, the Complaining Party may commence a Proceeding, subject to the terms of this Provision. Neither the Complaining Party nor the Defending Party shall disclose in any Proceeding the amount of any settlement demand made by the Complaining Party or any settlement offer made by the Defending Party until after the arbitrator or court determines the amount, if any, to which the Complaining Party is entitled (before the application of subsection (l) of this Provision). No settlement demand or settlement offer may be used in any Proceeding as evidence or as an admission of any liability or damages.

(l) *Special Payment.* If: (i) you submit a Claim Notice in an arbitration Proceeding on your own behalf (and not on behalf of any other party) and comply with all of the requirements (including timing and confidentiality requirements) of subsection (k); (ii) we refuse to provide you with the money damages you request; and (iii) the arbitrator issues you an award that is greater than the latest money damages you requested at least ten days before the date the arbitrator was selected, then we will pay you the amount of the award or $7,500, whichever is greater, in addition to the attorneys' fees and expenses (including expert witness fees and costs) to which you are otherwise entitled. We encourage you to address all Claims you have in a single Claim Notice and/or a single arbitration. Accordingly, this $7,500 minimum award is a single award that applies to all Claims you have asserted or could have asserted in the arbitration, and multiple awards of $7,500 are not contemplated by this subsection l.

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## NOTICE OF CANCELLATION

6/5/2021 | 2:54 PM EDT
6/5/2021 | 2:59 PM EDT
_____
(date)

You may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date.

If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within TEN DAYS following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale, or you may, if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice or any other written notice, or send a telegram, to Cross River Bank, c/o Sunlight Financial LLC, at 101 N Tryon St, Suite 1000, Charlotte, NC 28246  NOT LATER THAN MIDNIGHT OF THE THIRD BUSINESS DAY FROM THE DATE ABOVE.

I HEREBY CANCEL THIS TRANSACTION.

_____         _____
(Date)                        (Borrower's Signature)

THIS IS A COPY

This is a copy view of the Authoritative Copy held
by the designated custodian

**NOTICE OF CANCELLATION**

6/5/2021 | 2:54 PM EDT
6/5/2021 | 2:59 PM EDT

(date)

You may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date.

If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within TEN DAYS following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale, or you may, if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice or any other written notice, or send a telegram, to Cross River Bank, c/o Sunlight Financial LLC, at 101 N Tryon St, Suite 1000, Charlotte, NC 28246  NOT LATER THAN MIDNIGHT OF THE THIRD BUSINESS DAY FROM THE DATE ABOVE.

 I HEREBY CANCEL THIS TRANSACTION.

_____          _____
(Date)                                    (Borrower's Signature)

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

**NOTICE TO CO-SIGNER (Traduccíon en Inglés Se Requiere Por La Ley)**

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the other Borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of *your* credit record.

This notice is not the contract that makes you liable for the debt.

**AVISO PARA EL FIADOR (Spanish Translation Required By Law)**

Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

| | |
|---|---|
| IF YOU ARE A CO-BORROWER WHO DOES NOT RESIDE AT THE RESIDENCE, YOU ACKNOWLEDGE THAT, BEFORE SIGNING THE NOTE, YOU RECEIVED THIS NOTICE TO CO-SIGNER. | SI USTED ES UN CO-PRESTATARIO QUE NO RESIDE EN LA RESIDENCIA, USTED RECONOCE QUE, ANTES DE FIRMAR LA NOTA, USTED RECIBIÓ ESTE AVISO. |

Co-Borrower: _____     Date: _____ 6/5/2021 | 2:59 PM EDT _____

THIS IS A COPY

This is a copy view of the Authoritative Copy held
by the designated custodian

## NOTICE TO COSIGNER

(for each Co-Borrower who does not reside at the Residence identified in the Note described below)

You agree to pay the debt identified below although you may not personally receive any property, services, or money. You may be sued for payment although the person who receives the property, services, or money is able to pay. You should know that the Total of Payments listed below does not include finance charges resulting from delinquency, late charges, repossession or foreclosure costs, court costs or attorney's fees, or other charges that may be stated in the note or contract. You will also have to pay some or all of these costs and charges if the note or contract, the payment of which you are guaranteeing, requires the borrower to pay such costs and charges. If this debt is ever in default, that fact may become a part of your credit record.

This notice is not the note, contract, or other writing that obligates you to pay the debt. Read that writing for the exact terms of your obligation.

### IDENTIFICATION OF DEBT(S) YOU MAY HAVE TO PAY

Sheryl L Krause Pacheco
*(Name of Borrower)*

Cross River Bank
*(Name of Creditor)*

06/05/2021 | 2:38 PM EDT
*(Date)*

| Solar Energy System Loan | $125,261.56 |
|---|---|
| *(Kind of Debt)* | *(Total of Payments)* |

By signing below, you acknowledge that you have received a completed copy of this notice and of each writing that obligates you or the Borrower on this debt.

Co-signer: _____ 6/5/2021 | 2:59 PM EDT

Signature            Date

Co-signer: _____

Signature            Date

THIS IS A COPY
This Copy view of the Authoritative Copy held
by the designated custodian

---

**NOTICE TO CO-SIGNER**

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the other Borrower, such as suing you, etc. If this debt is ever in default, that fact may become a part of *your* credit record.

This notice is not the contract that makes you liable for the debt.

---

IF YOU ARE A CO-BORROWER WHO DOES NOT RESIDE AT THE RESIDENCE, YOU ACKNOWLEDGE THAT, BEFORE SIGNING THE NOTE, YOU RECEIVED THIS NOTICE TO CO-SIGNER.

Co-Borrower: _____     Date: _____6/5/2021 | 2:59 PM EDT_____

COPY VIEW

THIS IS A COPY

This Copy View of the Authoritative Copy held
by the designated custodian



Page Intentionally left blank

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: E70D67FB2F4C4B7196B0F6122B6289C3 | | Status: Completed |
| Subject: Documents for your DocuSign Signature | | |
| Source Envelope: | | |
| Document Pages: 30 | Signatures: 4 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 8 | Sunlight Financial |
| AutoNav: Enabled | | 400 Frank W. Burr Boulevard, Suite 37 |
| EnvelopeId Stamping: Enabled | | Suite 1000 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | Teaneck, NJ 07666 |
| | | no_reply@sunlightfinancial.com |
| | | IP Address: 64.207.219.7 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Sunlight Financial | Location: DocuSign |
| 6/5/2021 2:38:28 PM | no_reply@sunlightfinancial.com | |
| Status: Authoritative Copy (1 of 1 documents) | Holder: Sunlight Financial | Location: DocuSign |
| 6/5/2021 2:59:48 PM | no_reply@sunlightfinancial.com | |
| Status: Receipt Confirmed | Holder: Sunlight Financial | Location: Sunlight Financial |
| 6/5/2021 3:00:21 PM | no_reply@sunlightfinancial.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Charles Pacheco<br>cpachecosr@gmail.com<br>Security Level: Email, Account Authentication (None), Access Code, Authentication | *Charles Pacheco*<br>CBE4957C0C4A43E... | Sent: 6/5/2021 2:38:30 PM<br>Resent: 6/5/2021 2:38:57 PM<br>Viewed: 6/5/2021 2:43:15 PM<br>Signed: 6/5/2021 2:54:48 PM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 68.109.205.169<br>Signed using mobile | |
| **Authentication Details**<br>ID Check:<br>  Transaction: 31010467516825<br>  Result: passed<br>  Vendor ID: LexisNexis<br>  Type: iAuth<br>  Recipient Name Provided by: Recipient<br>  Information Provided for ID Check: Address<br>  Performed: 6/5/2021 2:42:56 PM | Question Details:<br>passed   corporate.association.real<br>passed   vehicle.historical.association.real<br>passed   property.purchasedfrom.fake<br>passed   vehicle.historical.association.real<br>passed   property.county.real<br>passed   property.association.single.real | |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 6/5/2021 2:43:15 PM<br>  ID: 386bfeb2-8127-4e3a-a4e4-c6b794ad60fa | | |
| Sheryl L Krause Pacheco<br>krausesheryl@yahoo.com<br>Security Level: Email, Account Authentication (None), Access Code, Authentication | *Sheryl L krause Pacheco*<br>ABDEC664A79D427... | Sent: 6/5/2021 2:54:51 PM<br>Viewed: 6/5/2021 2:59:09 PM<br>Signed: 6/5/2021 2:59:46 PM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 68.109.205.169<br>Signed using mobile | |
| **Authentication Details**<br>ID Check:<br>  Transaction: 31010467689195<br>  Result: passed<br>  Vendor ID: LexisNexis<br>  Type: iAuth<br>  Recipient Name Provided by: Recipient<br>  Information Provided for ID Check: Address<br>  Performed: 6/5/2021 2:59:00 PM | Question Details:<br>passed   property.purchasedfrom.fake<br>passed   vehicle.color.real<br>passed   vehicle.historical.color.real<br>failed   county.lived.single.real<br>passed   person.state.real<br>passed   corporate.association.real | |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 6/5/2021 2:59:09 PM<br>  ID: 1f34830e-7d7c-41d8-bffa-484252d34bf8 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/5/2021 2:38:30 PM |
| Certified Delivered | Security Checked | 6/5/2021 2:59:09 PM |
| Signing Complete | Security Checked | 6/5/2021 2:59:46 PM |
| Completed | Security Checked | 6/5/2021 2:59:46 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on 3/24/2021 5:46:06 AM
Parties agreed to: Charles Pacheco, Sheryl L Krause Pacheco

Case: 1:25-cv-02327   Doc #: 1   Filed: 10/28/25   92 of 94.   PageID #: 92

**CONSENT TO ELECTRONIC RECEIPT AND/OR EXECUTION OF CERTAIN CONTRACTS AND RELATED NOTICES AND DISCLOSURES**

You are considering the purchase of a residential solar energy system or the completion of a home improvement project (the "Project"). The installation company or contractor for the Project ("Contractor") and the lender or lenders who may finance your Project ("Lender(s)") and Sunlight Financial, LLC ("Sunlight") and any agents of the Contractor, Lender an Sunlight would like to provide you with the necessary contracts and other documents relating to your account, including but not limited to notices, periodic payment statements, and payment authorizations (together, "Documents") and have you execute or acknowledge receipt of Documents electronically. The Documents covered by this Consent are described in more detail under the caption "Scope of Consent" below. By electronically signing this Consent, you agree to receive and sign Documents electronically, as provided in this Consent. The Documents may be emailed to you directly or through DocuSign, Inc. ("DocuSign") or another company. As used in this Consent, references to "we," "us," and "our" refer to Contractor, Lender(s), Sunlight, DocuSign, any other company used to send you Documents and any assignee of their rights.

Please read the information below and, if you agree to the terms of this Consent, confirm your agreement by checking the box labeled "I agree to use electronic records and signatures" and clicking the box reading CONTINUE. This Consent will become effective once you take these actions and you subsequently sign electronically any Document we email you. (Your electronic signature on such Document will serve as a reasonable demonstration of your ability to read Documents emailed to you.)

**Getting paper copies**

You do not need to execute this Consent in order to enter into a home improvement contract ("HIC") with Contractor or to obtain a loan or loans from Lender(s) ("Loan(s)"). Instead, you may have the HIC, and the loan agreement and promissory note evidencing any Loan ("Note"), provided to you in paper format. Also, by following the procedure described below, at any time you may obtain from us, without charge, a paper copy of any Document we email you and/or any Document you execute electronically. (You will also have the ability to download and print Documents we email you for execution through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such Documents are first sent to you.)

**Scope of Consent**

This Consent applies to the HIC; the Loan or any related Note; any application for a HIC or Loan; any approval, adverse action, risk-based pricing or credit score notice in connection with your Application; any documents relating to the application, funding or servicing of the Loan, including but not limited to periodic statements, payment authorizations, and default notices; and any related Documents we provide you. If you electronically sign this Consent, we may send any Document to you electronically. However, we may instead send you any Document in paper format if we choose.

**Withdrawing your consent**

If you initially consent to receipt of Documents from us by email, you may at any time change your mind and tell us that thereafter you want to receive Documents in paper format only. To do so, you may: (1) decline to sign a Document from within your DocuSign session, and on the subsequent page select the check-box indicating you wish to withdraw your consent to receipt of Documents by email; or (2) send us an email to support@sunlightfinancial.com setting forth in the body of the email your email address, full name, mailing address, phone number and request to receive paper Documents rather than emailed Documents. If you initially elect to receive Documents in paper and not by email, your election may delay the execution of certain Documents and/or delivery of certain Documents. The same is true if you withdraw your consent to receive the Documents by email before you receive, sign and deliver the HIC and/or Note(s). However, we do not believe that a decision to execute and receive Documents in paper form will materially delay the completion of your Project or have any other material consequences.

**To update your email address**

You agree that we may send emails to you at the email address you have provided to us. To let us know of a change in your email address, you should send an email message to support@sunlightfinancial.com, setting forth in the body of the email your previous and new email addresses, full name, mailing address and phone number. In addition, if you create a DocuSign account and wish to change the login from your old email address to your new email address, you should log in to your DocuSign account and follow the online directions to change your email address in the DocuSign system.

**To obtain paper copies of Documents**

To obtain paper copies of any or all Documents previously provided to you by email or electronically executed, you must send us an email to support@sunlightfinancial.com, setting forth in the body your email address, full name, mailing address, phone number and request to receive specified Documents or all Documents previously provided by email or executed electronically.

**Minimum required hardware and software for receipt and retention of Documents by email**

To access the Documents by email, you must have a personal computer or device with the following software and settings:

| | |
|---|---|
| Operating System: | Windows 2000, Windows XP, Windows Vista; Mac OS X, iOS 9.0 or above, Android 5.0 or above |
| Browsers: | Final release versions of Internet Explorer 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); SafariTM 3.0 or above (Mac only), Google Chrome, Microsoft Edge, Safari |
| Email Program: | Any standard email program (e.g., Microsoft Outlook, Gmail; AOL) |

| | |
|---|---|
| PDF Reader: | Acrobat or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

Separate from any consent you have may have given the Company to contact you with marketing messages or communications, you agree that the Company may try to contact you about your application and/or account in writing, by email, or using prerecorded/artificial voice messages, SMS/text messages, and automatic telephone dialing systems, as the law allows. You also agree that the Company may try to contact you in those and in other ways at any address or telephone number you provide us or the Company discovers, even if the telephone number is a cell phone number or the contact results in a charge to you. You also agree to inform the Company if the telephone number you provided as part of the application changes.

In order to store or print the Documents, you need to have a printer connected to your computer or other device or you need to have a hard drive, disk drive or cloud-based document storage system.

These minimum requirements are subject to change. If these requirements change in a manner that creates a material risk that you will not be able to access or retain Documents by email, you will be sent a new Consent to execute or we will provide any subsequent Documents in paper format. Pre-release (e.g., beta) versions of operating systems and browsers are not supported.

By checking the box labeled "I agree to use electronic records and disclosures" and clicking the box reading CONTINUE, and/or by subsequently signing electronically any Document we send you, you confirm that you can access and read this Consent and you agree to receive Documents by email and to use the system we make available for the electronic execution of Documents.